# EXHIBIT B

Service: **Get by LEXSEE®**
Citation: **1985 U.S. Dist. lexis 13475**

*1985 U.S. Dist. LEXIS 13475, \*; 229 U.S.P.Q. (BNA) 795*

CALVIN KLEIN COMPANY, Plaintiff, v. FARAH MANUFACTURING COMPANY, INC. and FARAH SALES CORPORATION, Defendants

No. 85 Civ. 2989 (CBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1985 U.S. Dist. LEXIS 13475; 229 U.S.P.Q. (BNA) 795

November 26, 1985

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff jean manufacturer moved for a preliminary injunction in its civil action against defendant jean manufacturer for trademark infringement and unfair competition arising under the Lanham Act 15 U.S.C.S. §§ 1051 et seq. and the laws of the state of New York under N.Y. Gen. Bus. Law § 368-d.

**OVERVIEW:** Plaintiff began marketing and selling jeans under a trademarked name. The jeans included a back pocket decoration of an inverted omega design. Defendant also produced jeans, but of a lower end variety. Some of its jeans also contained the back pocket inverted omega design. Plaintiff filed a trademark infringement case, but waited seven weeks until filing for a preliminary injunction. The court found no evidence was produced that anyone actually confused defendant's jeans with the similar inverted omega stitching with jeans manufactured by plaintiff. Moreover, if defendant were preliminarily enjoined from selling its jeans, a substantial amount of inventory would have to be destroyed. Moreover, a substantial likelihood of confusion did not exist. Although there were sufficiently serious questions going to the merits to make fair ground for litigation, the balance of hardships tipped in defendant's favor. Finally, plaintiff failed to demonstrate possible irreparable injury absent a preliminary injunction and its failure to act sooner suggested there was, in fact, no irreparable injury.

**OUTCOME:** The court denied the motion for a preliminary injunction in this trademark infringement case.

**CORE TERMS:** farah, jean, inverted, omega, stitching, trademark, pocket, secondary meaning, label, preliminary injunction, decoration, customer, irreparable harm, manufacturer, advertising, style, loop, advertisement, registration, dilution, hardship, trademark infringement, permanently, confused, magazine, unfair competition, movant, buyers, manufacturing, sophisticated

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview

**HN1** A preliminary injunction should be granted where the movant establishes: (1) the possibility of irreparable injury, and (2) either the likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly in the movant's favor. More Like This Headnote

Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview
Trademark Law > Federal Unfair Competition Law > General Overview
Trademark Law > Infringement Actions > Determinations

**HN2** The crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.  More Like This Headnote

Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 2nd Circuit Court
Trademark Law > Likelihood of Confusion > Noncompeting Products > General Overview
Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview

**HN3** The likelihood of confusion turns on may factors including the strength of the mark, the degree of similarity between the marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion and the reciprocal of defendant's good faith in adopting its own mark, the quality of the defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities. These *Polaroid* factors, which originally applied only to noncompeting products, have been extended now to competing products.  More Like This Headnote

Trademark Law > Dilution of Famous Marks > General Overview
Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview

**HN4** The strength of the mark refers to the distinctiveness of the mark or its tendency to identify goods sold under the mark as emanating from a particular source. Courts in the Second Circuit have stated that where third party use of a mark exists, it is a plausible inference that the mark's strength had been at least somewhat diluted by third party use.  More Like This Headnote

Trademark Law > Federal Unfair Competition Law > General Overview
Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview

**HN5** Even close similarity between two marks is not dispositive of the issue of likelihood of confusion. Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question. The combination of features as a whole and not differences in details determines the likelihood of customer confusion. Where an alleged mark appears in close conjunction with a company name, the likelihood of confusion may thereby be lessened.  More Like This Headnote

Trademark Law > Dilution of Famous Marks > General Overview
Trademark Law > Likelihood of Confusion > General Overview
Trademark Law > Special Marks > Trade Names > General Overview

**HN6** Where a trade name is independently strong, and always appears with the design in issue, the likelihood of confusion is further diminished.  More Like This Headnote

Trademark Law > Infringement Actions > Determinations
Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview

**HN7** Although a plaintiff does not have to prove actual confusion to prevail, an inference may still be made that confusion is not likely.  More Like This Headnote

Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview

**HN8** The test of the likelihood of customer confusion is whether a customer who is somewhat familiar with the plaintiff's mark, when compared with the defendant's goods alone, not a side-by side comparison, is likely to be

confused.  More Like This Headnote

Trademark Law > Federal Unfair Competition Law > False Advertising > General Overview
Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Elements
Trademark Law > Federal Unfair Competition Law > Trade Dress Protection > General Overview

**HN9** A nonverbal mark must have acquired secondary meaning and be nonfunctional to be protected under 15 U.S.C.S. § 1125(a). Proof of secondary meaning entails vigorous evidentiary requirements, including a showing of advertising expenses, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize the mark and the length and exclusivity of the mark's use. However, no one factor is determinative, and every element need not be proved. Each case necessarily turns on its own facts.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview
Trademark Law > Special Marks > Trade Names > General Overview
Trademark Law > Subject Matter > Secondary Meaning > General Overview

**HN10** Proof of secondary meaning entails vigorous evidentiary requirements. The plaintiff who seeks injunctive relief, bears the burden of establishing that its trade name had acquired secondary meaning by the time or the year in which the defendant introduced its product.  More Like This Headnote

Evidence > Inferences & Presumptions > General Overview
Trademark Law > Subject Matter > Secondary Meaning > General Overview

**HN11** Advertising expenses are only an inference of secondary meaning. This evidence concerning attempts to popularize a mark is not conclusive. Clearly a trademark owner makes a stronger showing as to the strength of his mark if he offers evidence probative of the effectiveness of his efforts.  More Like This Headnote

Trademark Law > Federal Unfair Competition Law > General Overview
Trademark Law > Likelihood of Confusion > General Overview
Trademark Law > Subject Matter > Secondary Meaning > General Overview

**HN12** To state a cause of action for trademark infringement or unfair competition under common law, the plaintiff must establish that the defendant had copied a non-functional design which had developed secondary meaning, and there was a likelihood of confusion.  More Like This Headnote

Trademark Law > Conveyances > General Overview
Trademark Law > Special Marks > Trade Names > General Overview
Trademark Law > Subject Matter > Secondary Meaning > General Overview

**HN13** To state a cause of action for dilution of a trademark pursuant to N.Y. Gen. Bus. Law § 368-d, the plaintiff must establish that it possesses a trademark that is truly distinctive or has acquired secondary meaning and must also prove a likelihood of dilution. Typically, dilution is characterized as a whittling down of the identity or reputation of a tradename or mark. Courts in the Second Circuit have stated that a more helpful definition is: dilution is an act which threatens two separable but related components of advertising value. Junior uses may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey. Competition between the parties or confusion as to the source of the products need not be shown.  More Like This Headnote

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview

**HN14** Perhaps the single most important prerequisite for the issuance of a preliminary

injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.  More Like This Headnote

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions 
Trademark Law > Infringement Actions > Remedies > Equitable Relief > Preliminary Injunctions

HN15 Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

HN16 The standards for granting a preliminary injunction are essentially the following: The movant must show (a) the possibility of irreparable injury, and (b) either the likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly in the movant's favor.  More Like This Headnote

Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview
Trademark Law > Federal Unfair Competition Law > General Overview
Trademark Law > Infringement Actions > Determinations

HN17 The crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.  More Like This Headnote

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

HN18 The United States Court of Appeals for the Second Circuit has set forth stringent requirements for a finding of possible irreparable harm. A showing of likelihood of confusion is strong, not conclusive evidence that irreparable harm may occur in the absence of a preliminary injunction.  More Like This Headnote

Trademark Law > Infringement Actions > Remedies > Equitable Relief > General Overview
Trademark Law > Special Marks > Trade Names > General Overview
Trademark Law > Subject Matter > Secondary Meaning > General Overview

HN19 Proof of secondary meaning entails vigorous evidentiary requirements and that the plaintiff who seeks injunctive relief, bears the burden of establishing that its trade name had acquired secondary meaning by the time or the year in which the defendant introduced its product.  More Like This Headnote


**OPINION BY:** [*1]

PALMIERI

**OPINION:** Edmund L. Palmieri, U.S.D.J.

Plaintiff having moved for a preliminary injunction and the Court having considered the motion papers, including the supporting affidavits and memoranda of law, and having heard testimony and received evidence during an evidentiary hearing on October 29th, 30th, and 31st, 1985 and having heard oral argument following the close of the evidence, the Court expressed its tentative conclusions in open court denying plaintiff's motion for a preliminary injunction. The Findings of Fact and Conclusions of Law which follow are intended to amplify and confirm the Court's tentative opinion which is attached hereto as Appendix A.

*FINDINGS OF FACT*

1. This is a civil action for trademark infringement and unfair competition arising under the trademark laws of the United States, 15 U.S.C. §§ 1051 et seq. (The "Lanham Act") and the laws of the State of New York.

2. Plaintiff, Calvin Klein is a New York partnership with a place of business at 205 West 39th Street, New York, New York. Calvin Klein manufacturers and distributes through affiliated and licensed companies, a line of goods bearing the label "Calvin Klein".

Defendant, Farah Manufacturing **[*2]** Company, Inc. and its subsidiary Farah Sales Corporation (hereinafter "Farah") are Texas corporations, with a place of business at 8889 Gateway Boulevard, El Paso, Texas.

4. In about 1978, Calvin Klein began marketing and selling jeans under the name Calvin Klein. These jeans included back pocket decorations consisting of an inverted omega stitching with a stitched line above the inverted omega (hereinafter "inverted omega stitching"), and a "Calvin Klein" label, permanently affixed to the right back pocket. Calvin Klein refers to its jeans with the inverted omega stitching as "Western Style" jeans. Other jeans which do not bear an inverted omega stitching are not so designated. Calvin Klein contends that it has a protective trademark in this inverted omega stitching.

5. Calvin Klein jeans are marketed as "designer jeans" with a "fashion" or "sophisticated" fit. The jeans are sold in limited sizes up to size 16 for women and up to size 40 for men. The retail price for Calvin Klein jeans range generally from $36.00 to $50.00.

6. From 1978-85, total sales for Calvin Klein "Western Style" jeans with the inverted omega stitching have exceeded 40,000,000 units, which amounts to a wholesale **[*3]** cost of over $600,000,000 and a retail value of over $1,000,000,000.

7. Michael Calman, Chief Operating Officer at CRK, which handles all the advertising for Calvin Klein products, testified that the primary targets of Calvin Klein advertisements were males and females, ages 18 to 49, with an income bracket of $15,000 or more, and Calvin Klein advertisements are and have been designed to illustrate the fashion fit or sophisticated fit of the jeans.

8. Calvin Klein's extensive jean advertising efforts always show or use the Calvin Klein name but not always the inverted omega stitching. Most of the advertising which shows the inverted omega stitching occurred from 1980-85. Television advertisements of any inverted omega stitching began only in 1980.

9. Defendant introduced nineteen television commericals produced to it by the plaintiff. Only five of these commercials displayed the inverted omega pocket stitching. In those five commericals, the inverted omega stitching was shown for only a second or two. Claman testified that only twenty or thirty percent of Calvin Klein's television advertising shows the back pocket at all.

10. Calvin Klein has advertised in magazines including Vogue, **[*4]** Harper's Bazaar, W Magazine, M Magazine, People, Cosmopolitan, Seventeen, Esquire, Gentlemen's Quarterly, Glamour, Playboy, Rolling Stone and Vanity Fair.

11. The advertisements focus primarily on the fashion or sophisticated fit of the jeans as well as the Calvin Klein name or label. The back of the model is displayed to demonstrate the fit of the jeans as well as the "Calvin Klein" label. In displaying the fit, the rear pocket as well as other parts of the jeans such as the label, stitching, rivets, etc. are also shown. The

advertising does not focus on the inverted omega stitching. Unlike others in the jean business, like the Jordache horse or the Levi Strauss pocket design, the inverted omega stitching has never been used by Calvin Klein as a "logo" or identifying symbol, apart from the product itself. Unlike Levi, the advertisements for Calvin Klein do not pint to the inverted omega stitching as a means of identifying Calvin Klein jeans.

12. Calvin Klein western style jeans are always clearly marked with the "Calvin Klein" label on the right pocket above the inverted omega stitching. Calvin Klein jeans are usually sold in separate designer departments and on racks separate from **[*5]** those of other brands of jeans.

13. Calvin Klein is the proprietor of registration no. 1,208,583, issued September 14, 1982, in the United States Patent and Trademark Office for a composite trademark consisting of the "Calvin Klein" label and the inverted omega stitching, on the pocket. However, Calvin Klein is not depending on this composite trademark registration. Nor is Calvin Klein asserting that Farah has infringed its "Calvin Klein" label.

14. Until recently, Calvin Klein has not acted in any way to indicated that it considered the inverted omega stitching as its trademark. It did not conduct a search to determine whether the design was available as a trademark and has never identified it as a trademark either by using the symbol "TM" along with the stitching or representing that its jeans were recognizable because of the inverted omega stitching.

15. On February 11, 1983, Calvin Klein filed an application to register alone, the inverted omega stitching. The application was rejected on the grounds that the stitching was merely a decoration, until one of Calvin Klein's partners, Barry Schwartz, filed a declaration that this stitching had been used by Calvin Klein continuously **[*6]** and with substantial exclusivity in the preceding five years. There was no persuasive or credible evidence offered to this Court to this effect. This application has been opposed by Sears Roebuck & Company which asserts that Sears and third parties have been using the decoration for many years. Litigation between Calvin Klein and Sears is presently pending in the Patent and Trademark Office and in the courts. Thus, there has been no registration of the inverted omega stitching.

16. Manufacturers other than Farah have been making and selling Western style jeans with inverted omega decorations or slight variations thereof for many years. Although exact statistics as to the extent and continuity of use by these manufacturers cannot be precisely ascertained, extensive and continuous use can be inferred from the fact that the inverted omega loop pocket style repeatedly appeared in their nationally distributed catalogues. Some variation in the inverted omega stitching does not alter the overall effect of similarity of the jeans illustrated in catalogues of Sears Roebuck & Company in 1961, 1967, 1970, 1971, 1978, 1979, 1980 and 1981; J.C. Penney in 1979, 1980 and 1981; Montgomery Ward in **[*7]** 1978, 1979, 1980 and 1981; and Spiegels in 1979 and 1981. Almost the exact inverted omega stitching appears in the catalogues for Sears in 1980, for J.C. Penney in 1979 and for Montgomery Ward in 1980, and for Spiegels in 1981.

17. A prior suit by Calvin Klein against J.C. Penney involved an alleged infringement of the Calvin Klein name. The consent judgment referred only to the trademark name "Calvin Klein". After the lawsuit against J.C. Penney was filed, Calvin Klein sought and obtained registration of the composite trademark discussed above. J.C. Penney in subsequent years continued its use of the inverted omega stitching.

18. Calvin Klein's license of its "Calvin Klein" trademark to Centerfold Industries, a wholly owned subsidiary of Calvin Klein and wholly owned by the partnership of Calvin Klein and Barry Schwartz, refers only to a single "Licensed Mark", "Calvin Klein". The inverted omega stitching is nowhere referred to as a trademark.

19. Calvin Klein commissioned Dr. Robert Sorensen to conduct a survey to determine whether the inverted omega stitching had attained secondary meaning. The survey, conducted in April and May of 1985, does not indicate whether secondary meaning **[*8]** existed years before when Farah entered the market.

20. The survey was conducted in four cities chosen for geographic diversity and degree of penetration of Calvin Klein products. The universe of persons was limited to 18 to Calvin Klein's primary targets and excludes substantial secondary targets of Calvin Klein products as well as a relevant segment of the population to which Farah sells. The survey therefore excludes a substantial portion of the relevant buying population.

21. The survey was a random "intercept" study which is less accurate than a probability sampling survey. Dr. Sorensen testified that his results could not be statistically projected to the entire nationwide population.

22. The survey interviewers used specially-made jeans without any Calvin Klein label or identification although Calvin Klein jeans always have the name permanently affixed to them. The respondents were therefore not tested under actual market conditions. The interviewers displayed the front, side and back of the jeans before placing the jeans on a table with the legs dangling and the back pockets facing the respondent. Although the respondents were told they were free to handle the jeans, this **[*9]** placement on the table immediately drew attention to the back pockets. The survey can be faulted for other reasons which need not be explicated or discussed here.

23. Farah was founded as a family business in 1928. Farah has been manufacturing jeans for decades and is a major manufacturer and distributor of apparel. Its annual sales in 1984 were around $240,000,000. Approximately six percent of these sales were from jeans.

24. William W. Compton, Executive Vice-President and President of Farah Domestic Division of Farah Manufacturing Company, Inc., testified that Farah made clothes for "fashion" people, but that Farah's clientele are "middle of the road American" families who are solid and established in life. Farah's products, including jeans, re manufactured for children, men, and women of all ages. The sizes of its jeans range for women from 3 to 20 and for men from 2 to 50. Farah jeans are made of fabrics that are different from Calvin Klein's and have a different appearance. The usual retail price for Farah men's jeans ranges from $26.00 to $32.00.

25. Farah advertises in magazines such as Redbook and Good Housekeeping, which are family-oriented magazines, as well as airline **[*10]** magazines which are magazines for business men and women with moderate incomes. Calvin Klein does not advertise in them because it believes these magazines are read by a less "fashion conscious" audience.

26. Farah's marketing and advertising efforts are directed to a clientele different from Calvin Klein's.

27. Compton testified that a western style jean was a four or five pocket jean with a decorative stitch on the back pocket, often a loop stitching.

28. Farah has made western style jeans with an inverted omega style stitching on the back pockets for many years.

29. In the mid-1970's, Farah developed a machine which was technologically more advanced than the machines used by other manufacturers. This machine could automatically sew a loop pocket decoration on the back pocket of jeans. Before this, the decorations were placed manually on the back pocket.

30. Farah's records establish that at least as early as October 6, 1978, Farah was making jeans with an inverted omega loop pocket decoration to be sold through its own factory outlet "Valu" stores.

31. In late 1978 or early 1979, Farah's manufacturing facilities were not operating at full capacity. In consequence, William [*11] Isaac, a Senior Vice-President of Manufacturing, sought to manufacture garments for other companies. Isaac entered into a contract on behalf of Farah with Puritan Fashions and Centerfold Industries, subsidiaries of Calvin Klein, and wholly owned by the partnerships of Calvin Klein and Barry Schwartz, to manufacture Calvin Klein jeans.

32. Although Farah would not let Calvin Klein's quality control personnel into its manufacturing facilities because it wanted to keep secret its advanced machinery, Farah did show the machines to one employee of Puritan Fashions and Centerfold Industries to prove Farah's capabilities for sewing a regular loop. Farah allowed Calvin Klein to conduct its quality control by allowing Calvin Klein personnel to examine samples in the hallway outside Farah's manufacturing facilities.

33. Farah was not advised at the time it was engaged to manufacture or during the period in which Farah manufactured Calvin Klein jeans in 1979, 1980 and 1981 that Calvin Klein was making any assertions of trademark rights with respect to the inverted omega stitching. In fact, the specification sheets Calvin Klein gave to Farah identify the jeans as "western" style jeans with a [*12] "decorative stitch" on the back pockets.

34. During 1979, 1980 and 1981, the years Farah manufactured jeans for Calvin Klein, Farah continued to make jeans with inverted omega stitching on its own account.

35. Farah jeans are sold invariably with the Farah trademark or one of its other trademarks such as E. Jovan or Jason Brooks, permanently affixed to the interior of the jeans and often identifying trademarks on the outside including the pocket and fly button. Additionally, Farah normally attaches a removable paper tag as well. Thus, all Farah's jeans are clearly labelled with the Farah brand label.

36. Farah jeans are generally sold in department stores on separate racks apart from jeans of other manufacturers. Since Calvin Klein jeans are usually sold in separate designer department, Farah jeans are often in different departments from Calvin Klein jeans, although they are sold in some of the same stores.

37. Farah has offered credible documentary evidence of its use of an inverted omega design on the back pockets of its jeans as well as the volume of shipment of these jeans as far back as 1978. A comparison of the style numbers taken from the illustrated sales books Farah could [*13] find for the relevant years, with a computer printout of the style numbers and units shipped for the particular year, indicate that at a minimum, over 1.5 million paris of jeans with some form of the inverted omega decoration, similar to the inverted omega stitching at issue, have been shipped since 1978. While the documentary evidence is not entirely clear, it lends itself to the inference that the sales were actually greater.

38. Such sales have been to major department stores such as Macy's, Mays and Federated Stores. During all these years from 1978 - 85, Calvin Klein has never objected to farah's use of the inverted omega stitching.

39. No evidence has been produced that anyone actually confused Farah jeans with the exact or similar inverted omega stitching with jeans manufactured by Calvin Klein.

40. Joel M. Sandleman, former Vice President of Administration of Puritan Fashion Corporation and Centerfold Industries, from 1975 to May 1984, and since May 1984,

consultant to Calvin Klein and Puritan Fashion Corporation and Centerfold Industries, testified that since about 1977 to the present, Calvin Klein had a nationwide Road Sales Force which investigated retail outlets to see **[\*14]** what other manufacturers in the jeans business were producing as well as whether counterfeits were being made. Since at least 1982, Calvin Klein has maintained a nationwide security staff to investigate whether contract manufacturers were making Calvin Klein jeans for their accounts or otherwise infringing Calvin Klein's trademark.

41. Calvin Klein claims to have discovered FArah's use of the inverted omega stitching only in 1985. The Court does not credit this testimony in view of the extensive investigative forces Calvin Klein employed throughout the relevant years and because Calvin Klein jeans and Farah jeans were often sold in the same stores such as May's, Macy's and Federated Stores, and the further fact that a large number of Farah jeans with a similar inverted omega stitching have been sold since 1978.

42. This lawsuit was filed on April 18, 1985. The motion for a preliminary injunction was not filed until nearly seven weeks later, on June 5, 1985. Calvin Klein has not satisfactorily explained its delay in filing both the complaint and its motion for a preliminary injunction.

43. If Farah were preliminarily enjoined from selling its jeans with the inverted omega stitching, **[\*15]** a substantial amount of inventory would have to be destroyed. Consequent damage to Farah's goodwill and customer loyalty would result.

44. The Court concludes that a substantial likelihood of confusion does not exist. Although there are sufficiently serious questions going to the merits to make them a fair ground for litigation -- whether the inverted omega stitching is a nonprotectible trademark or decoration or is a protectible trademark as an indicator of source -- the balance of hardships tips in Farah's favor rather than Calvin Klein's and Calvin Klein has failed to demonstrate possible irreparable injury absent a preliminary injunction.

45. Farah is financially able to respond in damages for any legally cognizable harm which may have ensued to Calvin Klein from the manufacture and distribution of the Farah jeans.

CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter. 15 U.S.C. § 1121; 28 U.S.C. §§ 1331, 1338; 15 U.S.C. §§ 1051, et seq.

2. <sup>HN1</sup>A preliminary injunction should be granted where the movant establishes (a) the possibility of irreparable injury, and (b) either (1) the likelihood of success on the merits or (2) sufficiently **[\*16]** serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly in the movant's favor. Scott Co. v. Scott Swimming Pools, Inc., 764 F.2d 62, 66 (2d Cir. 1985); LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 74 (2d Cir. 1985).

3. <sup>HN2</sup>The "'crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" Universal City Studios, Inc. v. Nintendo, Co., Ltd., 746 F.2d 112, 115 (2d Cir. 1984) (quoting Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978) (per curiam), cert. denied, 439 U.S. 1116 (1979); Thompson Medical Co., Inc. v. Pfizer Inc., 753 F.2d 208, 213 (2d Cir. 1985).

4. <sup>HN3</sup>The likelihood of confusion turns on may factors including the strength of the mark, the degree of similarity between the marks, the proximity of the products, the likelihood that

the prior owner will bridge the gap, actual confusion and the reciprocal of defendant's good faith in adopting its own mark, the [*17] quality of the defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities. polaroid Corp. v. Polaroid Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820 (1961). These Polaroid factors, which originally applied only to noncompeting products, have been extended now to competing products. Thompson Medical Co., Inc., 753 F.2d at 214; Abraham Zion Corp. v. Lebow, 761 F.2d 93, 105 (2d Cir. 1985); 20th Century Wear, Inc. v. Sanmark-Stardust, Inc., 747 F.2d 81, 87 (2d Cir. 1984), cert. denied, 105 S. Ct. 1755 (1985); Plus Products v. Plus Discount Foods, Inc., 722 F.2d 999, 1004 n.6 (2d Cir. 1983).

5. HN4 The strength of the mark refers to the distinctiveness of the mark or its "tendency to identify goods sold under the mark as emanating from a particular ... source." McGregor-Doniger Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir. 1979); Lever Bros. Co. v. American Bakeries Co., 693 F.2d 251 256 (2d Cir. 1982) (quoting McGregor-Doniger Inc., 599 F.2d at 1131). The Second Circuit has stated that where third party use of a mark exists, it is a "plausible inference [*18] that the mark's strength had been at least somewhat diluted by third party use." Lever Bros. Co., 693 F.2d at 257. Farah has been using similar inverted omega designs at least since 1978. Third parties have also been using similar designs on their jeans as far back as 1961 and especially in the years 1978-81. Although there are variations in the exact shape of the inverted omega design, the overall appearance is similar. Only recently has Calvin Klein claimed that the inverted omega stitching is a protectible mark. It has not yet obtained registration of the inverted omega stitching although it does own a registration of a composite marke consisting of both the inverted omega stitching and the "Calvin Klein" label. A little over two and a half years ago. Calvin Klein finally attempted to register the inverted omega stitching alone. However, this delayed attempt is presently being opposed by Sears Roebuck & Company which also uses a similar design.

6. Calvin Klein and Farah use the same inverted omega stitching on the same product -- jeans. However, HN5 "even close similarity between two marks is not dispositive of the issue of likelihood of confusion. 'Similarity in and of itself [*19] is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question.'" McGregor-Doniger Inc., 599 F.2d at 1133 (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 82.1(a), at 601-02 (3d ed. 1969) (footnote omitted)). The combination of features as a whole and not differences in details determines the likelihood of customer confusion. LeSportsac, Inc., 754 F.2d at 79. Where an alleged mark appears in close conjunction with a company name, the likelihood of confusion may thereby be lessened. McGregor-Doniger Inc., 599 F.2d at 1134. The "Calvin Klein" label is permanently affixed on all its jeans to the right back pocket above the inverted omega stitching. Farah permanently affixes a label with the Farah trademark or one of its other trademarks on the inside of its jeans and often on the outside either on a label or the fly button. Although the inverted omega designs are similar, the overall contexts in which they appear render a likelihood of confusion improbable.

7. In addition, HN6 where a trade name is independently strong, as in the case of Calvin Klein, and always appears with the design in issue, the [*20] likelihood of confusion is further diminished. Nina Ricci, S.A.R.L. v. Gemcraft Ltd., 612 F. Supp. 1520, 1527 n.7 (S.D.N.Y. 1985).

8. Although the inverted omega stitching in question appears on the same basic product, the parties do not compete in identical markets. The parties' jeans are generally sold at disparate prices and in different departments on different racks of department stores. Each party's advertisements are directed to different markets, according to the image sought to be projected. A limited competitive distance between the products serves to decrease the

likelihood of customer confusion.

9. Calvin Klein has not demonstrated a single instance of actual customer confusion. *HN7* Although a plaintiff does not have to prove actual confusion to prevail, an inference may still be made that confusion is not likely. McGregor-Doniger Inc., 599 F.2d at 1136. In fact, Calvin Klein's alleged ignorance of Farah's use of the inverted omega stitching further supports the Court's finding that "no actual confusion had been proven and ... that confusion is not likely. Had customers, suppliers, or middlemen ever misdirected inquiries, complaints, raw materials, or finished goods, [*21] presumably the [defendant] and its mark could not have escaped [the plaintiff's] attention for ... years." Id. at 1136 n.6 (citation omitted).

10. Farah has demonstrated good faith in its use of the inverted omega stitching by its documentation of almost contemporaneous use of the stitching as far back as October 1978, and its evidence concerning its technologically advanced machine, developed in the mid-1970's, which could automatically sew a loop pocket decoration. In additions, Farah has shown that it believed, based on Calvin Klein's specification sheets as well as the widespread use by third parties of similar decorative designs, that the inverted omega stitching was a "loop pocket decoration" that was unprotectible as a trademark.

11. The difference in the quality and appearance of the fabrics used by Farah and Calvin Klein lessens the likelihood of confusion.

12. The evidence indicates that Calvin Klein sells to a more affluent and fashion conscious consumer than does Farah. Buyers of jeans made by Calvin Klein or Farah, whether they are first time or repeat buyers, are likely to look for the labels. The cost of Farah and Calvin Klein jeans is not insubstantial. They [*22] buyers of either brand of jeans can be expected to be relatively sophisticated and careful since "[t]he greater the value of an article the more careful the typical consumer can be expected to be." McGregor-Doniger Inc., 599 F.2d at 1137.

13. *HN8* The test of the likelihood of customer confusion is whether a customer who is somewhat familiar with the plaintiff's mark, when compared with the defendant's goods alone, not a side-by side comparison, is likely to be confused. Paco Rabanne Parfums, S.A. v. Norco Enters., Inc., 680 F.2d 891, 893 (2d Cir. 1982).

14. *HN9* A nonverbal mark must have acquired secondary meaning and be nonfunctional to be protected under 15 U.S.C. § 1125(a). Vibrant Sales, Inc. v. New Body Boutique, Inc., 652 F.2d 299, 303-04 (2d Cir. 1981), cert. denied, 455 U.S. 909 (1982). See Union Mfg. Co., Inc. v. Han Baek Trading Co., Ltd., 763 F.2d 42, 48 (2d Cir. 1985); Thompson Medical Co., Inc., 753 F.2d at 213 n.10. Proof of secondary meaning entails vigorous evidentiary requirements, including a showing of advertising expenses, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize the mark and the length and exclusivity [*23] of the mark's use. However, no one factor is determinative, and every element need not be proved. Each case necessarily turns on its own facts. Id. at 217.

15. *HN10* Proof of secondary meaning entails vigorous evidentiary requirements. The plaintiff who seeks injunctive relief, bears the burden of establishing that its trade name had acquired secondary meaning by the time or the year in which the defendant introduced its product. Thompson Medical Co., Inc., 753 F.2d at 217. Calvin Klein has failed to prove that at the time Farah began distributing its jeans, the inverted omega stitching had any secondary siginficance. Even if the plaintiff has acquired a right in a mark, it cannot prevent the use of that mark by one whose use had begun before the secondary meaning was acquired. Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1042 (2d Cir. 1980).

16. Not all Calvin Klein jean advertisements display the inverted omega stitching. Most of the

advertising that displays this stitching has been from 1980-85. The stitching appears almost incidentally in the process of showing the fit of the jeans and the "Calvin Klein" label. No advertisement suggests that the inverted omega [*24] stitching is a logo or identifying symbol of Calvin Klein jeans. In addition, HN11 advertising expenses are only an inference of secondary meaning. This "evidence concerning attempts to popularize a mark is not conclusive." McGregor-Doniger Inc., 599 F.2d at 1133 n.4. "Clearly a trademark owner makes a stronger showing as to the strength of his mark if he offers evidence probative of the effectiveness of his efforts." Id.

17. Calvin Klein's survey, designed to demonstrate secondary meaning, does not even purport to reproduce the market conditions years before when Farah entered the market. For this reason alone, the survey is fatally defective as a meaningful indication of secondary meaning for the relevant time period. Thompson Medical Co., Inc., 753 F.2d at 217. Dr. Sorensen's brief statement that the secondary meaning he believed to exist in 1985 was also developed in 1978 was unsupported by any evidence. The survey is flawed for additional reasons as well.

18. Calvin Klein has demonstrated high sales success. However, it has failed to demonstrate exclusivity of its use of the inverted omega stitching during the years in which Calvin Klein was producing jeans. Only recently [*25] has Calvin Klein asserted that third persons are attempting to plagiarize its mark.

19. HN12 To state a cause of action for trademark infringement or unfair competition under common law, the plaintiff must establish that the defendant had copied a non-functional design which had developed secondary meaning, and there was a likelihood of confusion. 20th Century Wear, Inc., 747 F.2d at 90-91; Mattel, Inc. v. Azrak-Hamway Int'l, Inc., 724 F.2d 357, 360-61 (2d Cir. 1983).

20. HN13 To state a cause of action for dilution of a trademark pursuant to New York General Business Law § 368-d, the plaintiff must establish that it possesses a trademark that is truly distinctive or has acquired secondary meaning and must also prove a likelihood of dilution. Miss Universe, Inc. v. Patricelli, 753 F.2d 235, 238 (2d Cir. 1985); Universal City Studios, Inc., 746 F.2d at 120. "Typically, dilution is characterized as a 'whittling down' of the identity or reputation of a tradename or mark." Sally Gee, Inc. v. Myra Hogan, Inc., 699 F.2d 621, 625 (2d Cir. 1983) (citations omitted)). Miss Universe, Inc., 753 F.2d at 238. The Second Circuit has stated that a more helpful definition is: "'Dilution [*26] is an act which "threatens two separable but related components of advertising value. Junior uses may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey."'" Sally Gee, Inc., 699 F.2d at 625 (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 84.2, at 954-55 (footnote omitted)). Competition between the parties or confusion as to t he source of the products need not be shown. Sally Gee, Inc., 699 F.2d at 624.

21. Calvin Klein has failed to show that the inverted omega stitching is a distinctive design or ever acquired secondary meaning. Therefore, we do not reach the second issue of likelihood of dilution.

22. Because the plaintiff has failed to establish any likelihood of confusion, the balance of hardships tips in the defendant's favor. McGregor-Doniger, Inc., 599 F.2d at 1139. Harm to the plaintiff's reputation is unlikely since customer confusion as to source is improbable. An injunction would be a great hardship to Farah since it would be forced our to the jeans business until a final determination on the merits. Inventory would have to be destroyed, and damage to Farah's [*27] goodwill and loyalty would result.

23. Additionally, such a preliminary injunction in this case would be a disservice to the jeans

purchaser and would have a serious anti-competitive result by removing from a competitive market a multi-million dollar segment of a nationally distributed product. 1 J.T. McCarthy, Trademarks and Unfair Competition §§ 1:2(C), 1:12, at 9, 28-30 (2d ed. 1984).

24. Calvin Klein has failed to demonstrate the likelihood of irreparable harm. HN14 ""Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" Bell & Howell: Mamiya Co., 719 F.2d at 45 (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948, at 431 (1973) (footnote omitted))." Citibank N.A. v. Citytrust, 756 F.2d 273, 275 (2d Cir. 1985).

25. Additionally," HN15 [s]ignificant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone amy justify denial of a preliminary [*28] injunction for trademark infringement." Citibank, N.A., 756 F.2d at 276. Majorica, S.A. v. R.H. Macy & Co., Inc., 762 F.2d 7, 8 (2d Cir. 1985).

26. The Court does not credit the plaintiff's evidence that Calvin Klein first became aware of Farah's use of the inverted omega stitching in 1985. Calvin Klein is chargeable with years of dilatoriness in enforcing its allegedly protectible mark. In addition, Calvin Klein continued to delay almost seven seeks after filing the complaint, to move for a preliminary injunction. Calvin Klein's "failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" Citibank, N.A., 756 F.2d at 277 (quoting LeSportsac, Inc. v. Dockside Research, Inc., 478 F. Supp. 602, 609 (S.D.N.Y. 1979)).

27. The plaintiff's motion for a preliminary injunction is denied.

IT IS SO ORDERED.

THE COURT: Gentlemen, as I told you at the outset, I don't think it is fair for me to leave you with the mystical words "decision reserved." I want to expose myself to your criticism and suggestions and what I want to say should be construed to be my tentative [*29] decision in the case, and I will expect you to submit, on a schedule we will discuss in a moment, proposed findings and conclusions. I don't think you need to await the transcript of this proceeding in order to submit them because you are both thoroughly familiar with the pleadings and with the exhibits as well as the testimony in the case. However, we can discuss that privately.

My task is very different from the task of the trial judge, because all I need do is to say that I believe that at a trial where all of the issues will be thoroughly ventilated that one side or the other should be able to prove or can probably prove by a preponderance of evidence the following propositions. I want to be understood to speak in that sense.

According to the plaintiff's memorandum of law, Calvin Klein registered on September 14, 1982, a composite trademark consisting of the two words "Calvin Klein" in combination with the inverted omega design which has been so much bruited in this case. Mr. Yavner has made it very clear in his closing statement that he is not depending upon that trademark registration. He is depending upon the inverted omega design alone which was placed upon both rear pockets [*30] of his client's jeans. This alleged trademark, which is now the subject of a dispute with Sears Roebuck and Company, was published for opposition on September 18, 1984. The issuance of the registration was opposed by Sears Roebuck and Company. In fact, Sears Roebuck has been represented in these proceedings by Mr. Floyd Mandell. Proceedings are presently pending before the Patent and Trademark Office and in the courts.

In any event, we must pass on to more specific and relevant facts in this proceeding.

I want to emphasize that there is no claim here that the two words, "Calvin Klein," the name Calvin Klein, the trademark Calvin Klein, has itself in any way been infringed upon. The defgndant Farah has never used that name or attempted to palm off its products as Calvin Klein products per se. It has never borrowed those two words for any purpose.

The essence of the plaintiff's claim is that Farah's use of the looped pocket decoration or the alleged inverted omega design trademark, is a violation of the rights of Calvin Klein under the trademark law and the Lanham Act.

HN16 The standards for granting a preliminary injunction are essentially the following as enunciated by the Second Circuit: [*31] The movant must show (a) the possibility of irreparable injury, and (b) either the likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping decidedly in the movant's favor.

I refer to two very recent cases, Joseph Scott Company v. Scott Swimming Pools, Inc., 764 F.2d 62, at 66, decided by the Second Circuit in 1985, and LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, at 74, decided by the Second Circuit in 1985.

That Court has stated that: " It is well settled that HN17 the crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" I quote from Universal City Studios, Inc. v. Nintendo Co., Ltd., 746 F.2d 112, at 115, decided by the Second Circuit in 1984, quoting Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, at 47, a case decided per curiam by the Second Circuit in 1978, cert. denied, 439 U.S. 1116 (1979).

The likelihood of confusion turns on many factors including [*32] the strength of the mark, the degree of similarity between the marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of the defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities. The court may have to take still other variables into account.

The famous Polaroid test enunciated by the Second Circuit in 287 F.2d 492, at 495 in 1961, cert. denied, 368 U.S. 820 (1961), which originally applied only to non-competing products has been extended now to competing products. I refer to Thompson Medical Co., Inc. v. Pfizer inc., 753 F.2d 208, at 214, decided by the Second Circuit in 1985. There are other cases I could cite, but I don't want to take the time to do it now.

Calvin Klein and the defendant Farah use the inverted omega design on the same product, namely, blue jeans. However, farah asserts that it operates in a different market since Klein caters to the affluent market in limited sizes while Farah aims at the middle American family in a slightly lower socio-economic class and [*33] in all sizes. Farah produces garments for the entire family, children as well as older people and in the entire gamut of sizes. I think Mr. Compton said women's sizes range from 3 to 20 and men's sizes range from 2 to 50.

The cost of the jeans has some significance because the more expensive the article, the more careful the typical customer will be. It is undisputed here that the Calvin Klein jeans are generally more expensive. Mr. Wingren, a witness for Calvin Klein testified that he bought Farah jeans in 1985 for $28 and Calvin Klein jeans for $36. Mr. Compton, who testified for Farah, as its Chief of Marketing and President of its domestic division for the U.S.A., said that Farah's price range for its jeans ranged from $26 to $32, while Calvin Klein's ranged from $36 to $50, although there is evidence that on one occasion a $50 garment was sold at

discount for $25. I think the impact of the entire evidence makes it clear that Calvin Klein sells a more expensive garment to a more sophisticated clientele than Farah.

The strength of the mark refers to the distinctiveness of the mark or its tendency to identify goods sold under the mark as emanating from a particular source. The [*34] Second Circuit said substantially that in McGregor-Doniger, Inc. v. Drizzle Inc., 599 F.2d 1126, at 1131, decided by the Second Circuit in 1979, and also in other cases I won't take time to cite. The inverted omega design or one closely resembling it appears to have been used by third party jeans manufacturers. It is a plausible inference that the mark's strength had been at least somewhat diluted by this third party use. Farah has included numerous exhibits of jeans made by other manufacturers with a substantially similar inverted omega design. Calvin Klein has registered the inverted omega design in conjunction with the Calvin Klein label. Its attempt to register the inverted omega design alone was the subject of the opposition by Sears Roebuck. I don't want to go into that again.

The factor relevant to Farah's good faith is that Farah has used its inverted omega design on its jeans since 1975 without ever contending that it is a trademark. In fact, Farah refers to it as a loop pocket decoration.

In addition, the fact that the alleged mark generally appears in close conjunction with a company name may increase the likelihood that the marks will not be confused. I refer to McGregor-Doniger, [*35] the case I cited a few minutes ago, 559 F.2d at 1134. In this case, Calvin Klein permanently affixes to its jeans the "Calvin Klein" label on the right back pocket above the inverted omega design. Farah always affixes a permanent label with one0of its names on the inside, and sometimes on the outside of its jeans.

The test of the likelihood of customer confusion is whether a customer who is somewhat familiar with the plaintiff's mark, when compared with the defendant's goods alone, not a side-by-side comparison, is likely to be confused. The combination of the features as a whole and not differences in details determines the likelihood of customer confusion.

Proof of secondary meaning entails vigorous envidentiary requirements, including a showing of advertising expenses, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize the mark and the length and exclusivity of the mark's use. However, no one factor is determinative, and every element need not be proved. Each case necessarily turns on its own facts. I refer again to the Thompson Medical case, already cited, 753 F.2d at 217.

Calvin Klein alleges a cause of action for dilution of its trademark pursuant [*36] to the New York General Business Law, Section 368-d. Section 368-d does not require competition between the parties or confusion as to the source of products. I cite Sally Gee, Inc. v. Myra Hogan, Inc., 699 F.2d 621, at 624, decided by the Second Circuit in 1983.

To state a cause of action under this statute, the plaintiff must establish that it possesses a trademark that is truly distinctive or has acquired a secondary meaning. The plaintiff must also prove the likelihood of dilution.

I would like to interject at this time that Farah has been in the jeans business for a long time, far longer than Calvin Klein. Calvin Klein appears to have entered the jeans business in 1979 or in 1978, depending upon which way I will decide that highly controverted issue. But at this point, I am disposed to find that Farah, a successful family business located in El Paso, Texas, which has been operating with increasing success ever since 1928, has used an inverted omega decoration on its jeans for a long time, possibly before Calvin Klein used it and probably since 1978, possibly earlier. Third parties have also used an inverted omega design at least since the early 1960's. Farah's annual sales for [*37] 1984, for all of its products, amounted to $240 million. Its business of jeans alone has amounted to several

Get a Document - by Citation - 229 U.S.P.Q. (BNA) 795
Case 1:07-cv-03821-RWS    Document 10-5    Filed 05/22/2007    Page 17 of 19
Page 16 of 18

million dollars. If Farah should be unsuccessful in this litigation, it can well afford to pay any damages that Calvin Klein might be able to recover.

HN18 The Second Circuit has recently set forth stringent requirements for a finding of possible irreparable harm. A showing of likelihood of confusion is strong, not conclusive evidence that irreparable harm may occur in the absence of a preliminary injunction. Again, I refer to the LeSportsac case, 754 F.2d at 79.

However, I am unable to make an explicit finding of possible irreparable harm in favor of the plaintiff in this case for a variety of reasons. The first reason is the Second Circuit's statement in Citibank N.A. v. City Trust, 756 F.2d 273, at 276, decided in 1985, that: "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." In that case, Citibank waited a little over ten weeks after it learned directly of [*38] the defendant's actions and more than 9 months after it had learned through the press. In Majorica, S.A. v. R.H. Macy & Co. 762 F.2d 7, at 8, decided by the Second Circuit in 1985, the plaintiff knew for several years of the offending conduct before filing its action and did not seek a preliminary injunction until 7 months after filing suit.

In this case, Farah had demonstrated that it has been using the inverted omega design since at least 1978, and third parties have been using the design since the 1960's. Calvin Klein says it has been using the design since 1978. I find that Calvin Klein knew or should have known long before it brought this suit that Farah was successfully using the inverted omega design on its jeans, and I am not persuaded by the testimony to the contrary.

I think this issue will have to be decided in another forum. I don't credit the evidence that seeks to sustain Calvin Klein's position. I think that it used it in 1979 and later. But any any rate, I am convinced on the basis of the evidence before me that the prior user was possibly Farah.

MR. YAVNER: May I ask a question, your Honor. I didn't hear something. You said someone used it in 1979 or later? Did [*39] you have a name before that?

THE COUVT: I can't remember. Will the stenographer read what I said.

MR. YAVNER: Two lines ago.

(Record read)

MR. YAVNER: That's the line, your Honor, I think it used it in 1979 or later, doesn't seem to have a name attached to it. Is it Calvin Klein or Farah that used it in 1979 or later?

THE COURT: Calvin Klein used it in '79.

THE COURT: In other words, I believe on the evidence before me that Calvin Klein may be proved to be a second comer, and it has to bear all of the implications of being a second comer. In spite of the fact that Calvin Klein professes to have remained ignorant of Farah's activities for a long period of time after Farah was using the inverted omega mark, I do not credit Calvin Klein's evidence to that effect. I am not persuaded by it, and I therefore reject it.

I think Calvin Klein is chargeable with dilatoriness in waiting nearly tow months after the filing of the complaint to move for a preliminary injunction, and a period of several years after Farah began the complained of activity to move for the sweeping relief which it now seeks.

I do not accept as credible or persuasive the evidence to the effect that the plaintiff [*40] will suffer possible irreparable harm. As I already pointed out, Farah marks its jeans with its own nationally-recognized brand names and never refers in any way to Calvin Klein in so many words. And Calvin Klein has made no showing whatever that such labeling by Farah with its own name would in any way tarnish or diminish the value of its own trademark, Calvin Klein, or even its so-called inverted omega mark, its pocket decoration, if it is at all protectible.

Another matter that concerns me very much is that the granting of an injunction in this case, to stop in its tracks a business which has been a multi-million dollar jeans business for a number of years by this drastic remedy, would create for Farah a tremendous harm. It would put them out of business so far as that segment of its activity is concerned, and as Mr. Comptom testified, it would force the destruction of a large part of the merchandise presently in their warehouses. In addition, consequent damage to good will and customer loyalty would result.

There is a very serious anti-competitive aspect to granting a preliminary injunction. If I signed the injunction that Calvin Klein asks me to sign, restraining Farah in the [*41] extraordinary manner that they wish me to restrain it, I would take a competitor out of the blue jeans market, a nationally-known multi-million dollar competitor. I don't think they are entitled to relief as drastic as that on the basis of the showing made in this hearing, and particularly in the light of Farah's ability to respond in damages.

This leads me to consider the balance of hardship rule that I must respect where, as here, the parties have demonstrated sufficiently serious questions going to the merits to make them a fair ground for litigation. The evidence indicates that the balance of hardships in this case, far from tipping decidedly in the movant's favor, that is, in favor of Calvin Klein, tips decidedly in favor of Farah. That, in itself, is another reason for my being disposed to decline the grant of a preliminary injunction.

Now, with respect to the survey of the distinguished expert witness, Dr. Sorensen, who testified for Calvin Klein, I have one or two words to add. This survey by Dr. Sorensen was conducted in April and May of 1985, after this litigation was initiated and several years after Farah began using the loop design. It does not even purport to reproduce [*42] the market conditions of 1979, when this allegedly offending conduct began or at nay other time other than 1985.

The Third Circuit has stated in Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, at 1231, that even if the plaintiff has rights in the name because its use of the name has acquired a secondary meaning, it could not prevent the use of that term by one whose use had begun before the secondary meaning was acquired. Priority depends not upon which mark succeeds in first obtaining secondary meaning but upon whether the plaintiff can prove by a preponderance of the evidence that his mark possessed secondary meaning at the time the defendant commenced his use of the mark.

In the recent case, Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, at 1042, the Second Circuit said in 1980 that even if the plaintiff has acquired a right in a mark, it cannot prevent the use of that mark by one whose use had begun before the secondary meaning was acquired.

The Second Circuit has said more recently that HN19 proof of secondary meaning entails vigorous evidentiary requirements and that the plaintiff who seeks injunctive relief, bears the burden of establishing that its trade [*43] name had acquired secondary meaning by the time or the year in which the defendant introduced its product. I refer again to Thompson Medical Co., Inc. v. Pfizer, Inc. 753 F.2d at 217, decided in 1985.

If we substitute the names of the parties here, it is quite clear that Calvin Klein is far from having conformed to this standard of proof. It seems to me indisputable that Farah has been using the inverted omega sign at least at the same time, and possibly before Calvin Klein began using the design. I might add there is no question of abandonment because if there were a question of abandonment, the above rule would be change. No suggestion has been made in this case of any abandonment.

Gentlemen, I think I have said all I need to say. These are my tentative conclusions. If I am wrong, I want you to persuade me that I am wrong. If I am persuaded that I am wrong, I will be glad to change my mind. If I have made any errors, I want you to point them out so I can correct them. I am told that at one point I said I didn't believe Farah had met a showing of irreparable harm. That was a lapsus linguae, and of course, the party that has to show irreparable harm is not Farah, it is Calvin Klein. **[*44]** They have not shown it. The irreparable harm in this case, as with the balance of hardships are all in favor of Farah. I hope I haven't made any other slips. Gentlemen, my whole purpose in making this statement is to give you the full benefit of my tentative views at this time and to await your further submissions.

If counsel will come into the robing room for a minute, I'd like to discuss the schedule with them, and then we can adjourn.

Service: **Get by LEXSEE®**
Citation: **1985 U.S. Dist. lexis 13475**
View: Full
Date/Time: Monday, May 21, 2007 - 4:09 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
■ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✚ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.