# EXHIBIT D

Service: **Get by LEXSEE®**
Citation: **1999 u.s. dist. lexis 2353**

*1999 U.S. Dist. LEXIS 2353, \**

LAZAR'S AUTO SALES, INC., LAZAR'S MOTOR CAR CORP., d/b/a/ LAZAR'S BMW and JIMMY LAZAR'S GMC TRUCK CENTER, INC., Plaintiffs, -against- CHRYSLER FINANCIAL CORPORATION and DAIMLERCHRYSLER CORPORATION, f/k/a CHRYSLER CORPORATION, Defendants.

99 Civ. 0213 (CM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1999 U.S. Dist. LEXIS 2353

March 2, 1999, Decided
March 2, 1999, Filed

**DISPOSITION: [\*1]** Plaintiffs' motion for preliminary injunction denied.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff car dealers moved for a preliminary injunction to prevent defendant corporation from terminating its financing of plaintiffs' operations. Plaintiffs had filed suit in state court, asserting claims for violation of the Automobile Dealers' Day in Court Act, 15 U.S.C.S. § 1221 et seq., N.Y. Veh. & Traf. Law § 460 et seq., breach of contract, and tortious interference with contract.

**OVERVIEW:** Defendant corporation informed plaintiff car dealers that it planned to terminate its financing of plaintiffs' operations. Plaintiffs moved for a preliminary injunction to prevent defendant from withdrawing its financing. The court denied the motion. Plaintiffs' delay in seeking relief was unjustified. Plaintiffs had had three and a half months to arrange for an alternative source of credit, and waited until the day before termination to seek relief. Plaintiffs also had not demonstrated a reasonable likelihood of success on the merits of their action brought in state court. Plaintiffs had not shown that defendant acted in bad faith when defendant gave heightened scrutiny to plaintiffs' finances. Plaintiffs had bounced a number of checks and provided insufficient financial statements. Plaintiffs' questionable business practices, including maintaining poor records, lending unsold vehicles to the president's family members, and an inadequate business plan, indicated that defendant would likely succeed on the merits. Plaintiffs had also not made a showing of irreparable harm because, even if plaintiffs proved their allegations, plaintiffs' losses could be remedied by monetary damages.

**OUTCOME:** The court denied an application for injunctive relief filed by plaintiff car dealers to prevent defendant corporation from terminating its financing of plaintiffs' operations. Plaintiffs had unduly delayed in seeking relief, and plaintiffs were unlikely to succeed on the merits where defendant had a legitimate business reason for withdrawing its financing because of plaintiffs' poor business practices.

**CORE TERMS:** dealership, financing, floor plan, terminate, dealer, manufacturer, franchise, lender, succeed, preliminary injunction, injunctive relief, franchised, inventory, finance, audit, irreparable harm, mandatory injunction, franchise agreement, net worth, breach of contract, et seq, contractual, hardship, credit agreement, terminating, termination, franchisees, effective, promptly, captive

Get a Document - by Citation - 1999 U.S. Dist. LEXIS 2353    Filed 05/22/2007    Page 3 of 11    Page 2 of 10

Case 1:07-cv-03821-RWS    Document 10-7

## LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

**HN1** ✚ The law clearly disfavors granting eleventh hour motions for preliminary relief where the plaintiffs' own delay is the very source of the irreparable harm or imbalance of hardships claimed by them.  More Like This Headnote

Civil Procedure > Remedies > Injunctions > Elements > General Overview

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

**HN2** ✚ To prevail on a motion for a preliminary injunction, plaintiffs must show that, without the injunctive relief, they will suffer irreparable harm and either (a) plaintiffs have a likelihood of success on the merits; or (b)(i) there are sufficiently serious questions going to the merits to make them a fair ground for litigation and (ii) a balance of hardships tips decidedly in plaintiffs' favor. Plaintiffs must show a substantial likelihood of success on the merits, i.e., that their cause is considerably more likely to succeed than fail (together, of course, with the requisite irreparable injury).  More Like This Headnote

Business & Corporate Law > Distributorships & Franchises > Causes of Action > Good Faith & Fair Dealing

Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > Franchise Agreements

Transportation Law > Private Motor Vehicles > General Overview

**HN3** ✚ Courts have narrowly construed the term "bad faith" under the Automobile Dealers' Day in Court Act, 15 U.S.C.S. § 1221 et seq., requiring an automobile dealer to show that the defendant exercised coercion, intimidation, or made threats against the dealer.  More Like This Headnote

Contracts Law > Contract Interpretation > Good Faith & Fair Dealing

Contracts Law > Performance > Discharges & Terminations

Torts > Business Torts > Commercial Interference > Contracts > General Overview

**HN4** ✚ Under New York law, a financing institution does not act in bad faith when it exercises its contractual right to terminate financing.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Remedies > Damages > Monetary Damages

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

**HN5** ✚ The court cannot grant a preliminary injunction where money damages is adequate compensation.  More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** For CHRYSLER FINANCIAL: Jonathan D. Deily, Richard Crowell Maider, Deily, Dautel & Mooney, L.L.P., Albany, NY.

For DAIMLER CHRYSLER CO: J. Gilmore Childers, Orrick, Herrington, & Sutcliffe, LLP, New York, NY.

For LAZAR'S AUTO SALES, LAZAR'S MOTOR CAR: Leonard A. Bellavia, Bellavia & Kassel, P.C., Mineola, NY.

**JUDGES:** Colleen McMahon, U.S.D.J.

**OPINION BY:** Colleen McMahon

**OPINION:** MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR A

PRELIMINARY INJUNCTION

McMahon, J.

Plaintiffs are three car dealers in the Peekskill/Yorktown Heights area of Northern Westchester County. They come before this Court seeking a preliminary injunction to prevent defendant Chrysler Financial Corporation ("CFC") -- the captive financing arm of defendant DaimlerChrysler Corporation ("Chrysler"), the franchisor of one of the three plaintiff dealerships -- from terminating its provision of financing to the three dealerships. In effect, plaintiffs seek a mandatory injunction compelling CFC to continue financing their operations pending resolution of this action. For a variety of reasons, the application is denied.

I. Factual Background **[*2]**

Charles Cartelemi is the President of each of the plaintiff corporations. Mr. Cartelemi and his wife started selling used cars in 1977. In 1980, he became a franchised AMC Jeep Renault dealer in Peekskill. In 1985, plaintiff Lazar's Auto Sales, Inc. ("Lazar Jeep/Eagle") originally commenced business as a duly franchised AMC Jeep Renault dealer under a Dealer Sales & Service Agreement with AMC Corp. At about the same time, plaintiff Lazar's Motor Car Corp. ("Lazar BMW") commenced business as a duly franchised BMW dealer in Highland Falls, New York, under a similar agreement with BMW of North America. In 1987, Chrysler purchased Renault's share of American Motors and then acquired the entire company, including the Jeep/Eagle Division. Since about June 1991, plaintiff Jimmy Lazar's GMC Truck Center, Inc. ("Lazar GMC") has operated as a duly franchised GMC truck dealer in Peekskill and Yorktown under a Dealer Sales & Service Agreement with General Motors Corporation.

Since at least February 1994, CFC has provided floor plan financing for all three dealerships - - the Chrysler/Jeep/Eagle dealership and the two dealerships that were franchised by other automobile manufacturers. The record **[*3]** contains agreements between CFC and Lazar Jeep/Eagle dated February 15, 1994 and June 8, 1995, between Lazar BMW and CFC dated February 15, 1994, and between Lazar GMC and CFC dated May 31, 1995, as well as a supplemental letter agreement dated June 26, 1995 and a continuing guarantee dated July 7, 1995, both of which were applicable to all three dealerships. Plaintiffs assert that CFC has been their floor plan financer for 13 years, and defendants do not dispute it.

The terms of the financing agreements (each known as the Security Agreement and Master Credit Agreement) are "lender friendly." They provide a line of credit with the respective manufacturers against which plaintiffs are entitled to direct that advances be made to the manufacturers to pay for new vehicles for eventual resale by the respective dealerships. According to the agreements, the maximum amount of credit advances to be allowed by Chrysler Financial is to be established "in its sole discretion" (Section 1.0); the making of any particular advance is at the option of CFC "and shall not be obligatory" (Section 1.0); the right of the dealerships to request advances "may be terminated at any time" by CFC "at its election **[*4]** without notice" (Section 1.0); and CFC reserves the right to demand payment of all advances, plus interest and other charges, at any time (Section 2.0). For their part, the dealerships agree to remit the total due on any advance "promptly" following the sale of a vehicle purchased with such advance (Section 2.1). The dealerships allow CFC access to their books and records (Section 7.0), and further agree to provide balance sheets and statements of profit and loss "as required by" CFC (Section 7.1). In the separate June 26, 1995 letter agreement, Mr. Cartelemi agrees to provide CFC with signed and audited financial statements.

Per Section 6.0 of each agreement, CFC may terminate the agreement, refuse to advance funds, and declare all amounts due and payable if:

    (1) the dealerships fail to pay any advance or other payment when due, or as

demanded by CFC;

(2) CFC deems itself "insecure for any reason;"

(3) the dealerships fail to comply with any other provision of the agreement; or

(4) the dealerships make any misrepresentations to obtain an extension of credit, or fail to furnish financial information or permit inspection of books and records.

According to **[\*5]** CFC, a floor plan financing provider requires this degree of security because, under Uniform Commercial Code 9-307(1), CFC's lien on an automobile -- the collateral that secures the financing -- disappears once the car is sold off the lot.

Two different patterns, which developed more or less simultaneously after the signing of the most recent Master Credit Agreement, gave rise to the instant dispute. Not surprisingly, each party assigns greater import to a different sequence of events.

According to Mr. Cartelemi, Chrysler has developed a business plan referred to as Project 2000, which outlines the most desirable size, location and composition of Chrysler's future dealerships. In October 1995, Chrysler wrote to Mr. Cartelemi and suggested splitting the Peekskill/Yorktown market for Jeep Eagle and Chrysler Plymouth, with a desired end result of having two franchisees in the area, each selling all four types of Chrysler vehicles (Chrysler, Plymouth, Jeep, and Eagle). Chrysler proposed adding a Jeep/Eagle franchise to Salerno's Dodge in Yorktown by the end of 1995. However, due to what Chrysler described as "your continued poor performance in Peekskill," it indicated that it would not **[\*6]** consider adding Chrysler and Plymouth franchises to Lazar Jeep/Eagle unless operations improved dramatically. Mr. Cartelemi immediately protested that this would violate his dealership's franchise agreement with Chrysler, and the manufacturer backed off any unilateral action. Instead, it suggested that Salerno's Dodge franchise be swapped for Lazar Jeep/Eagle's Jeep/Eagle franchise. Mr. Cartelemi rejected this idea as well, and pressed for permission to sell all four types of cars at a proposed new location in Yorktown. This was not acceptable to Chrysler. Over a year of negotiations yielded nothing.

Plaintiffs allege that Chrysler, stymied in its efforts to give the highly lucrative Jeep/Eagle business to Salerno's, attempted to do indirectly what it could not do directly. They contend that, beginning in early 1997, they were subjected to repeated and unjustified bank cutoffs, floor plan audits, contract rejections over technicalities, finance holds and heightened scrutiny of the dealerships' financial statements. Finally, on September 22, 1998, CFC notified Mr. Cartelemi that it intended to terminate their financing relationship, effective January 6, 1999.

CFC, of course, sees **[\*7]** matters differently. To it, the plaintiffs are risky businesses. CFC points to a series of financially irresponsible actions and financial warning signs, including:

(1) Lazar Jeep/Eagle bounced a check on April 18, 1997, resulting in a bank cut-off conducted in May 1997 and continued through June 1997, which continuation CFC justified by:

(a) CFC's inability to complete audits of the dealerships' financial records due to the poor condition of those records, and

(b) the lack of cooperation from Mr. Cartelemi and his staff;

(2) The dealerships' financial statements showed negative net worth or very low positive net worth at various times during 1997 and 1998;

(3) The dealerships failed to provide signed and audited financial statements, as required by the various agreements;

(4) Operating statements showed one or more of the dealerships operating at a loss;

(5) The dealerships failed to submit accurate inventory purchase contracts, which, had CFC not required a correction before approving financing, would have resulted in violations of the Federal Truth in Lending Act;

(6) The dealerships repeatedly failed, in violation of the agreements, **[*8]** to pay CFC for sold vehicles within five days after customers took title to the cars;

(7) The dealerships bounced three more checks during September 1997, resulting in another bank cut-off in October, which again was longer than anticipated due to plaintiffs' poor or incomplete records;

(8) Plaintiffs had insufficient cash on hand to operate the dealerships; in particular, Lazar Jeep/Eagle's bank account was overdrawn in October 1997;

(9) Lazar GMC improperly posted "classic" vehicles to its inventory, resulting in an overstatement of its net worth; absent the inclusion of these vehicles, it would have had a negative net worth;

(10) Automobiles could not be found on the dealership lots during wholesale inventory audits, in violation of the Security Agreement; and

(11) In July 1998, Mr. Cartelemi refused to permit a scheduled financial audit.

CFC does not deny that it heightened its scrutiny of plaintiffs' finances beginning in the Spring of 1997, or that it conducted more wholesale inventory audits than it otherwise might have. However, it attributes its actions entirely to plaintiffs' precarious financial conditions and its own lender insecurity, as evidenced **[*9]** by the events outlined above. CFC's insecurity was further eroded by the parties' inability to communicate. CFC's perception that relations were bad was not unilateral; indeed, Mr. Cartelemi sent CFC a letter on August 14, 1998, in which he stated that he would obtain financing from another source, due to the deterioration of his relationship with CFC. CFC argues that, as a prudent lender, it had no choice but to terminate this highly unsatisfactory relationship.

Plaintiffs claim that CFC's action was designed to drive them out of business, since automobile dealerships cannot function without floor plan financing. Arguing that CFC and Chrysler had conspired together to bring about the ruination of their businesses, plaintiffs filed suit in the New York State Supreme Court on January 5, 1999, alleging violations of the Automobile Dealers' Day in Court Act (15 U.S.C. §§ 1221 *et seq.*), New York's Franchised Motor Vehicle Dealer Act (Vehicle and Traffic Law §§ 460 *et seq.*), breach of contract, and tortious interference with contract. Plaintiffs also moved by order to show cause before the Hon. Kenneth Rudolph, for a preliminary injunction "enjoining, restraining and prohibiting **[*10]** [CFC] from terminating, suspending, limiting, restricting or otherwise curtailing its dealer floor plan financing to each of the plaintiffs . . . during the pendency of

this action." Justice Rudolph entered a temporary restraining order enjoining CFC from "terminating" its dealer floor plan financing to plaintiffs. Defendants immediately removed the action to this Court, and the TRO was extended by agreement of the parties.

II. Conclusions of Law

Plaintiffs seek a mandatory injunction to force CFC to continue to extend its credit facilities, without modification, to the Lazar auto dealerships throughout the pendency of this action. The application is denied.

A. Plaintiffs' Unjustified Delay in Seeking Injunctive Relief Militates Against Their Motion.

As noted above, CFC advised plaintiffs on September 22, 1998 of its plans to terminate their floor plan financing effective January 6, 1999. Plaintiffs made no effort in the ensuing three and a half months to arrange an alternative source of credit. Instead, they waited until January 5, 1999 -- on the eve of termination -- to seek injunctive relief, arguing that, without judicial intervention, the dealerships will **[*11]** be unable to secure outside credit to finance their inventory, and their businesses will not survive.

Plaintiffs' dire assessment of the dealerships' viability may or may not be accurate, but they have only themselves to blame for the severity of whatever harm they suffer. If, as alleged, CFC seeks to terminate the floor plan financing for unlawful reasons, then plaintiffs may be entitled to damages for their injuries; however, plaintiffs would not have been in danger of losing their businesses if they had either explored credit alternatives or sought the Court's relief more promptly. *HN1*⇥The law in this Circuit clearly disfavors granting "eleventh hour motions for preliminary relief" where plaintiffs' own delay "is the very source of the irreparable harm or imbalance of hardships claimed by [them]." Nassau Boulevard Shell Service Station, Inc. v. Shell Oil Co., 869 F.2d 23, 24 (2d Cir. 1989); see also Hirschfeld v. Board of Elections, 984 F.2d 35, 39 (2d Cir. 1993) (applying the same rule in ballot access dispute).

Here, plaintiffs' counsel conceded at oral argument that numerous lenders offer floor plan financing. Plaintiffs did not explore the possibility of establishing **[*12]** a lending relationship with any of them. The only reason suggested -- that it would be hard to interest a new lender after CFC had walked away from the Lazar dealerships -- is no excuse at all; if it were, the Nassau Boulevard Shell rule would be meaningless. True, the cost of obtaining alternative financing might be higher given the fact that plaintiffs had been cut off by their former lender, but if CFC's termination proved wrongful, that could be compensated in damages.

As for plaintiffs' failure to move more promptly, the excuses offered ring hollow. Plaintiffs contend that the real notice of termination did not come until November 22, 1998 but the September 23 letter quite clearly expresses CFC's intentions. In any event, plaintiffs (and their counsel) cannot justify the seven week delay that followed November 22 simply by pleading that the holidays were upon them; the state courts, to which they resorted, are open for business between Thanksgiving and Christmas.

Under the Second Circuit's ruling in Nassau Boulevard Shell, I need not consider the merits of plaintiffs' claim prior to denying them preliminary relief. But plaintiffs are not entitled to a mandatory injunction **[*13]** on the merits, either.

B. Plaintiffs Have Not Met the Second Circuit's Strict Prerequisites to Granting Mandatory Injunctive Relief.

The Second Circuit has long held preliminary injunctive relief to be an extraordinary remedy that should not routinely be granted. See Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60

(2d Cir. 1985). In order $^{HN2}$to prevail on a motion for a preliminary injunction, plaintiffs must show that, without the injunctive relief, they will suffer irreparable harm and either (a) plaintiffs have a likelihood of success on the merits; or (b)(i) there are sufficiently serious questions going to the merits to make them a fair ground for litigation and (ii) a balance of hardships tips decidedly in plaintiffs' favor. See Jackson Dairy, Inc. v. H.P. Hood & Sons, 596 F.2d 70, 71 (2d Cir. 1979).

Here, plaintiffs seek a mandatory injunction rather than an order preserving the status quo. That is, plaintiffs want a court order requiring CFC to extend its credit facilities to the dealerships notwithstanding CFC's contractual right to exercise its discretion in these matters. In this posture, plaintiffs must satisfy an even higher standard than the test **[*14]** articulated in Jackson Dairy. Plaintiffs must show a "*substantial* likelihood of success on the merits, i.e., that their cause is considerably more likely to succeed than fail (together, of course, with the requisite irreparable injury)." Abdul Wali v. Coughlin, 754 F.2d 1015, 1026 (2d Cir. 1985) (emphasis added); see also S.E.C. v. Unifund SAL, 910 F.2d 1028, 1039 (2d Cir. 1990). They have satisfied neither standard on the record before this Court.

1. Plaintiffs Have Not Demonstrated a Reasonable Likelihood of Success on the Merits.

Plaintiffs' claims rest on their assertion that CFC's enhanced scrutiny of the Lazar auto dealerships constituted a bad faith action carried out on behalf of Chrysler to coerce plaintiffs into either acceding to its Project 2000 goals or going out of business. Plaintiffs ask the Court to draw this inference despite a three-year time lapse between plaintiffs' refusal to cooperate with Chrysler's plans for the Peekskill/Yorktown market and CFC's September 1998 decision to terminate plaintiffs' floor plan financing. Plaintiffs have presented no evidence of any nexus between CFC's actions and Chrysler's alleged agenda. Plaintiffs speculate **[*15]** that a nexus exists, but (inexplicably) they have neither taken nor sought any discovery from defendants to buttress their allegations.

(a) First Cause of Action: Violation of the Automobile Dealer's Day in Court Act

Plaintiffs seek relief for CFC's alleged lack of "good faith" under the federal Automobile Dealer's Day in Court Act ("ADDCA"), 15 U.S.C. § 12221, et seq., but plaintiffs are not substantially likely to prevail under this statute on the facts presented. Plaintiffs must show both that CFC was a "manufacturer" and that it lacked "good faith" in its dealings with the dealerships. Obviously, CFC does not manufacture cars and is not a party to the franchise agreements. Accordingly, plaintiffs must prove that CFC acted as the manufacturer (Chrysler)'s agent in order to prevail under the statute. This they are unlikely to do. See, e.g., Keys Jeep Eagle, Inc. v. Chrysler Corp., 897 F. Supp. 1437, 1444-45 (S.D. Fla. 1995).

Like the instant dispute, the Keys Jeep Eagle case arose out of a financing agreement between a Jeep/Eagle franchise dealership and a Chrysler captive financing arm (Chrysler Credit Corporation, or "CCC"). The floor plan financing **[*16]** agreement in Keys Jeep Eagle also vested the creditor with discretion to refuse to advance payments or to terminate the franchisee's right to request advances. CCC decided to terminate the credit agreement after a series of financially irresponsible actions by the dealership. In response, the dealership sued CCC and Chrysler alleging fraud, breach of fiduciary responsibility, breach of contract, and violation of the ADDCA's "good faith" requirement. Again, just as in this case, the plaintiff dealership alleged that CCC acted at Chrysler's behest to reduce the number of Jeep dealers in the United States.

On defendants' motion for summary judgment, the district court dismissed all of the dealership's claims, holding, inter alia, that plaintiff failed to demonstrate a sufficient nexus between CCC's actions and Chrysler's purported agenda for CCC to be liable under the ADDCA. The Court observed that the ADDCA provides franchisees with a cause of action against the manufacturer for violations of good faith. Because CCC was not a party to the

Get a Document by Citation - 1998 U.S. Dist. LEXIS 2353    Filed 05/22/2007    Page 9 of 11

Case 1:07-cv-03821-RWS    Document 10-7    Filed 05/22/2007    Page 9 of 10

franchise agreement, the statute would only apply if the plaintiffs showed that CCC had acted as Chrysler's agent. The Keys Jeep Eagle **[*17]** plaintiff failed in this regard because it asserted no facts in support of apparent or actual agency. That is, the dealership's allegations concerning Chrysler and CCC did not show any representation or acknowledgment of an agency relationship by Chrysler, nor did they show that the plaintiff had relied on any representation of agency. Id.

Here, as in Keys Jeep Eagle, plaintiffs impliedly assert that CFC, Chrysler's captive financing arm, acted as its agent for purposes of the ADDCA. In order to recover on a theory of apparent authority in New York, plaintiffs must establish two facts: "(1) '[Chrysler] was responsible for the appearance of authority in [CFC] to conduct the transaction in question,' and (2) [the Lazar dealerships] reasonably relied on the representations of [CFC]." Herbert Const. Co. v. Continental Ins. Co., 931 F.2d 989, 993-94 (2d Cir. 1991) (citing Ford v. Unity Hospital, 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659 (1973) and Hallock v. State, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984)).

Plaintiffs present the following "evidence" in support of their contention that Chrysler was behind CFC's decision **[*18]** to cut off its floor plan financing:

> 1) Chrysler announced its Project 2000 plans to plaintiffs in an October 1995 letter. Chrysler's plans included adding a Jeep/Eagle franchise to Salerno's Dodge at the expense of Lazar Jeep/Eagle.
>
> 2) In October 1997, Salerno's Dodge in Yorktown received a shipment of Jeep/Eagle product, in contravention of Lazar Jeep/Eagle's franchise agreement.
>
> 3) Plaintiffs protested to Chrysler concerning both of the above events at the time they occurred.
>
> 4) Beginning in April or May 1997, and continuing into mid-1998, CFC scrutinized the Lazar dealerships' finances more carefully, and eventually terminated their financing, effective January 1999.

Plaintiffs would have this Court draw an inference of agency from the fact that these events are tenuously connected in time, while ignoring more obvious and compelling inferences that can be drawn from the record. The heightened scrutiny CFC gave to plaintiffs' finances coincided with the bouncing of checks and the provision of alarmingly insufficient financial statements. The renewed emphasis on filling out contracts properly followed a warning memorandum about the Federal Truth in Lending **[*19]** Act that was sent to all dealerships getting credit via CFC. And the ultimate cut-off notice came after the parties' relationship had deteriorated to the point that Mr. Cartelemi, plaintiffs' principal, advised CFC that he thought it advisable to find a new source of floor plan financing. This is far from sufficient evidence to warrant a finding that plaintiffs are substantially likely to succeed -- or, for that matter, likely to succeed at all -- in demonstrating that CFC acted at Chrysler's behest and not for its own business reasons when it decided to stop doing business with the Lazar dealerships. The evidence of plaintiffs' shoddy business practices offered by CFC -- including poorly maintained records, lending unsold vehicles (CFC's collateral for its loans) to Cartelemi family members and others, and a two-paragraph "business plan" that can only qualify as a joke -- is so overwhelming that it virtually compels the conclusion that defendants, not plaintiffs, are substantially likely to succeed on the merits.

Nor have plaintiffs established that they are likely to succeed in showing ADDCA "bad faith" on CFC's part. The [HN3]courts have narrowly construed the term "bad faith" under **[*20]**

the statute, requiring an automobile dealer to show that the defendant exercised coercion, intimidation, or made threats against the dealer. See Empire Volkswagen, Inc. v. World Wide Volkswagen Corp., 627 F. Supp. 1202, 1209-10 (S.D.N.Y. 1986); see also Keys Jeep Eagle, 897 F. Supp. at 1444. Plainly, the Lazar dealerships have made no showing at this stage that Chrysler ever made any threats to plaintiffs, let alone that they threatened to convince CFC to cut off plaintiffs' financing. Moreover, the inference of bad faith that plaintiffs would have the Court draw is strained: CFC had plenty of reasons to walk away from its relationship with plaintiffs; it certainly did not need a push from Chrysler to do so.

(b) Seventh, Eighth and Ninth Causes of Action: State Common Law Claims

Plaintiffs also seek damages and injunctive relief for breach of contract, tortious interference, and other wrongful acts arising from the termination of the floor plan credit facility. These claims also suffer from plaintiffs' failure to establish that CFC's actions were anything other than the lawful exercise of its contractual rights. HN4 Under New York law, "[a] financing institution [*21] does not act in bad faith when it exercises its contractual right to terminate financing." Chrysler Credit Corp. v. Dioguardi Jeep Eagle, Inc., 192 A.D.2d 1066, 1067, 596 N.Y.S.2d 230, 232 (4th Dep't 1993) (citing Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988)). As discussed above, the financing agreements between CFC and the dealerships reserve considerable discretion for CFC to terminate the agreements, refuse to advance funds, and declare all amounts due and payable, based on changes in the plaintiffs' financial practices.

Plaintiffs have not demonstrated how they will establish, on these facts, that CFC's actions amount to bad faith under New York law. Accordingly, plaintiffs have not shown a substantial likelihood of success on their common law claims.

(c) Tenth Cause of Action: Violation of New York's Franchised Motor Vehicle Dealer Act

Plaintiffs' claim for injunctive relief under the New York Franchised Motor Vehicle Dealer Act (Vehicle and Traffic Law §§ 460 et seq. (McKinneys 1996)) must fail because the statute does not apply to CFC, a financing company having no franchise agreement with plaintiffs. See [*22] Dioguardi Jeep Eagle, Inc., 192 A.D.2d at 1068, 596 N.Y.S.2d at 232.

* * * *

On this record, I can only conclude that CFC acted as any reasonable lender would have in asserting its contractual rights to protect itself from the questionable financial practices of the Lazar auto dealerships (e.g., bouncing checks, failing to account for unsold vehicles on its floor plan, submitting erroneous financial statements, and repeatedly failing to sign financial statements). Plaintiffs' counsel stated at oral argument that CFC had tolerated similarly shoddy accounting and questionable business practices by the three dealerships over the course of a thirteen-year relationship, but there is no evidence in the record to support his contention. Moreover, even assuming arguendo that CFC chose to ignore plaintiffs' behavior in the past, that would not divest defendant of its right to hold plaintiffs strictly to their contractual obligations today.

2. Plaintiffs Have Not Made a Sufficient Showing of Irreparable Harm.

Plaintiffs claim that CFC's actions to withdraw its credit facilities will result in the closure of all three Lazar auto dealerships. In light of plaintiffs' inexcusable [*23] failure to investigate alternative credit arrangements, they cannot simply assert that the inevitable destruction of their dealerships satisfies the irreparable harm requirement. Even if plaintiffs subsequently prove their allegations of conspiracy, they have not demonstrated why their losses could not have been remedied by monetary damages (e.g., the difference between plaintiffs' financing from CFC and other, potentially less favorable, credit arrangements they could have

Get a Document - by Citation - 1999 U.S. Dist. LEXIS 2353    Page 10 of 10

Case 1:07-cv-03821-RWS    Document 10-7    Filed 05/22/2007    Page 11 of 11

procured). Under Jackson Dairy and its progeny, *HN5* this Court cannot grant a preliminary injunction where money damages is adequate compensation. *See* Jackson Dairy, 596 F.2d at 72. To the extent that alternative financing is less available or unavailable today than it was some months ago, it is plaintiffs' own fault for waiting. Therefore, it has created its own hardship; CFC cannot be taxed with it.

III. Conclusion

For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied and the TRO is lifted, effective immediately. A scheduling order for discovery and pre-trial proceedings is attached to this order.

This constitutes the decision and order of the Court.

Dated: **[*24]** March 2, 1999

Colleen McMahon

U.S.D.J.

Service: **Get by LEXSEE®**
Citation: **1999 u.s. dist. lexis 2353**
View: **Full**
Date/Time: Monday, May 21, 2007 - 4:04 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
■ - Questioned: Validity questioned by citing refs
▲ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 **LexisNexis®**

About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.