**EXHIBIT J**

*2000 Pa. Dist. & Cnty. Dec. LEXIS 239, \*; 48 Pa. D. & C.4th 129, \*\**

### **Robert Half** of PA Inc. v. Feight

April Term 2000, no. 1667

COMMON PLEAS COURT OF PHILADELPHIA COUNTY, PENNSYLVANIA

2000 Pa. Dist. & Cnty. Dec. LEXIS 239; 48 Pa. D. & C.4th 129

June 29, 2000, Decided

## **CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employer filed a petition for a preliminary injunction in the cause of action it brought against defendant, a former employee. The employer had brought suit seeking to enforce a restrictive covenant against the former employee.

**OVERVIEW:** The employer was a nationwide personnel placement agency. The former employee had worked for the employer and placed temporary accounting and financial personnel. An employment contract existed between the parties, which contained nondisclosure and non-solicitation provisions as well as an agreement not to compete. The former employee resigned and took a job with a competitor. The employer sought to prohibit the former employee from working for the competitor. The court found that the restrictive covenant in the employment contract was valid and that the employer had a legitimate business interest in protecting the client good will that the former employee had established with certain law firms while she had been employed. However, the court found that the non-competition provision was too broad in that it effectively barred the former employee from working for any employee placement agency in the greater metropolitan area for one year. The court found such a restriction unnecessary to protect the legitimate business interests of the employer and modified the agreement's application to firms that were the former employee's clients while working for the employer.

**OUTCOME:** The court granted, in part, the employer's petition for a preliminary injunction by enjoining the former employee from soliciting, contacting, or otherwise engaging in business relations with the 16 law firms with which she did establish relationships during her employment with the employer.

**CORE TERMS:** customer, covenant, placement, candidate, legitimate business, non-solicitation, personnel, non-competition, restrictive covenant, hiring, preliminary injunction, manager, training, temporary, trade secrets, skills, enforceable, specialized, soliciting, staffing, compete, affirming, enforcing, necessary to protect, injunction, trade secret, non-disclosure, solicitation, accounting, irreparable harm

### **LexisNexis(R) Headnotes**

Contracts Law > Types of Contracts > Covenants
Evidence > Procedural Considerations > Burdens of Proof > General Overview
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN1* A restrictive covenant between an employer and an employee is enforceable at equity only if it is ancillary to an employment relation, it is reasonably limited in duration and geographic scope, and enforcement is necessary to protect a legitimate

business interest of the employer without imposing an undue hardship on the employee. The burden of establishing the unenforceability of the covenants rests on the employee. A court must consider the facts and circumstances on a case-by-case basis. If a restrictive covenant meets the three-part test, it is prima facie enforceable at equity.

Contracts Law > Consideration > Adequate Consideration
Contracts Law > Types of Contracts > Covenants
Labor & Employment Law > Employment Relationships > General Overview
*HN2*⬆To be ancillary to an employment relation, a restrictive covenant must be supported by adequate consideration.

Contracts Law > Types of Contracts > Covenants
Evidence > Procedural Considerations > Burdens of Proof > General Overview
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements
*HN3*⬆A former employee bears the burden of showing that the time and geographic extent of a non-competition and a non-solicitation agreement are not reasonable. The burden is on him who sets up unreasonableness as the basis of contractual illegality to show how and why it is unlawful. The duration of the covenant is reasonable if it is no longer than necessary for a former employer to put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers.

Contracts Law > Types of Contracts > Covenants
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements
Real Property Law > Restrictive Covenants > General Overview
*HN4*⬆Trade secrets of an employer, customer good will, and specialized training and skills acquired from the employer are all legitimate interests protectible through a general restrictive covenant.

Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets
*HN5*⬆Under traditional agency concepts, any new business or improvement in customer relations attributable to an employee during his employment is for the sole benefit of the principal. That is what the employee is being paid to do. When the employee leaves the company he should no more be permitted to try to divert to his own benefit the product of his employment than to abscond with the company's cashbox.

Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets
Trade Secrets Law > Protected Information > Customer Lists
*HN6*⬆With or without a confidentiality agreement, an employer is entitled to protect its trade secrets from disclosure. Though confidential customer data may be entitled to

protection as a trade secret, customer lists are at the very periphery of trade secret law. An employer bears the burden of showing that the information was a trade secret and that a former employee misappropriated the information in violation of a contract or in violation of a confidential relationship.

Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets
Trade Secrets Law > Protected Information > Customer Lists

HN7⬦ Whether an employment agency's client and candidate lists are trade secrets entitled to protection depends on whether they are the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged.

Trade Secrets Law > Nonprotected Information > General Overview
Trade Secrets Law > Ownership Rights > Customer Solicitation
Trade Secrets Law > Protected Information > Customer Lists

HN8⬦ Equity will not protect mere names and addresses easily ascertainable by observation or reference to directories. Solicitation of the same customers by a number of competitors is evidence that the customer identities are generally known or readily ascertainable in the trade. Information easily ascertainable by calling known customers is not protectible.

Trade Secrets Law > Ownership Rights > Employee Knowledge & Skill

HN9⬦ The protection of specialized training and skills and carefully guarded business methods may rise to the level of a legitimate business interest.

Contracts Law > Types of Contracts > Covenants
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements
Trade Secrets Law > Protected Information > Customer Lists

HN10⬦ Advertising, cold-calling numbers drawn from the telephone book, and telephoning a list of prospective customers provided by the employer are not specialized techniques subject to protection under a general **covenant not to compete.**

Civil Procedure > Equity > General Overview
Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses

HN11⬦ The doctrine of unclean hands does not apply to a defendant in an equity action. In determining the issue of clean hands, a court looks solely at the conduct of the plaintiff, the one who seeks the aid of the chancellor, and not the conduct of the defendant.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury
Contracts Law > Types of Contracts > Covenants
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > General Overview

HN12⬦ The determination of whether a post-employment restrictive covenant is reasonable, and therefore enforceable, is a factual one which requires the court to consider all the facts and circumstances.

Contracts Law > Types of Contracts > Covenants
Governments > Legislation > Overbreadth
Real Property Law > Restrictive Covenants > General Overview

HN13 ± Where the covenant imposes restrictions broader than necessary to protect the employer, a court of equity may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer.

Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm
Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
Evidence > Procedural Considerations > Burdens of Proof > General Overview

HN14 ± In determining whether to grant a preliminary injunction, a court may consider the averments of the pleadings and petition, affidavits of the parties or third parties, or any other proof. Pa. R. Civ. P. 1531. A preliminary injunction is a most extraordinary form of relief which is to be granted only in the most compelling cases. The purpose of a preliminary injunction is to preserve the status quo as it exists or previously existed before the acts complained of, thus preventing irreparable injury or gross injustice. A court may grant the injunction only if the moving party establishes the following elements: (1) that relief is necessary to prevent immediate and irreparable harm that cannot be compensated by damages, (2) that greater injury will occur from refusing the injunction than from granting it, (3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct, (4) that the wrong is actionable and an injunction is reasonably suited to abate that wrong, and (5) that the plaintiff's right to relief is clear. Those requisite elements are cumulative, and if one element is lacking, relief may not be granted.

**COUNSEL:** **[\*1]** *Thomas J. Barton*, for plaintiff.

*Thomas G. Servodidio*, for defendant.

**JUDGES:** HERRON, J.

**OPINION BY:** HERRON, J.

**OPINION: [\*\*130]** HERRON, *J.*, June 29, 2000 -- Plaintiff-petitioner **Robert Half** of Pennsylvania Inc., a subsidiary of **Robert Half** International Inc., seeks to enforce a restrictive covenant against defendant-respondent Shana Feight. Feight worked for the Accountemps division of RHI, where she placed temporary accounting and financial personnel. After one and a half years at RHI, Feight took a job with Legal Search where she places permanent legal secretaries and paralegals. Legal Search competes with another division of RHI, the Affiliates division.

RHI filed a petition for a preliminary injunction to prohibit Feight from working for Legal Search. The court grants the petition in part and will enjoin Feight from soliciting, contacting or otherwise engaging in business relations with the 16 law firms with which she established relationships while at RHI. The court submits the following findings of fact and conclusions of law in support of its contemporaneous order.

FINDINGS OF FACT

I. *The Parties*

(1) RHI operates a nationwide personnel placement agency with several **[\*2]** divisions. Each division has a distinct product line. (4/20/00 N.T. 13, 115.)

**[\*\*131]** (2) Out of its Philadelphia office at 2000 Market Street, Suite 1800, RHI operates at least three divisions: (1) Accountemps, (2) Affiliates, and (3) Office Team. (4/20/00 N.T. 13, 101; 5/1/00 N.T. 40.)

(3) The Accountemps division specializes in the temporary placement of accounting and financial personnel, including accountants, bookkeepers and clerical workers. (4/20/00 N.T. 6-7, 101.)

(4) The Affiliates division of RHI specializes in the temporary and permanent placement of legal personnel, including lawyers, legal secretaries and paralegals. (4/20/00 N.T. 12, 98, 100.)

(5) The Office Team division specializes in the temporary placement of administrative receptionists. (5/1/00 N.T. 13.)

(6) Shana Feight is a 24-year-old college graduate who lives in Philadelphia. (4/20/00 N.T. 6.)

II. *The Employment Agreement*

(7) Sometime before August 10, 1998, RHI offered Feight -- and Feight accepted -- a position as a staffing manager in the Accountemps division in the Philadelphia office. (4/20/00 N.T. 6, 101, 120; exhibit P-1.)

(8) RHI's initial offer of employment and Feight's acceptance **[*3]** of that offer were verbal. (5/1/00 N.T. 7-8.)

(9) The staffing manager position is entry level and non-managerial. (4/20/00 N.T. 12.)

(10) On August 10, 1998 her first day of employment at RHI, Feight signed an employment agreement. (4/20/00 N.T. 106, 5/1/00 N.T. 9, 10; exhibit P-1 and D-1.)

(11) The agreement contained a nondisclosure agreement:

**[**132]** "*Disclosure or misuse of confidential information*. Employee shall not at any time during employee's employment by any of the RHI companies or thereafter, directly or indirectly, disclose, furnish or make accessible to any person, firm[,] corporation, or other entity, or make use of, any confidential information of any of the RHI companies, including, without limitation, information with respect to the name, address, contact persons, or requirements of any customer, client applicant, candidate or employee of any of the RHI companies (whether having to do with temporary, contract or permanent employment) and information with respect to the procedures, advertising, finances, organization, personnel, plans, objectives or strategies of the RHI companies. Employee acknowledges that such information was developed by the RHI **[*4]** companies at great time and expense and is safeguarded by the RHI companies as trade secrets. . . ." (Exhibit P-1, P8.)

(12) The agreement contained a general agreement not to compete:

"*Restrictive covenant*. In consideration and view of [(i)] employee's position with the RHI companies, (ii) the valuable consideration furnished to the employee by employer employing employee and entering into this agreement, (iii) employee's access to confidential information and trade secrets of the RHI companies, and (iv) the value of such confidential information and trade secrets to the RHI companies, for a period of 12 months after the termination date . . ., employee agrees that employee shall not, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of, any competitor in any part **[**133]** of the area encompassed within 50 miles from [RHI's Philadelphia office] . . . ." (Exhibit P-1, P9.)

(13) The agreement contained a non-solicitation agreement:

"*Non-solicitation of customers*. In consideration and view of [(i)] employee's position with the RHI companies, (ii) **[*5]** the valuable consideration furnished to the employee by employer employing employee and entering into this agreement, (iii) employee's access to confidential information and trade secrets of the RHI companies, and (iv) the value of such confidential information and trade secrets to the RHI companies, for a period of 12 months after the termination date . . ., employee agrees that employee shall not, directly or indirectly, on behalf of any competitor, solicit the trade or patronage of any customer or perform services for any customer. Such restriction on soliciting or performing services for customers shall apply regardless of whether or not any such customer was previously a customer of employee or whether or not such customer was previously, or is at the time of solicitation or the performance of services, a customer of any competitor. . . ." (Exhibit P-1, P10.)

(14) The agreement defines "customer" as any company for whom RHI's Philadelphia office "*performs or has performed services in the course of its business within the 12 months preceding the termination date.*" (Exhibit P-1, P7.)

(15) Feight claims that RHI did not inform her of the restrictive covenants or show her the written **[*6]** employment contract before Feight began working at RHI. (5/1/00 N.T. 8-9.)

**[**134]** III. *Feight's Training at RHI*

(16) Before working for RHI, Feight had no experience in employee recruiting or placement. (4/20/00 N.T. 6; 5/1/00 N.T. 6.)

(17) Feight's training at RHI lasted two to three weeks. (4/20/00 N.T. 105; 5/1/00 N.T. 16, 18.) For a few hours each day, Feight watched a CD-ROM presentation about selling techniques, telephone solicitation skills, ad calls n1 and candidate interviews. (4/20/00 N.T. 65-66, 105; 5/1/00 N.T. 79.) After watching the CD-ROM presentation each day, Feight practiced her sales techniques by telephoning clients. (5/1/00 N.T. 79.) During her training, Feight participated in role-playing exercises with her supervisor, Scott Schorr. (4/20/00 N.T. 68, 105; 5/1/00 N.T. 79.) These exercises covered such topics as sales techniques, client telephone calls, client visits, contacting clients and potential clients, interviewing candidates, converting a temporary employee to a permanent employee and cross-selling services of other RHI divisions. n2 (4/20/00 N.T. 66-68; 5/1/00 N.T. 16-17.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 An ad call is a response to a newspaper job listing. RHI instructed Accountemps personnel to respond to accounting and finance help wanted ads in the Sunday newspaper to see if the employer needed a temporary employee. (5/1/00 N.T. 16-17.) **[*7]**

n2 The client is the employer. The candidate is the prospective employee.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

IV. *Feight's Position and Responsibilities at RHI*

(18) As a staffing manager at RHI, Feight was responsible for recruiting and placing temporary accounting and finance personnel. (4/20/00 N.T. 6-7, 87; 5/1/00 N.T. 12.) **[**135]** Feight held the same position during her entire time at RHI. (5/1/00 N.T. 12.)

(19) Feight's duties included selling, "working desk," recruiting candidates, and setting client billing rates and candidate pay rates. (4/20/00 N.T. 101-102).

(20) Feight's success in sales depended in part on her establishing and maintaining relationships with contacts at each client. Feight's contacts were those in charge of hiring temporary financial personnel. The person in charge may have been a company controller or someone from the tax, accounting or human resources department. (4/20/00 N.T. 29, 32, 41-42, 47, 49, 53, 54, 57, 61.) In order to keep clients, Feight called each hiring contact every 30, 60, 90 or 180 days; the frequency of the calls varied from client to client. (4/20/00 N.T. 12, 30, 31, **[*8]** 43, 50, 59-60.)

(21) The duty of working desk rotated among Accountemps staffing managers, with each rotation lasting one week. The person on desk was responsible for receiving incoming calls for Accountemps and for filling Accountemps orders, including orders from clients of Accountemps staffing managers who were not on desk that week. (4/20/00 N.T. 37, 101; 5/1/00 N.T. 23.) These clients included law firm clients of Accountemps. (4/20/00 N.T. 37.)

(22) There was considerable interaction between Accountemps and Affiliates employees in the Philadelphia office. (4/20/00 N.T. 104; 5/1/00 N.T. 58-59, 8183.) The two divisions shared a single office. (4/20/00 N.T. 104.) Employees of both divisions participated in regular meetings together. (4/20/00 N.T. 69-74.) At least twice, an Affiliates employee accompanied Feight on a sales call. (4/20/00 N.T. 58-59.)

**[\*\*136]** (23) Accountemps and Affiliates shared supervisors. Scott Schorr -- the branch manager for RHI's Philadelphia office -- supervised both Accountemps and Affiliates personnel, including Feight. (5/1/00 N.T. 77.) Schorr's supervisor was Nancy Radke. Radke was the regional manager of all RHI offices in Pennsylvania, Delaware, **[\*9]** Maryland, D.C. and Virginia, including the Philadelphia office. (4/20/00 N.T. 100.)

(24) Feight was very successful at RHI. (4/20/00 N.T. 110.) When Feight resigned from RHI, Radke tried to convince Feight to stay. (4/20/00 N.T. 110.)

V. *Feight's Clients at RHI*

(25) There is significant overlap between the clients of Accountemps and Affiliates. The Affiliates division has about 750 clients, and 360 of those clients are also Accountemps clients. (5/1/00 N.T. 79, 84.)

(26) Feight had approximately 260 clients out of which she received commissions for placement of accounting and finance employees. (5/1/00 N.T. 30; exhibit D-2.) Of those 260 clients, 13 were law firms: Cozen & O'Connor (4/20/00 N.T. 92); Dechert Price & Rhoads (4/20/00 N.T. 60); Dilworth Paxson (4/20/00 N.T. 49); Drinker Biddle & Reath (4/20/00 N.T. 14, 93); Duane Morris & Hecksher (4/20/00 N.T. 29); McCann & Geschke (exhibit D-2); Obermeyer Rebmann Maxwell & Hippel (4/20/00 N.T. 58, 94); Reed Smith Shaw & McClay (4/20/00 N.T. 22, 26); Seidel Gonda (exhibit D-2); Spector, Gadon & Rosen (4/20/00 N.T. 54, 95); Stradley Ronan Stevens & Young (4/20/00 N.T. 61, 62, 95); Swartz Campbell & Detweiler **[\*\*137]** (4/20/00 N. **[\*10]** T. 46-48, 96); and Wolf Block Schorr & Solis-Cohen (4/20/00 N.T. 41-42, 97). (Exhibit D-2.) n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 At the hearing, Feight offered exhibit D-3 into evidence under Pa.R.E. 1006 as a summary of documents that Feight received from RHI. After reviewing the underlying documents, RHI objected to this exhibit. (See 5/3/00 letter to the court from Barton *and* 5/1/00 N.T. 54-56.)

The court sustains the objection substantially for the grounds raised in counsel's 5/3/00 letter. Columns 4 and 5 of exhibit D-3 are based not on the RHI documents, but on the hearing testimony of Feight and Rocco. The court notes that the admission of exhibit D-3 would have had no effect on the court's decision in this matter. Most of the information in columns 1, 2, 4 and 5 of exhibit D-3 is contained in Feight's and Rocco's testimony. The commission amounts listed in column 3 -- which the court has not considered -- are less important than whether Feight had a hiring contact at each firm, which indicates that Feight established some good will with that firm on RHI's behalf.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*11]**

(27) Cozen & O'Connor and Dechert Price & Rhoads were not Feight's clients and Feight did not have a contact person at either firm. Feight received credit for placing orders at these firms only while working desk. (4/20/00 N.T. 56, 90, 92.)

(28) RHI encourages the Accountemps sales staff to inform clients of the services that other RHI divisions offer. (4/20/00 N.T. 51-53, 105; 5/1/00 N.T. 68, 82.) RHI calls this practice "cross-selling." (4/20/00 N.T. 51-53, 105; 5/1/00 N.T. 68, 82.) But as an Accountemps staffing manager, Feight was permitted only to place accounting and financial personnel. (4/20/00 N.T. 51-53, 89-91; 5/1/00 N.T. 68.) Therefore, when an existing Accountemps client of Feight told Feight that the client had a legal opening, RHI required Feight to refer the client to a staffing manager in the Affiliates division, who then attempted to fill the order. (4/20/00 N.T. 51, 89-91; 5/1/00 N.T. 24.) RHI calls such a cross-division **[**138]** referral "flipping an order." (4/20/00 N.T. 51.) Similarly, when Feight received a lead for a legal placement, Feight did not attempt to make the placement, but instead referred the lead to someone in the Affiliates division. (5/1/00 N. **[*12]** T. 59-60.)

(29) Feight received credit for flipping three orders for legal placements to the Affiliates. (4/20/00 N.T. 90; 5/1/00 N.T. 25.) The clients for these three placements were Schnader Harrison Segal & Lewis, Duane Morris & Hecksher, and Dilworth Paxson. (4/20/00 N.T. 56, 60, 92, 94; 5/1/00 N.T. 25, 49, 95.) In total, Feight received about $ 70 in commissions for flipping these orders. (4/20/00 N.T. 91; 5/1/00 N.T. 25.)

(30) The total number of law firm clients for which Feight received credit for either a financial or legal placement was 14.

(31) At RHI Feight had hiring contacts at two law firms with which she made no placements: Morgan Lewis & Bockius and Stevens & Lee. (4/20/00 N.T. 9, 57-58.) n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 RHI alleges that many of Feight's non-law firm corporate clients at RHI have legal departments in which Affiliates makes placements. Based on this allegation, RHI argues that Feight's relationships with Affiliates clients go beyond the 16 listed law firms. The court disagrees. Accepting these allegations as true, there is no evidence that any of these corporate clients are also Legal Search clients. There is no evidence that Feight has contacted these corporate clients since leaving RHI. There is no evidence or even an allegation that Feight's financial placement contact at any of these corporate clients was also responsible for legal placement.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*13]**

VI. *The RHI Database*

(33) RHI maintains a database of clients. Before September 1999, the Accountemps division and the Affiliates **[\*\*139]** division each maintained a separate database. In September 1999, the databases merged, such that one database now contains both financial and accounting clients and legal clients. (4/20/00 N.T. 63, 113.)

(34) For each client, the database contains the client name, address, phone number, fax number, e-mail address, contact name, history of conversations with RHI representatives, history of RHI placements, pay rates, billing rates and credit history. (4/20/00 N.T. 24, 64, 103).

(35) Feight accessed the database daily while at RHI. (4/20/00 N.T. 63, 104.)

VII. *Feight's Job at Legal Search*

(36) In February 2000, Feight accepted a job as director of legal staffing at Legal Search. (4/20/00 N.T. 122, 124; 5/1/00 N.T. 35.) Feight's salary at Legal Search is $ 57,000 per year plus guaranteed commissions of $ 7,000 the first quarter and $ 10,000 each additional quarter. (4/20/00 N.T. 124.)

(37) Legal Search's office is at 1515 Market Street and within 50 miles of the RHI Philadelphia office where Feight worked. (4/20/00 N.T. 13, 98.) **[\*14]**

(38) Legal Search is a direct competitor of the Affiliates. (4/20/00 N.T. 98, 106, 120.) Both companies place temporary and permanent clerical workers, legal secretaries, paralegals and attorneys. (4/20/00 N.T. 106, 120.) Legal Search calls on the same clients as the Affiliates, and sometimes recruits the same candidates. (4/20/00 N.T. 122.)

(39) Legal Search does not place accounting and financial personnel and does not compete with Accountemps. (4/20/00 N.T. 127.)

**[\*\*140]** (40) In her final weeks at RHI, Feight discussed the Legal Search job -- including the issue of her restrictive covenant -- with three RHI employees: Nick Araco, division director of Affiliates in Philadelphia; Tina Bardo, division director of Office Team in Philadelphia; and Kelly Marciani, division director of Office Team in Wilmington, Delaware. (5/1/00 N.T. 40-41, 57.) Feight claims that all three told her that there was nothing to worry about in accepting the Legal Search job. (5/1/00 N.T. 41.)

(41) Feight gave written notice of resignation in or about the end of February 2000. (4/20/00 N.T. 79, 108, 124, 134; plaintiff's proposed findings of fact PP 27, 32; defendant's proposed findings of fact P16). **[\*15]** Feight told her supervisors -- Schorr and Radke -- that she would be working as a manager of a small office in the mortgage industry. (4/20/00 N.T. 81-82; 5/1/00 N.T. 84.) Feight did not tell Schorr or Radke that she was going to work for Legal Search.

(42) Feight's responsibilities at Legal Search include calling on clients who seek to fill permanent paralegal and legal secretarial positions, recruiting candidates for those positions, and managing the office. (4/20/00 N.T. 122; 5/1/00 N.T. 35-38.) Feight is not involved in placing temporary candidates. (4/20/00 N.T. 125; 5/1/00 N.T. 30.)

(43) After Feight left RHI, Radke learned that Feight was working for Legal Search. (4/20/00 N.T. 111.) Radke called Feight at Legal Search to inform her that she was in violation of the employment agreement. (4/20/00 N.T. 111; 5/1/00 N.T. 48-49.) Feight told Radke that she did not know that she had an employment agreement. (4/20/00 N.T. 112.)

**[\*\*141]** VIII. *Feight's Solicitation of Affiliates Clients on Behalf of Legal Search*

(44) Feight's supervisor at Legal Search is Mark Rocco. (4/20/00 N.T. 14, 121.)

(45) The identities of prospective clients are available on the internet, in the **[*16]** legal directory, in the membership directory of the Association for Legal Secretaries, and in the phone book. (4/20/00 N.T. 122-23; 5/1/00 N.T. 38-39.)

(46) While at Legal Search, at Mark Rocco's request, Feight contacted and attempted to place permanent legal personnel at six of the law firms with which she had placed personnel while at RHI: Dilworth Paxson, Drinker Biddle & Reath, Duane Morris, Reed Smith, Swartz Campbell & Detweiler, and Wolf Block. (4/20/00 N.T. 27, 37, 48, 92-97, 122-23.)

(47) Jane Sheridan is in the human resources department of Drinker Biddle & Reath and is responsible for hiring financial and legal personnel. (4/20/00 N.T. 132, 138.) In addition to RHI, Sheridan deals with about 20 placement agencies. (4/20/00 N.T. 137.)

(48) While Feight was at RHI, Feight had a good relationship with Sheridan, called her on a monthly basis, and placed at least one temporary financial candidate through Sheridan. (4/20/00 N.T. 93, 133-35.)

(49) At RHI, Feight did not place or attempt to place legal personnel with Sheridan. Sheridan dealt with the Affiliates for legal placement. (4/20/00 N.T. 136.)

(50) In March 2000, Feight called Sheridan on Legal Search's behalf in an **[*17]** attempt to place a legal secretary or paralegal, but Sheridan had no hiring needs at that time. (4/20/00 N.T. 93, 134-35.)

**[\*\*142]** (51) Sheridan has had no legal hiring needs since Feight left RHI and has hired no legal personnel through RHI or Legal Search since then. (4/20/00 N.T. 135.)

(52) Feight's Legal Search placement contact at Dilworth Paxson, Reed Smith and Swartz Campbell is a different person than her RHI placement contact at each of those firms. (4/20/00 N.T. 22-26, 46-49, 96.)

(53) As of April 20, 2000, Feight had placed no personnel through Legal Search. (4/20/00 N.T. 34, 129.) There is no evidence that Feight has caused RHI to lose business.

(54) There is no evidence that Feight has taken any confidential documents from RHI. (4/20/00 N.T. 114, 127; 5/1/00 N.T. 38.)

IX. *New Hires at RHI*

(55) After Feight resigned from RHI, Accountemps hired two staffing managers for the Philadelphia office, and Affiliates hired two staffing managers or account executives for the Philadelphia office. (5/1/00 N.T. 8586.)

## DISCUSSION

RHI seeks a preliminary injunction ordering Feight to leave her current job based on alleged violations of three covenants: the non-disclosure **[*18]** agreement, the general agreement not to compete and the non-solicitation agreement. RHI has failed to show that Feight has violated the non-disclosure agreement. The court will enforce the remaining agreements to the full extent necessary to protect the legitimate business interests of RHI. On the record presented, however, the agreements are overbroad **[\*\*143]** because they would effectively bar Feight from working for any employee placement agency in the greater Philadelphia area for one year. Such a restriction is not necessary to protect the legitimate

business interests of RHI, and would impose an undue burden on Feight. For this reason, the court will modify and enforce the covenants to prohibit Feight from dealing with the 16 law firms that were her clients at RHI.

I. *The Non-Competition and Non-Solicitation Agreements Are Enforceable to the Extent That They Protect Customer Relationships That Feight Established on Behalf of RHI*

A. Standard of Review for Enforceability of Restrictive Covenants

The court must first determine whether the covenants are enforceable. *HN1*A restrictive covenant between an employer and an employee is enforceable at equity only if (1) it is ancillary **[*19]** to an employment relation, (2) it is reasonably limited in duration and geographic scope, and (3) enforcement is necessary to protect a legitimate business interest of the employer without imposing an undue hardship on the employee. *John G. Bryant Co. Inc. v. Sling Testing & Repair Inc.*, 471 Pa. 1, 8, 369 A.2d 1164, 1168 (1977); *Boldt Machinery & Tools Inc. v. Wallace*, 469 Pa. 504, 511-12, 366 A.2d 902, 906 (1976); *Sidco Paper Co. v. Aaron*, 465 Pa. 586, 591, 351 A.2d 250, 252 (1976); *Thermo-Guard Inc. v. Cochran*, 408 Pa. Super. 54, 64-65, 596 A.2d 188, 193 (1991). The burden of establishing the unenforceability of the covenants rests on the employee. *John G. Bryant Co.*, 471 Pa. at 9-10, 369 A.2d at 1169. The court must consider **[**144]** the facts and circumstances on a case-by-case basis. *Insulation Corp. of America v. Brobston*, 446 Pa. Super. 520, 530, 667 A.2d 729, 733-34 (1995). If the restrictive covenant meets this three-part test it is prima facie enforceable at equity. *John G. Bryant Co.*, 471 Pa. at 8, 369 A.2d at 1167; *Bettinger v. Carl Berke Associates Inc.*, 455 Pa. 100, 103-104, 314 A.2d 296, 298 (1974). **[*20]**

B. The Covenants Are Ancillary to Feight's Employment Relation with RHI

*HN2*To be ancillary to an employment relation, a covenant must be supported by adequate consideration. *Insulation Corp. of America v. Brobston*, 446 Pa. Super. 520, 529, 667 A.2d 729, 733 (1995). Since Feight's covenants were incident to RHI's hiring her, the covenants are supported by adequate consideration. That Feight did not sign the contract until already having accepted employment with RHI, in itself, does not make the covenant invalid. *Beneficial Finance Co. of Lebanon v. Becker*, 422 Pa. 531, 536, 222 A.2d 873, 876 (1966) (holding that restrictive covenant was ancillary to the taking of employment when all of the plaintiff's employees were required to sign restrictive covenants, the defendant signed the contract two days after he started working for plaintiff, and the plaintiff signed the contract nine days after that); *Harsco Corp. v. Klein*, 395 Pa. Super. 212, 219 n.4, 576 A.2d 1118, 1122 n.4 (1990). As long as the covenant is ancillary to the taking of regular employment rather than "an after-thought to impose additional restrictions on the unsuspecting **[*21]** employee," the contract is supported by valid consideration. *Beneficial Finance Co.*, 422 Pa. at 536, 222 A.2d at 876. That RHI regularly includes the same covenant in other employees' contracts **[**145]** and that Feight signed the contract on her first day of employment show that the covenant is not an impermissible "after-thought." *Id.*

C. The Non-Competition and Non-Solicitation Agreements Are Reasonably Limited in Time and Geographic Scope

Feight *HN3*bears the burden of showing that the time and geographic extent of the non-competition and non-solicitation agreements are not reasonable. See *John G. Bryant Co.*, 471 Pa. at 9, 369 A.2d at 1169. ("The law is clear that the burden is on him who sets up unreasonableness as the basis of contractual illegality to show how and why it is unlawful.") The duration of the covenant is reasonable if it is no longer than necessary for RHI to "put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers." *Robert Clifton Associates v. O'Connor*, 338 Pa. Super. 246, 255, 487 A.2d 947, 952 (1985).

RHI has already hired two new **[*22]** employees each for the Accountemps and Affiliates divisions. The court must determine how much time is reasonable for RHI to train Feight's replacements and for these replacements to demonstrate their effectiveness to Feight's old clients. n5 Feight testified that three months is the amount of time to train fully a new staffing manager. In addition, in her two **[**146]** months at Legal Search, Feight -- who by all accounts is an excellent saleswoman -- has not placed an employee.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Affiliates employees Nick Araco and Andy Sheppard already have business relationships with Drinker Biddle & Reath. (4/20/00 N.T. 136-37.) There is no evidence that Affiliates employees have established relationships with or made placements with the other 15 firms, which might indicate that a shorter time is reasonable.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The frequency of Feight's contact at RHI with her clients is also relevant: in industries involving frequent client contact, the new employee generally needs less time to demonstrate his effectiveness. *Boldt Machinery & Tools*, 469 Pa. at 513-14, 366 A.2d at 907 **[*23]** (citing Professor Blake's article). In industries requiring infrequent client contact, the new employee generally needs more time. *Id.* At RHI, Feight telephoned each client every 30 to 120 days. Since it may take several calls for the new employee to demonstrate his effectiveness, one year seems reasonable.

Absent any other evidence on the subject, the court cannot conclude at this time that one year is unreasonable for RHI's employees to establish relationships with and demonstrate their effectiveness to Feight's former clients. See *Robert Clifton & Associates*, 338 Pa. Super. at 256, 487 A.2d at 952 (holding that one-year restrictive covenant in contact of former employee of employment agency was reasonable); *Bettinger*, 455 Pa. at 104, 314 A.2d at 298 (same).

Feight does not address the geographic scope of the covenant in her brief, and the court need not decide whether 50 miles is reasonable. Because the court will bar Feight from dealing with her 16 former law firm clients, the geographic scope of the covenant as enforced will be inherently reasonable. See *Boldt Machinery*, 469 Pa. at 516, 366 A.2d at 908 (stating that an employer's **[*24]** legitimate business interest in enforcing a restrictive covenant extends no further than the employee's sales territory).

 **[**147]** D. Enforcement of the Non-Competition and NonSolicitation Covenants Is Necessary Only To Protect the Client Good Will That Feight Established on Behalf of RHI

Though the covenants meet the first two elements for enforceability, the non-competition and non-solicitation agreements are broader than necessary to protect RHI's legitimate business interests. *HN4*⚡"Trade secrets of an employer, customer good will and specialized training and skills acquired from the employer are all legitimate interests protectible through a general restrictive covenant." *Thermo-Guard Inc. v. Cochran*, 408 Pa. Super. 65, 596 A.2d at 193-94. See also, *Sidco Paper Co.*, 465 Pa. at 591-94, 351 A.2d at 252-54 and *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 631, 136 A.2d 838, 846 (1957). Though RHI argues that all three of these interests are implicated here, it is clear that enforcement of the non-competition and non-solicitation covenants is necessary only to protect the client good will that Feight established on RHI's behalf **[*25]** with 16 identifiable law firms.

1. *RHI has a legitimate business interest in protecting the client good will that Feight*

*established while at RHI*

The Pennsylvania Supreme Court has repeatedly recognized the employer's right to protect, by non-competition and non-solicitation agreements, interest in customer good will acquired through the efforts of the employee. See *e.g.*, *John G. Bryant Co.*, 471 Pa. at 8, 369 A.2d at 1168; *Sidco Paper Co.*, 465 Pa. at 591, 351 A.2d at 252-53; *Morgan's Home Equip. Corp.*, 390 Pa. at 631, **[\*\*148]** 136 A.2d at 846. In a passage often quoted by Pennsylvania courts, Professor Harlan Blake discussed the nature of the employer's right to protect good will:

"In almost all commercial enterprises . . . contact with customers or clientele is a particularly sensitive aspect of the business. . . . In most businesses . . . as the size of the operation increases, selling and servicing activities must be at least in part decentralized and entrusted to employees whose financial interest in the business is limited to their compensation. The employer's sole or major contact with buyers is through these agents **[\*26]** and the success or failure of the firm depends in part on their effectiveness. . . . The possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available. Thus, some customers may be persuaded, or even be very willing, to abandon the employer should the employee move to a competing organization or leave to set up a business of his own. . . .

"The employer's point of view is that the company's clientele is an asset of value which has been acquired by virtue of effort and expenditures over a period of time, and which should be protected as a form of property. Certainly, the argument goes, the employee should have no equity in the custom which the business had developed before he was employed. Similarly, ^HN5^under traditional agency concepts, any new business or improvement in customer relations attributable to him during his employment is for the sole benefit of the principal. This is what he is being paid to do. When he leaves the company **[\*\*149] [\*27]** he should no more be permitted to try to divert to his own benefit the product of his employment than to abscond with the company's cashbox."

Harlan Blake, *Employee Agreements Not to Compete*, 73 Harv.L.Rev. 625, 653-54 (1960), quoted in *John G. Bryant Co.*, 471 Pa. at 8-9, 369 A.2d at 1167-68; also quoted in *Sidco Paper Co.*, 465 Pa. at 593-94, 351 A.2d at 253-54 (1976). After quoting this passage, the court in *John G. Bryant Co.* concluded

"*It is clear that the interest sought to be protected by the issuance of the preliminary injunction was that relationship which had been established on behalf of appellees' companies through the efforts of the former employee.* . . . This is clearly an interest which is incapable of adequate protection by monetary damages and the use of equitable relief is needed to avoid the threatened harm." *John G. Bryant Co. v. Sling Testing & Repair Inc.*, 471 Pa. 1, 9, 369 A.2d 1164, 1167-68 (1977) (emphasis added), quoted in *Robert Clifton Associates*, 338 Pa. Super. at 255, 487 A.2d at 951-52. See also, *Boldt Machinery & Tools Inc. v. Wallace*, 469 Pa. 504, 513-14, 366 A.2d 902, 906 (1976) **[\*28]** (affirming preliminary injunction enforcing restrictive covenant to protect the employer's interest in customer relationships developed by the employee) and *Wainwright's Travel Service Inc. v. Schmolk*, 347 Pa. Super. 199, 205, 500 A.2d 476, 478 (1985) (stating that the "contacts and good will built up by Schmolk are certainly a protectable interest" and that "it could be reasonably found that Schmolk's employment by Fantasy would cause irreparable harm to Wainwright's by disturbing business relationships established by Schmolk as a representative of Wainwright's . . .").

 **[\*\*150]** Professor Blake's reasoning is especially applicable to RHI and Feight and the employee placement field. See *Robert Clifton Associates v. O'Connor*, 338 Pa. Super. 246,

255, 487 A.2d 947, 951-52 (1985) (quoting the above passage from *John G. Bryant Co*. and Professor Blake as support for enforcing a non-competition agreement against the former employee of a temporary help agency). By all accounts, employee placement is a very competitive field. Over 20 placement agencies compete for Sheridan's business at Drinker Biddle & Reath. Many Affiliates clients are also Legal **[*29]** Search clients. The products supplied by Affiliates and Legal Search -- legal personnel -- are essentially identical; the two companies often recruit and place the same candidates. Thus, the strength of the relationship that Feight establishes with hiring contacts like Sheridan are crucial to successful and continued candidate placements. In *Bettinger v. Carl Berke Associates*, 455 Pa. 100, 104, 455 A.2d 296, 298 (1974), the Superior Court focused on such relationships to enforce a restrictive covenant against the former salesman of a temporary help agency. In *Bettinger*, the defendant's "sole job was to maintain the close affiliations with prospective employers of temporary help." *Id.* The defendant testified that customer contact was crucial in the business, and regular contact with each customer was necessary for keeping that customer. *Id.*

Like the defendant in *Bettinger*, Feight testified that frequent calls to hiring contacts like Sheridan are important for maintaining the strength of the relationship. Feight's relationship with Sheridan is good. It is foreseeable that based on Feight's relationships with hiring contacts like Sheridan -- relationships **[*30]** that Feight established on RHI's behalf -- these hiring contacts might **[**151]** transfer some business to Legal Search. RHI has a right to protect these relationships through enforcement of the covenants until other RHI employees are able to establish their own relationships with Feight's RHI clients. *John G. Bryant Co.*, 471 Pa. at 9, 369 A.2d at 1168 (affirming issuance of a preliminary injunction enforcing a restrictive covenant where "the interest sought to be protected . . . was that relationship which had been established on behalf of [plaintiff's] companies through the efforts of the former employee . . ."); *Robert Clifton Associates*, 338 Pa. Super. at 255, 487 A.2d at 952.

Because RHI's legitimate business interests extend no further than protecting the good will that Feight established on RHI's behalf, however, the non-competition and non-solicitation agreements are too broad. *John G. Bryant Co.*, 471 Pa. at 9, 369 A.2d at 1168. Of the Affiliates' 760 law firm clients and of the other law firms and corporate legal departments within 50 miles of the RHI Philadelphia office, Feight is credited with sales to only 14 law firms. **[*31]** RHI showed that Feight established customer relationships with two other firms on RHI's behalf. n6 Together, these 16 law firms represented about 6 **[**152]** percent of Feight's 260 clients at RHI. Feight did not establish a relationship on RHI's behalf with the 744 remaining law firms, and Feight will not divert the product of her RHI employment by soliciting those 744 firms on Legal Search's behalf. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 Feight solicited business from Morgan Lewis & Bockius and Stevens & Lee on RHI's behalf, but made no placements at these firms. At the hearing, she readily identified Tony Messari and Tammy Miller as her respective hiring contacts at the two firms. She even referred to Morgan Lewis as her "client." Certainly Feight established some good will with both of these firms. Feight bears the burden of showing the covenants are unnecessary to protect a legitimate business interest. Though it may be arguable that Feight's failure to place a candidate at either of these firms indicates that the customer relationship was weak and unworthy of protection, the court holds that Feight has not carried her burden of proof. In *Certified Laboratories of Texas v. Rubinson*, 303 F. Supp. 1014, 1023-24 (E.D. Pa. 1969), the court reached a similar result. Relying on *Morgan's Home Equip. Corp.*, the court held that enforcement of blanket territorial restrictions in the defendant salesmen's restrictive covenants were not necessary to protect a legitimate business interest. *Id.* Instead, the court enjoined the salesmen from soliciting and selling any accounts called on while in the plaintiff's employ, regardless of whether the accounts were actually sold. *Id.* at 1023-24,

1029.

The court's order will prohibit Feight from soliciting, contacting or otherwise engaging in business relationships with Morgan Lewis & Bockius and Stevens & Lee. **[\*32]**

n7 Feight admits that of the average 100 daily calls she took while on desk, many were from law firms. Based on these telephone contacts, RHI argues that Feight's law firm relationships exceed 16. But the record shows that any such contacts were brief and did not rise to the level of protectible relationships. Feight's relationships were strong because of the constant contact she had with her clients. It follows that Feight's relationship was not strong with firms with which she had only a single or sporadic telephone contact and placed no candidates.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Therefore, RHI has no legitimate business interest in barring Feight from soliciting the 744 firms with whom Feight had no relationship. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 Since Feight was not involved in legal candidate recruitment at RHI, Feight could not have established good will with legal candidates on RHI's behalf. Therefore, RHI has no legitimate business interest in barring Feight from recruiting legal candidates on Legal Search's behalf.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*33]**

2. *RHI has no legitimate business interest in protecting the identities of clients and hiring contacts known to Feight, because these identities are not trade secrets*



Distinct from RHI's protection of the relationships with its legal clients and candidates is protection of the confidentiality **[\*\*153]** of the identities of those clients and candidates as trade secrets. *HN6* With or without a confidentiality agreement, RHI is entitled to protect its trade secrets from disclosure. *Bell Fuel Corp. v. Cattolico*, 375 Pa. Super. 238, 250, 544 A.2d 450, 458 (1988). Feight's non-disclosure agreement identifies RHI's customer information as "trade secrets." (Exhibit P-1, P9.) Though confidential customer data may be entitled to protection as a trade secret, "customer lists [are] at the very periphery" of trade secret law. *Renee Beauty Salons v. Blose-Venable*, 438 Pa. Super. 601, 604, 652 A.2d 1345, 1347 (1995) (affirming order denying protection of employer's customer lists). See also, *Carl A. Colteryahn Dairy v. Schneider Dairy*, 415 Pa. 276, 283, 203 A.2d 469, 471 (1964) (stating that "[customer] lists are generally not the type of **[\*34]** secrets which require equitable preservation."); *Fidelity Fund Inc. v. DiSanto*, 347 Pa. Super. 112, 121, 500 A.2d 431, 436 (1985); *Bettinger*, 455 Pa. at 103, 314 A.2d at 298. As the plaintiff, RHI bears the burden of showing that the information was a trade secret and that Feight misappropriated the information in violation of a contract or in violation of a confidential relationship. *Fidelity Fund Inc. v. DiSanto*, 347 Pa. Super. 112, 121, 500 A.2d 431, 436 (1985).

In this case, RHI has failed to show that the customer information that Feight now possesses is a trade secret. *HN7* Whether an employment agency's client and candidate lists are trade secrets entitled to protection depends on whether they are "the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged." *Bettinger v. Carl Berke Associates*, 455 Pa. 100, 105, 314 A.2d 296, 298 (1974). See also, *Spring Steels Inc. v. Molloy*, 400 Pa. 354, 162 A.2d 370 (1960) **[\*\*154]** (stating that a former employee

may use non-confidential customer lists although he "cannot properly use confidential information **[\*35]** peculiar to his employer's business and acquired therein"). In *Bettinger*, the court held that the client lists of a temporary help agency were not entitled to trade secret protection because the names of companies who were in the market for temporary help were widely known throughout the industry. *Id.* See also, *Harsco Corp. v. Klein*, 395 Pa. Super. 212, 218, 576 A.2d 1118, 1121 (1990) (stating that the identities of the employer's customers were not confidential where those identities "would be generally known to all firms in the same business as" the employer). Similarly, the identities of firms seeking legal help are also widely known or readily available in the legal placement industry.

RHI has shown that Feight has knowledge of the identities of at least 16 of RHI's law firm clients and of the identities of the contacts at some of those clients, and it is reasonable to conclude that she knows the identities of other clients. The record shows that potential clients for the placement of legal personnel are widely known throughout the legal placement trade. It is not a secret that law firms and corporations with legal departments are in the hiring market **[\*36]** for legal personnel. The identities of those firms and corporations are available through resources like the internet, the legal directory, the Membership Directory of the Association for Legal Secretaries and the phonebook. Findings of fact, P45. *HN8*"Equity will not protect mere names and addresses easily ascertainable by observation or reference to directories." *Carl A. Colteryahn Dairy v. Schneider Dairy*, 415 Pa. 276, 279, 203 A.2d 469, 471 (1964), quoted in *Renee Beauty Salons*, 438 Pa. Super. 609, 652 A.2d at 1349-50 **[\*\*155]** (holding that lists of hair salon's customers' names, telephone numbers and styling preferences were not protectible trade secrets because the information was easily obtainable through a number of sources). Furthermore, before hiring Feight, Legal Search already established relationships with several of the law firms about which RHI complains, and had placed legal personnel in many of those firms. See Restatement (Third) of Unfair Competition § 42, cmt. f (1995) (stating that "solicitation of the same customers by a number of competitors is evidence that the customer identities are generally **[\*37]** known or readily ascertainable in the trade.").

RHI also argues that the identities of its hiring contacts are protectible. But one can identify the hiring contact at each firm simply by calling that firm and asking for the person in charge of hiring legal personnel. The Superior Court has held that information easily ascertainable by calling known customers is not protectible. *Fidelity Fund*, 347 Pa. Super. at 122, 500 A.2d at 431 (holding that the policy expiration dates of insurer's customers was not protectible because a competitor would "merely need to contact the customers to get such information.").

The information that RHI seeks to protect is widely known throughout the industry or readily ascertainable. This information is not a trade secret, and its protection is not a legitimate business purpose on which to base enforcement of the non-competition and non-solicitation agreements.

RHI's database also contained detailed information about law firm clients and candidates -- for instance, the billing and pay rates and placement histories for each client and the placement histories of candidates. RHI may **[\*\*156]** have a legitimate business interest in this **[\*38]** specialized information. See *e.g., Air Products and Chemicals Inc. v. Johnson*, 296 Pa. Super. 405, 418-20, 442 A.2d 1114, 1121 (1982) (affirming trial court's holding that business plans, bidding procedures and financial projections not generally known in the industry were protectible as trade secrets); *Robinson Electronic Supervisory Co. v. Johnson*, 397 Pa. 268, 270, 154 A.2d 494, 495 (1959) (affirming order enjoining defendants from competing with plaintiff, their former employer, where defendants, "through their employment relationship with plaintiff, became familiar with the special problems and details of many potential customers' business establishments" and after leaving the plaintiff's employ, used this information to compete with the plaintiff); *Den-Tal-Ez Inc. v. Siemens Capital Corp.*, 389 Pa. Super. 219, 251, 566 A.2d 1214, 1230 (1989) (holding that

projections, unit costs and product-by-product profit margins were protected as trade secrets); Restatement (Third) of Unfair Competition § 42, cmt. f (stating that a compilation of specific information about individual customers may be **[\*39]** sufficiently valuable and secret to qualify as a trade secret). But there is no evidence that Feight took copies of this information when she left RHI. There is no evidence that Feight memorized such detailed information from the database of legal clients and candidates -- a client base with which she was at most tangentially interested and a candidate base with which she was not interested at all. Therefore, RHI has failed to show that Feight misappropriated this information.

**[\*\*157]** 3. *RHI has no legitimate business interest in protecting the training and business methods that it provided to Feight because this information is not specialized to RHI*

RHI also argues that it has a legitimate business interest in protecting the training and skills that it provided to Feight. *HN9* The protection of specialized training and skills and carefully guarded business methods may rise to the level of a legitimate business interest. *Morgan's Home Equipment*, 390 Pa. at 632, 136 A.2d at 846; *Thermo-Guard Inc.*, 408 Pa. Super. at 65, 596 A.2d at 193-94. n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 Paradoxically, as the particularity and, therefore, the protectibility of the skills conveyed to the employee increase, so does the hardship imposed on the employee by enforcement of a non-competition agreement. If the employer trains the employee in highly specialized techniques, the employee "may encounter difficulty in transferring his particular experience and training to another line of work, and hence his ability to earn a livelihood is seriously impaired" by enforcement of the covenant. *Morgan's Home Equipment Corp.*, 390 Pa. at 632, 136 A.2d at 846.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*40]**

The skills that Feight was trained for and developed at RHI -- soliciting clients by telephone, developing and maintaining client relationships, referring leads to other divisions, interviewing candidates, responding to help-wanted advertisements -- are not specialized to RHI or even to the legal employment industry. These skills are well-known sales techniques, not trade secrets. The protection of these techniques is not a legitimate business interest on which to base enforcement of a restrictive covenant. *Thermo-Guard Inc.*, 408 Pa. Super. at 66, 596 A.2d at 194 (holding that *HN10* advertising, cold-calling numbers drawn from the telephone book, and telephoning a list of prospective customers provided by the employer **[\*\*158]** were not specialized techniques subject to protection under a general **covenant not to compete**). n10 Therefore, the non-competition and non-solicitation agreements are not enforceable to protect the training and skills that Feight received at RHI.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 Pennsylvania courts typically enforce non-competition or non-solicitation covenants against salesmen to protect customer relationships and/or confidential customer information, see *e.g. Boldt Machinery & Tools*, 469 Pa. at 509, 366 A.2d at 902 (customer relationships); *John G. Bryant Co.*, 471 Pa. at 9, 369 A.2d at 1168 (customer relationships); *Sidco Paper Co.*, 465 Pa. at 591, 351 A.2d at 254 (customer relationships); *Bettinger*, 455 Pa. at 103, 314 A.2d at 298 (customer relationships); *Jacobson & Co. v. International Environment Co.*, 427 Pa. 439, 235 A.2d 612 (1967) (customer relationships); *Morgan's Home Equipment Corp.*, 390 Pa. at 623, 136 A.2d at 843 (customer relationships and confidential customer information); *Robert Clifton Associates*, 338 Pa. Super. at 254, 487 A.2d at 951-52

(customer relationships).

In *Pennsylvania Funds Corp. v. Vogel*, 399 Pa. 1, 159 A.2d 472 (1960), the Pennsylvania Supreme Court enforced a restrictive covenant against the manager of a mutual fund company to protect the training that the company gave him. The court described that training as *"an extensive and continuous training program . . . tailored to problems unique to the sale of mutual fund shares. . . ." Id.* at 7-8, 159 A.2d at 475. (emphasis in original) The defendant was not merely an employee. He was the plaintiff's manager for four years. *Id.* Feight's skills as an entry-level employee would not have been as extensive. Furthermore, Feight's training program was not continuous, but lasted only two or three weeks.

This court is aware of no other case where a Pennsylvania appellate state court enforced a restrictive covenant specifically to protect training or skills that an employer conveyed to a salesman. See *Boldt Machinery & Tools*, 469 Pa. at 509, 366 A.2d at 902 (recognizing that plaintiff's salesman of 14 years had received no specialized training or skills, but enforcing covenant on other grounds); *Morgan's Home Equipment Corp.*, 390 Pa. at 631, 136 A.2d at 846-47 (holding that non-competition agreement was not enforceable against door-to-door salesman where there was no evidence that salesman received specialized training and where non-disclosure and non-solicitation agreements adequately protected plaintiff's customer relationships and trade secrets); *Thermo-Guard Inc.*, 408 Pa. Super. at 66, 596 A.2d at 194 (holding that non-competition covenant was not enforceable to protect training and sales techniques that plaintiff conveyed to salesmen). Compare *Pennsylvania Funds Corp.*, 399 Pa. at 8, 159 A.2d at 475 (holding that training received by four-year manager of mutual fund company was specialized) with *Girard Investment Co. v. Bello*, 456 Pa. 220, 222, 318 A.2d 718, 720-21 (1974) (holding that defendant -- who had managed the branch office of a consumer loan company for 10 years -- had not received specialized training or skills, and affirming trial court's order denying enforcement of non-competition agreement).

- - - - - - - - - - End Footnotes- - - - - - - - - - - - **[*41]**

**[**159]** II. *There Is No Evidence That Feight Violated Her Non-Disclosure Agreement*

The information that Feight possesses about Affiliates clients and hiring contacts is not a trade secret. RHI admits that there is no evidence that Feight has taken any confidential information from RHI and given it to Legal Search. Therefore, the court concludes that Feight has not violated the non-disclosure agreement.

III. *RHI Is Not Estopped From Enforcing the Covenants*

Feight argues that RHI is estopped from enforcing the covenants. Feight offers two bases for this estoppel. First, Feight points to her testimony that three RHI division managers assured her that RHI would not enforce the covenants. Even accepting this undisputed testimony as true, the court must reject Feight's argument. Feight bears the burden of proving that she justifiably relied on the division managers' assurances. *Cosner v. United Penn Bank*, 358 Pa. Super. 484, 488, 517 A.2d 1337, 1339 (1986). Since Feight lied about the identity of her new employer to her own supervisors, Schorr and Radke, the **[**160]** court must conclude that *Feight anticipated that RHI would enforce the covenants against* **[*42]** her, and took the job anyway. n11 Thus Feight did not rely on the three managers' statements.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 Feight certainly acted inequitably when she lied to Schorr and Radke about the identity of her new employer. Unfortunately for RHI, however, *HN11*the doctrine of unclean hands does not apply to a defendant in an equity action. "In determining the issue of clean hands,

we look solely at the conduct of the plaintiff -- the one who seeks the aid of the chancellor -- and not the conduct of the defendant." *Salomon Smith Barney Inc. v. Vockel*, 2000 WL 558580, *4 (E.D. Pa.).


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Second, Feight points to RHI's failure to enforce restrictive covenants against three other Philadelphia-area RHI employees. (5/1/00 N.T. 45-48.) Accepting this undisputed testimony as true, the court must again reject Feight's argument. On the scant facts that Feight presented about these three employees, the court cannot determine at this point whether the covenants in these three employees' contracts -- whatever the terms of those covenants [*43] were -- were enforceable or whether these employees violated their covenants. See *Insulation Corp. of America v. Brobston*, 446 Pa. Super. 520, 530, 667 A.2d 729, 733-34 (1995) (stating that *HN12* "the determination of whether a post-employment restrictive covenant is reasonable, and therefore enforceable, is a factual one which requires the court to consider all the facts and circumstances."). And the court cannot conclude that Feight relied on these three incidents of non-enforcement in deciding to take the job at Legal Search.

[**161] IV. *The Court Will Modify the Covenants To Prohibit Feight From Soliciting or Performing Services for the Sixteen Law Firms That Were Her Clients at RHI*

The overbreadth of the covenants in Feight's contract does not, alone, render the covenants unenforceable. *HN13* "Where the covenant imposes restrictions broader than necessary to protect the employer, [the Pennsylvania Supreme Court has] repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions which are reasonably necessary for the protection of the employer." *Sidco Paper Corp. v. Aaron*, 465 Pa. 586, 595, 351 A.2d 250, 254 (1976). [*44] See also, *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 632-33, 136 A.2d 838, 847 (1957); *Insulation Corp. of America v. Brobston*, 446 Pa. Super. 520, 537, 667 A.2d 729, 737 (1995); *Thermo-Guard Inc. v. Cochran*, 408 Pa. Super. 54, 66, 596 A.2d 188, 194 (1991).

RHI has a legitimate business interest in protecting the good will that Feight established and maintained with the 16 law firms while working for RHI. Partial enforcement of the covenants -- applied only to those 16 firms -- is necessary to protect that good will. *John G. Bryant Co.*, 471 Pa. at 8, 369 A.2d at 1167-68. Broader enforcement of the covenants is not necessary to protect RHI's legitimate business interests. See *Morgan's Home Equipment Corp.*, 390 Pa. at 632, 136 A.2d at 846-47 (refusing to enforce general **covenant not to compete** where enforcement of non-disclosure and non-solicitation provisions adequately protected the employer's legitimate interest in customer good will generated by its ex-employees); *Thermo-Guard*, 408 Pa. Super. at 67, 596 A.2d at 194-95 (refusing to enforce general **covenant not to** [**162] [*45] compete** where enforcement of non-solicitation provision adequately protected the employer's legitimate interest in customer good will generated by its ex-employees); *Insulation Corp.*, 446 Pa. Super. at 537, 667 A.2d at 737-38 (refusing to enforce general **covenant not to compete** where enforcement of non-disclosure agreement adequately protected the employer's legitimate business interests); *Certified Laboratories of Texas v. Rubinson*, 303 F. Supp. 1014, 1023-24, 1029 (E.D. Pa. 1969) (refusing to enforce blanket territorial restrictions in defendant salesmen's restrictive covenants and enjoining the salesmen only from soliciting and selling any accounts called on while in the plaintiff's employ, regardless of whether the accounts were actually sold).

This modification will achieve a proper balance between protecting RHI's interests and not imposing an undue hardship on Feight. It is clear that hardship to Feight is a necessary consideration -- both under the reasonableness standard for restrictive covenants and under the test for preliminary injunctions. See *Insulation Corp.*, 446 Pa. Super. at 537, 667 A.2d at

737 (stating that enforcement **[\*46]** of a restrictive covenant must be necessary to protect a legitimate business interest without imposing an undue hardship on the employee) and *School District of Wilkinsburg v. Wilkinsburg Education Association*, 542 Pa. 335, 337-38 n.2, 667 A.2d 5, 6 n.2 (1995) (stating that harm from denying a preliminary injunction must outweigh harm from granting the injunction and that the injunction must be reasonably suited to abate the harm it is designed to prevent). RHI seems to have occupied the entire field of employee placement. RHI places both temporary and permanent personnel in administrative, legal, financial, information technology, and **[\*\*163]** web design positions. Were RHI entitled to full enforcement of the covenants as written, RHI could likely prevent Feight from working in the employee placement industry, even where her contacts and influence were nonexistent. To impose this heavy burden on Feight would tip the balance of reasonableness away from the protection of RHI's legitimate business interests and into the realm of undue oppression upon Feight's ability to earn a living. *Insulation Corp.*, 446 Pa. Super. at 537-38, 667 A.2d at 738. Under **[\*47]** these circumstances, partial enforcement of the covenants will achieve the necessary protection.

Drawing such a clear line of enforceability is of course not always possible. Where a defendant takes a new job soliciting a pool of customers with whom she had extensive contact in her old job, an order barring competition for any of the customers in the pool is proper without singling out the customers with which the defendant had actual contact. See *e.g., John G. Bryant Co.*, 471 Pa. at 9, 369 A.2d at 1169 (affirming enforcement of restrictive covenant against plaintiff's former employee, where former employee had been plaintiff's principal sales representative for 10 years and had personally serviced numerous accounts on plaintiff's behalf); *Sidco Paper Co.*, 465 Pa. at 589-90, 351 A.2d at 252 (affirming enforcement of general restrictive covenant against plaintiff's former employee, where employee went to work for competitor and began to "solicit business from the same customers he had dealt with" for seven years while working for plaintiff); *Robert Clifton Associates*, 338 Pa. Super. at 255, 487 A.2d at 952 (holding that restrictive **[\*48]** covenant was enforceable against former salesman for temporary agency, where the salesman worked for the agency **[\*\*164]** for 11 years, became one of the agency's top salesmen, and serviced "hundreds of clients" on the agency's behalf). Had Feight taken a job at Accountant Search instead of Legal Search, the court would likely order to Feight to resign from the new job. But where -- as here -- the defendant's contacts with the proscribed class of customers at her old job was limited, close scrutiny of the covenant to carve out a reasonable area of enforcement achieves the proper balancing of interests.

### V. *RHI is Entitled to a Preliminary Injunction Enforcing the Modified Non-Competition and Non-Solicitation Agreements*

Having determined the scope of enforceability of the covenants, the court must still determine whether RHI is entitled to a preliminary injunction enforcing the covenants. *Harsco Corp. v. Klein*, 395 Pa. Super. 212, 218, 576 A.2d 1118, 1122 (1990) (affirming order denying preliminary injunction where restrictive covenant was enforceable, because plaintiff failed to show likelihood of immediate and irreparable harm); *Rollins Protective Services Co. v. Shaffer*, 383 Pa. Super. 598, 602-603, 557 A.2d 413, 415 (1989) **[\*49]** (same). The court concludes that RHI has shown the elements for a preliminary injunction enforcing the modified non-competition and non-solicitation covenants.

$^{HN14}$ In determining whether to grant a preliminary injunction, a court may consider the averments of the pleadings and petition, affidavits of the parties or third parties, or any other proof. Pa.R.C.P. 1531. A preliminary injunction is "a most extraordinary form of relief which is to be granted only in the most compelling cases." *Goodies Olde Fashion Fudge Co. v. Kuiros*, 408 Pa. **[\*\*165]** Super. 495, 501, 597 A.2d 141, 144 (1991). "The purpose of a preliminary injunction is to preserve the status quo as it exists *or previously existed before the acts complained of*, thus preventing irreparable injury or gross injustice." *Maritrans GP Inc. v. Pepper Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1286 (1992). (emphasis in

original) The court may grant the injunction only if the moving party establishes the following elements:

(1) that relief is necessary to prevent immediate and irreparable harm that cannot be compensated by damages,

(2) that greater injury will occur from refusing the injunction [*50] than from granting it,

(3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct,

(4) that the wrong is actionable and an injunction is reasonably suited to abate that wrong, and

(5) that the plaintiff's right to relief is clear. See *School District of Wilkinsburg v. Wilkinsburg Education Association*, 542 Pa. 335, 337-38 n.2, 667 A.2d 5, 6 n.2 (1995); *New Castle Orthopedic Associates v. Burns*, 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978). These requisite elements "are cumulative, and if one element is lacking, relief may not be granted." *Norristown Municipal Waste Authority v. West Norriton Township Municipal Authority*, 705 A.2d 509, 512 (Pa. Commw. 1998).

RHI has shown that relief is necessary to prevent imminent, irreparable harm that money damages cannot compensate. Feight admits that she contacted six of the 16 law firms on behalf of Legal Search. The knowing solicitation of these customers in violation of the covenants [**166] is an "unwarranted interference with customer relationships that is unascertainable and not capable of being fully compensated [*51] by money damages." *John G. Bryant Co. v. Sling Testing & Repair Inc.*, 471 Pa. 1, 8, 369 A.2d 1164, 1168 (1977); *Rollins Protective Services Co. v. Shaffer*, 383 Pa. Super. 598, 602, 557 A.2d 413, 415 (1989). The evidence of these solicitations satisfies the irreparable harm requirement. *John G. Bryant Co.*, 471 Pa. at 8, 369 A.2d at 1167; *Rollins Protective Services Co.*, 383 Pa. Super. 602, 557 A.2d at 415 (affirming denial of preliminary injunction on basis of lack of irreparable harm where record established that former employer had not stolen or knowingly solicited employer's customers). But RHI will not suffer irreparable harm from Feight's solicitation of customers with whom she had no relationship at RHI. See *Harsco Corp. v. Klein*, 395 Pa. Super. 212, 218, 576 A.2d 1118, 1121 (1990) (holding that there would be no irreparable harm from alleged breach of restrictive covenant where national sales manager of building supplies company left to work for a competitor, because sales manager's former job did not involve customer contact).

Greater injury will occur from refusing the preliminary injunction [*52] than from granting it. If the court refuses to enforce the injunction at all, Feight will be free to exploit customer relationships -- which are RHI's assets -- to RHI's detriment. If the court grants the preliminary injunction, RHI can fairly re-establish its relationships with the 16 firms, and Feight can still ply her chosen trade with the hundreds of other law firms in and around the city.

A preliminary injunction prohibiting Feight from contacting the 16 law firms will restore the parties to the [**167] status quo that existed before Feight contacted any of those law firms.

It is clear that Feight solicited law firms with which she established relationships on RHI's behalf. Those solicitations are actionable. A preliminary injunction prohibiting such solicitations in violation of the modified non-competition and non-solicitation agreement is reasonably suited to abate the interference to RHI's relationships with those firms.

CONCLUSIONS OF LAW

(1) Enforcement of the modified non-competition and non-solicitation agreements is necessary to protect good will that Feight established with 16 law firms on RHI's behalf.

(2) Because the knowledge that Feight has about clients **[\*53]** and hiring contacts of Affiliates is not a trade secret and because RHI did not give Feight specialized training or skills, the non-competition and non-solicitation agreements are not enforceable to protect this information.

(3) The non-competition and non-solicitation agreements are ancillary to Feight's employment relationship with RHI.

(4) The non-competition and non-solicitation agreements, as modified, are reasonable in duration and geographic scope.

(5) Feight has not violated the non-disclosure agreement.

(6) RHI is not estopped from enforcing any of the covenants.

(7) If Feight continues to solicit Affiliates clients with whom she established relationships while at RHI, RHI **[\*\*168]** will suffer immediate irreparable harm that is incapable of protection by monetary damages.

(8) A greater injury will occur from denying the preliminary injunction than from partially granting the injunction.

(9) An injunction will restore the parties to the status quo.

(10) Feight's solicitation of the 16 firms is an actionable wrong. An injunction prohibiting Feight from dealing with those 16 firms is reasonably suited to abate that wrong.

(11) RHI's right to relief is clear.

(12) **[\*54]** These conclusions require that the court partially grant RHI's petition for preliminary injunction. The court's order will prohibit Feight from soliciting, contacting or otherwise engaging in business relations with the 16 firms until one year after the effective date of her resignation from RHI. n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 Though RHI alleges an effective date of March 3, 2000 in its proposed findings of fact, (plaintiff's proposed findings of fact PP 27, 32), the effective date does not appear in the record of hearing. (Findings of fact P41.) Various references in the record indicate that Feight's resignation was effective in late February or early March 2000. (4/20/00 N.T. 79, 108, 124, 134.)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On the basis of the record, the court will enter a contemporaneous order granting in part and denying in part the petition for preliminary injunction. The court will condition the order on RHI's filing a bond or depositing legal tender with the prothonotary in the amount of $ 25,000 within five days of the date of this order, Pa.R.C.P. 1531(b). **[\*55]**

Source:  **Combined Source Set 2**  **- Federal & State Cases, Combined; Federal Court Cases, Combined; State Court...**

Terms:  **Robert Half and "covenant not to compete"**  (Edit Search | Suggest Terms for My Search | Feedback on Your Search)

View:  Full

Date/Time:  Tuesday, May 15, 2007 - 8:21 PM EDT

* Signal Legend:

● -  Warning: Negative treatment is indicated

■ -  Questioned: Validity questioned by citing refs

▲ -  Caution: Possible negative treatment

◆ -  Positive treatment is indicated

Ⓐ -  Citing Refs. With Analysis Available

Ⓘ -  Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

**LexisNexis®**

About LexisNexis  | Terms & Conditions

Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.