UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT HALF INTERNATIONAL INC.,

        Plaintiff,

-against-

DAVID WOJDYL; and THE EXECU/SEARCH GROUP, INC.,

        Defendants.

Civ. A. No. 07-CIV-3821(RWS)

## DECLARATION OF EDWARD FLEISCHMAN

EDWARD FLEISCHMAN, being duly sworn, deposes and says under the penalty of perjury:

1. I am the Founder and CEO of The Execu/Search Group, Inc. ("Execu/Search") and, I am fully familiar with the facts and circumstances set forth below.

2. I submit this declaration in support of Defendants' Cross Motion to Vacate Temporary Restraining Order, in support of Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1) and in Opposition to Plaintiff's Motion for a Preliminary Injunction and Certain Expedited Discovery.

3. Execu/Search is a regional job placement firm, conducting business principally in New York, New Jersey and Connecticut. The Company has existed for 22 years and since 1994 has recruited and placed job candidates in the financial services industry. As of May 2007, Execu/Search had seven recruiters dedicated to this function.

## Overview of the Permanent Placement Industry for Financial Services

4. As a preliminary matter, I want to advise the Court that in job placement industry "permanent placements" are when a job candidate accepts employment with an employer with the expectation of continued employment. In contrast, "temporary placements" constitute placement of a job candidate with a customer for a temporary assignment. Robert Half International, Inc. ("RHI") and Execu/Search are in both the permanent and temporary placement business. The present dispute, however, appropriately relates only to the permanent placement business because that is the only type of recruiting Wojdyl conducted at either RHI or Execu/Search.

5. The two corporate parties in this action are employment placement agencies whose customers can be any entities in the financial services industry that employ people.

6. The customers are openly engaged in business in advertised locations and their names and addresses may readily be found by those engaged in the trade. Moreover, the identity of the employee of any potential customer, who is in charge of hiring permanent help, can be readily ascertained by a telephone call to the human resources department. Alternatively, many of the clients post their available positions (and the qualifications, experience and other criteria necessary to fill these positions) on their own internet sites or on commercial job sites such as Monster.com and Careerbuilder.com, which sites can be viewed by any and all placement recruiters or the public in general.

7. Similarly, the candidates post their resumes and other information on the same commercial websites and often use the services of several different placement firms

during their job searches. In other words, while RHI would like the Court to believe that Wojdyl and/or Execu/Search could possibly steal "its clients" and/or "its candidates," that is simply not the case. The clients and candidates do not "belong" to anyone – they are available to the public and to those permanent placement firms that look.

8. In paragraphs 10 and 11 of the Complaint, RHI claims that its relationships with "its clients" are based on their confidence in the quality of its services and recognition of its name. This is false. It is exceedingly rare that clients in this industry have any exclusive relationship or loyalty with a single placement firm. Instead, the clients usually use several different placement firms in their attempts to fulfill their hiring needs with qualified personnel. In particular, for the financial services sector, there is little (if any) client loyalty given the fact that are more jobs available than qualified applicants to fill the positions. Moreover, it is the clients, not the permanent placement firms, that establish the placement fees they are willing to pay. In other words, the clients "hold all the cards," and pricing information is readily available to all placement companies who simply contact the client.

9. Moreover, the vast majority of time the clients in this industry do not provide job orders (requests that open positions be filled) to simply one permanent placement company. Instead, the clients generally post job orders with many permanent placement firms in their desire to fill their open positions.

10. Similarly, job candidates (and detailed information respecting these candidates) is not the exclusive "property" of RHI or any permanent placement firm. Job candidates often rely on the services of several placement firms and they often

independently pursue job opportunities by posting their resumes on commercial internet job sites or responding to newspaper advertisements.

11.    It is apparent to me that RHI submitted a "canned complaint" to the Court because it asserts it has some "inside track" respecting candidates because it knows candidates' test scores and evaluations by various employers. *See* Complaint, ¶23. Such information, however, is not applicable to financial services candidates.

**Execu/Search's Interview and Hiring of David Wojdyl**

12.    On or about March 19, 2007, Defendant David Wojdyl ("Wojdyl") met with me and Gary Grossman and Mitchell Peskin, both of whom are Execu/Search shareholders.

13.    Execu/Search was and is a successful leader in the financial services sector of the permanent placement industry, and it did not need any information from RHI because it had its own databases of clients, job orders and candidates. Indeed, Execu/Search consistently has approximately 200 or more financial services industry job orders pending at ay given time and over 19,000 candidates in its financial services job candidate database. Indeed, the risks to Execu/Search of Wojdyl misappropriating RHI's information far outweighed the unlikely benefits Execu/Search would receive by having any information from RHI, a company with no recognizable presence in the financial services permanent placement industry. At present there are fewer available qualified job candidates in the financial services sector than available financial services industry jobs. It was, in part, for this reason that Execu/Search hired Wojdyl – not to exploit RHI's alleged confidential and proprietary information – but instead to comb through

4

Execu/Search's 19,000 candidate database and make contacts with candidates, which candidates Execu/Search could then match with the clients' job orders.

14.    Execu/Search has and had no interest in RHI's alleged confidential information because it has succeeded the past 13 years in the financial services sector by competing fairly. Indeed, prior to RHI's lawsuit, Execu/Search had never before been sued for any claims arising from an alleged breach of a restrictive covenant agreement. As a consequence, prior to and during the course of Wojdyl's subsequent employment with Execu/Search me and my shareholders instructed Wojdyl that he should not take or use any of RHI's confidential or proprietary information in performing his job.

15.    Wojdyl received and accepted a job offer from Execu/Search on Friday, March 23, 2007. Rather than immediately starting work as recruiter, Execu/Search put Wojdyl in its two week training course to educate him on how to succeed.

16.    We knew that Wojdyl had little recruiting experience and what experience he obtained from RHI was probably not useful. We viewed the hiring of Wojdyl not as an opportunity to obtain RHI's alleged confidential and proprietary information (which we had no need for), but instead as an opportunity to hire someone with financial services industry knowledge, and to train him to be a successful financial services recruiter.

17.    Accordingly, in addition to the warnings we provided Wojdyl during the interview process, Execu/Search required Wojdyl, as a condition of Execu/Search employment, to execute a March 23, 2007 offer letter which expressly provided that he was prohibited from misappropriating or exploiting his former employer's confidential and proprietary information. A true and correct copy of the March 23, 2007 offer letter is attached hereto as Exhibit A.

18.  In contrast to RHI, I note that Execu/Search does not require its recruiters to enter a restrictive covenant preventing our recruiters from accepting employment with a competitor after their Execu/Search employment terminates.

19.  I understand that notwithstanding our warnings and the terms of Execu/Search's offer letter, Wojdyl erred by taking some of RHI's property in advance of his resignation. I also understand, however, that Wojdyl no longer has any of RHI's alleged confidential and proprietary information. Likewise, Execu/Search does not have and never received any confidential or proprietary information of RHI nor has it attempted to exploit any such information.

### **RHI Cannot Demonstrate that It Is Likely to Suffer Immediate and Irreparable Harm**

20.  RHI is deluding itself if it thinks Wojdyl, an inexperienced recruiter, could cause it irreparable harm where, as here, in his first seven weeks after he accepted employment with Execu/Search he failed to make a single placement. Wojdyl has been with Execu/Search for two months. I note that RHI, however, fails to cite any decrease in revenue attributable to Wojdyl nor can it.

21.  Moreover, although there is confidential and proprietary information requiring protection in this industry, in my opinion, on the basis of my experience in the industry and having read the Complaint, RHI has not made any showing that Wojdyl actually misappropriated any such information in this case.

22.  I also note that Wojdyl presents no risk of potential irreparable harm to RHI in the future. On the basis of Wojdyl's accompanying affidavit, I understand Wojdyl made gross billings at RHI of approximately $150,000. In this industry, a

permanent placement employer, such as RHI or Execu/Search, can expect to obtain net income of twenty-five percent of this gross amount or approximately $37,500 at the most. Moreover, I understand from Wojdyl's affidavit that of the 10 to 12 placements Wojdyl made last year with RHI, he actually had to split the credit on his placements about eight times. In other words, even assuming Wojdyl could somehow damage RHI, its ability to prove prospective damages on the basis of Wojdyl's past performance is significantly below $75,000.

23. Execu/Search, however, will be harmed should the Court enter a preliminary injunction because, without any proof by RHI of wrongdoing, it would be prohibited from making job placements for clients and candidates, with which it had independent and pre-existing relationships prior to its hiring of Wojdyl.

24. Approximately seven weeks have expired since Wojdyl has left his former position with RHI. On the basis of my familiarity with the permanent placement business and, in particular, as applied to the financial services sector in which Wojdyl is employed, any information that Wojdyl may have acquired from his former employer is likely stale and it is probably not useful. The job orders he knew of during his RHI employment were most likely filled and any qualified candidates suitable for a particular job order have likely been placed. Job orders for the types of positions Wojdyl attempted to fill with RHI are usually filled within six to eight weeks. In other words, while Execu/Search did not and would not use any information from RHI, any information is, in any event, now "cold" and without any practical use.

25. For the reasons set forth above, Execu/Search respectfully requests that the Court deny Plaintiff's request for a preliminary injunction and expedited discovery; that it grant

I declare under the penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed on May 21, 2007

/s/<br>EDWARD FLEISCHMAN

Firmwide:82499397.1 051465.1005

**EXHIBIT A**



THE ▓▓▓▓ GROUP

March 23, 2007

Mr. David Wojdyl
47 Hudson Place – Apt. 1
Weehawken, NJ 07086

Dear David,

It is our pleasure to offer you an Associate position within the Permanent recruitment division of The Execu|Search Group ("Execu|Search" or the "Firm"). We believe that you will have an excellent opportunity to develop your professional skills and build a fine career with our Firm.

This offer of employment is conditioned upon your acceptance of the terms of this letter.

Term and Termination

Your employment with Execu|Search will commence on April 2, 2007. Your employment with the Firm is on an at-will basis, which means that you or the Firm can terminate your employment at any time. You acknowledge and agree that nothing contained in this offer or in any oral statement to you by anyone on behalf of the Firm can change or modify your employment with the Firm to anything other than on an at-will basis.

Standard of Employee Conduct

As a condition of your employment with Execu|Search, you agree to comply with the policies of the Firm as set forth in the Firm Handbook, as well as agree that you cannot, shall not and will not take or use any confidential or proprietary information from your former employer.

Compensation

Your compensation will be based on the Associate's Compensation plan, attached hereto as Exhibit A. You will receive monthly gross advanced commissions of $8,333.33, adjusted for applicable withholding taxes and deductions.

Time Off and Other Benefits

As an employee of Execu|Search, you will be eligible to participate in benefit programs as described in the Firm's employee manual. Execu|Search fringe benefits currently include 401K plan, contributory benefit coverage including major medical, hospitalization, long term disability, vision, and dental. You are eligible for paid time off (PTO) after 90 calendar days of service with Execu|Search. The amount of PTO you receive is governed by the Employee Manual. Details, including waiting periods and costs, are available by contacting Jacqueline Flynn, Director, Office Manager, at 212-204-5143.

### Confidentiality And Non-Solicitation Agreement

Should you accept this offer, you may be exposed to confidential information about our clients, candidates, other employees, and/or the Firm. Execu|Search is committed to providing a secure environment for confidential client information in order to prevent its loss or misuse. Your employment with Execu|Search is, therefore, conditioned on your execution of the Confidentiality And Non-Solicitation Agreement, attached hereto as Exhibit B. You are required to abide by the terms of the Confidentiality And Non-Solicitation Agreement throughout your employment with Execu|Search and thereafter.

By accepting this offer, you agree to devote your full working time, attention, and energies to the business of Execu|Search in a loyal and conscientious manner and to the best of your abilities and experience. Additionally, you agree that you will not engage in any activity that may be competitive with the Firm's business, or which may pose a conflict of interest with your work for the Firm. As stated above, your employment with Execu|Search is conditioned on your execution of the Confidentiality And Non-Solicitation Agreement.

By signing a copy of this letter, you agree that no promises or representations have been made to you about your prospective employment or the terms of your employment, except as contained in this letter.

Please indicate your acceptance of this offer and the terms of this letter by signing at the bottom of this page and by signing the enclosed Confidentiality And Non-Solicitation Agreement and return both to me.

Again we are delighted to extend you this offer and look forward to greeting you as a member of the Execu|Search team.

If you should have any questions, please do not hesitate to contact me.

Sincerely,

*[signature]*

Mitchell S. Peskin
Partner

Enclosures

Acknowledged and agreed to:

_____            3/23/07
Signature                                    Date

_____
Name (Print)