UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                      :

ROBERT HALF INTERNATIONAL INC.,       :

             Plaintiff,            :

       - against -          :    07-CV-3821(RWS)

                                        :

DAVID WOJDYL; and                     :
THE EXECU/SEARCH GROUP, INC.      :

             Defendants.       :

                                        :
------------------------------------------------------------------x

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED ELECTRONIC DISCOVERY

Dated:   New York, New York
         May 23, 2007

Of Counsel:

      Gary H. Glaser, Esq. (GG-9696)
      James S. Yu, Esq. (JY-9734)

SEYFARTH SHAW LLP
1270 Avenue of the Americas, Suite 2500
New York, New York 10020-1801
(212) 218-5500

Attorneys for Plaintiff
Robert Half International Inc.

Plaintiff Robert Half International Inc. ("RHI"), by and through its attorneys, Seyfarth Shaw

LLP, respectfully submits this reply memorandum of law in further support of its motion for a

preliminary injunction against Defendants David Wojdyl ("Wojdyl") and The Execu/Search Group,

Inc. ("Execu/Search"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, and for certain

expedited electronic discovery.

## PRELIMINARY STATEMENT

It is undisputed in this case that Defendant Wojdyl stole documents from RHI, and that he

did so with the intent to use the information contained in those documents in connection with his

employment with Execu/Search, a direct competitor of RHI. Having been caught red-handed,

Wojdyl has no choice but to admit that he e-mailed several RHI documents to his personal Hotmail

account prior to his resignation of employment with RHI, and that "he printed several documents

from RHI's computer relating to open job orders and candidates." Wojdyl's confession and self-

serving assurances that the documents he stole have either been returned or destroyed, however, do

not tell the whole story.

Indeed, Wojdyl's additional representation that the documents he printed from his computer

were all returned to Keith Feinberg of RHI is completely false. RHI's print logs, which enabled

RHI to identify and reprint some of the information that Wojdyl actually printed on the Sunday

night prior to his resignation, go well beyond whatever documents he handed to Mr. Feinberg on the

day of his resignation, and does not preclude the possibility that he may have kept a copy of the

documents he did in fact return for himself. Defendants have made no representations as to what

was done with any of the documents that were emailed or printed and stolen, other than broad

sweeping representations that they no longer have access to RHI's confidential or proprietary

information.

In a further effort to trivialize what can only be described as egregious acts of bad faith, Defendants make a number of disingenuous and contradictory assertions that only serve to demonstrate their lack of credibility. For example, Defendants attempt to portray Wojdyl's wanton misconduct as the hapless "error" of an unsuccessful recruiter. Indeed, he was so pitifully unsuccessful, that Execu/Search was magnanimous enough to offer more than double his draw at RHI upon joining Execu/Search, a compensation package that was agreed to the Friday before his weekend campaign to steal RHI's confidential information. Perhaps such compensation included payment for the invaluable client and candidate information that Wojdyl may have promised to bring with him.

Defendants further hope to garner the Court's sympathies by attaching a voluminous exhibit – RHI's 2006 Annual Report -- to support its depiction of RHI as a mammoth organization that cannot possibly suffer any irreparable harm based on Defendants' misconduct. At the same time, however, Defendants repeatedly juxtapose RHI's Financial Services Group as a "fledgling" department on the brink of failure with "no recognizable presence in the industry," compared to Execu/Search's supposedly "well-established" financial services division. Regardless of what Defendants hope to gain from either characterization, the truth is that RHI is one of the leaders of personnel placement firms and has been actively engaged in the business of providing permanent recruiting and placement services to the financial services industry since its founding in 1948 – almost sixty years ago. RHI's Financial Services Group ("FSG") was established as a separate, identifiable and distinct part of the Finance and Accounting Division in the New York Office in 1998, well before Wojdyl joined Execu/Search. If RHI were to allow its employees, irrespective of their aptitude in the staffing industry, to run off to competitors possessing its confidential and proprietary information, its business models, and/or its formula for success, that the company spent years developing and cultivating at great expense, RHI would be hard pressed to remain in business.

The only protection that RHI has that its admittedly stolen confidential documents will not be subject to misuse, dissemination, imported into Execu/Search's databases and other information and records systems, or passed on to other Execu/Search recruiters, and that Defendants will not continue to engage in unfair competition, is to enforce Wojdyl's employment agreement, including the restrictive covenants contained therein, enjoin Execu/Search from unfairly competing with RHI by taking advantage of, and benefiting by, Wojdjyl's unlawful conduct, and to grant expedited electronic discovery. There can be no conclusion other than that Wojdyl's act of emailing to himself RHI's confidential and proprietary documents, and systematically printing out other documents in the waning hours of a Sunday night, was an intentional act of bad faith for the sole purpose of engaging in unfair competition against RHI. Numerous New York cases, both state and federal – completely ignored by Defendants – have held that the act of stealing business information, which is precisely what Wojdyl did here, supports the grant of injunctive relief, even absent a showing of confidential, proprietary or trade secret information, which RHI has, nevertheless, shown.

The mere fact that Wojdyl signed an agreement with Execu/Search not to misappropriate information from RHI, which according to Defendants Wojdyl also breached within 48 hours of agreeing to its terms, does not absolve Execu/Search of guilt (indeed, it raises its own questions); rather, the undisputed fact remains that during that weekend, Wojdyl was, and acted as, Execu/Search's agent during his campaign to steal RHI's confidential and proprietary information, and that he brought this information with him to Execu/Search. RHI simply cannot be expected to rely on Execu/Search's empty claims of innocence. Execu/Search's refusal to allow electronic discovery – together with the conspicuous absence of *any* representations that it has conducted any credible investigation into whether Wojdyl imported or otherwise transferred the information that he admittedly stole from RHI into Execu/Search's computer or other records systems, or disclosed

such information to others at Execu/Search -- demonstrates that Execu/Search is unprepared to take

all steps necessary to ensure that others within its organization will not misuse the information that

Wojdyl wrongfully misappropriated and may have disclosed, and must be held equally responsible

with Wojdyl, for his unlawful campaign.

In sum, injunctive relief is necessary and appropriate because RHI's goodwill with its clients

and candidates, and its confidential, proprietary and trade secret information has been forever

compromised and will suffer further loss as a result of Wojdyl's unlawful activities, plainly engaged

in with the tolerance of, if not the complicity and encouragement of, Execu/Search.  If the

Defendants continue to compete unfairly, RHI will suffer further damage that cannot be

compensated by money alone.

**SUPPLEMENTAL STATEMENT OF FACTS**

In addition to the Statement of Facts set forth in RHI's initial moving brief and the Declaration of Dawn Fay dated May 14, 2007, the Court is respectfully referred to the accompanying Supplemental Declaration of Dawn S. Fay, dated May 23, 2007, submitted herewith.

**ARGUMENT**

**I.    THE ACT OF STEALING CONFIDENTIAL BUSINESS INFORMATION SUPPORTS THE GRANT OF INJUNCTIVE RELIEF.**

Defendants completely ignore the line of cases cited in RHI's moving brief that have granted injunctive relief where, such as here, an employee blatantly stole information belonging to the former employer. See, e.g., Fortune Personnel Agency, Inc. v. Livingston, 102 Misc. 2d 369, 423 N.Y.S.2d 360 (Sup. Ct. N.Y. County 1979). In issuing injunctive relief against a number of defendants who physically removed or copied confidential customer and candidate information, the Court in Fortune Personnel held that an employee entrusted with trade secrets by the employer has a duty "not only not to purloin such material or copy it or even commit it to memory with the intention of using it for their own gain but [is also] obligated to respect this confidentiality and utilize it in no way in their own behalf." See also Webcraft Techs., Inc. v. McCaw, 674 F. Supp. 1039, 1046 (issuing injunction where defendant employee admitted having taken rolodex containing client contact information, quotes and pricing sheets, among other protectable information).

Injunctions have been issued even in instances where the stolen information may not amount to a trade secret. See, e.g., Churchill Commc'ns Corp. v. Demyanovich, 668 F. Supp. 207, 212 (S.D.N.Y. 1987) ("'[i]f there has been a physical taking or studied copying, the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence' by the employee") (citing Leo Silfen, Inc. v. Cream, 29 N.Y.2d 387, 391-92, 328 N.Y.S.2d 423, 427 (1972)). See also Panther Systems II, Ltd. v. Panther Computer Systems, Inc., 783 F. Supp. 53, 66 (E.D.N.Y. 1991) ("where the information would not otherwise

qualify as a trade secret, the unauthorized physical taking and exploitation of internal company

documents, including detailed customer information by an employee for use in his future business

or employment is . . . unfair competition") (citing <u>Ecolab Inc. v. Paolo</u>, 753 F. Supp. 1100, 1009-10

(E.D.N.Y. 1991)); <u>Aktiebolag v. ABA Optical Corp.</u>, 441 F. Supp. 747, 754 (E.D.N.Y. 1977)

("[C]ustomer lists are protected . . . where an employee appropriates the list by copying or studied

memory."); <u>Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical</u>

<u>Corp.</u>, 135 A.D.2d 889, 522 N.Y.S.2d 287 (3d Dep't 1987) ("an employee's illegal physical taking

or copying of an employer's files or confidential information constitutes actionable unfair

competition").

        Here, although Wojdyl has admitted that he emailed to himself some RHI documents, he

stops short of confessing the entire truth of his misconduct.  RHI's building logs indicate that

Wojdyl was present in the office from 8:20 PM to 10:58 PM on March 25, 2007.  (Supplemental

Declaration of Dawn S. Fay ("Supplemental Fay Decl.") ¶ 12.)   On that date, he had already

accepted an offer of employment from Execu/Search and intended to, and did in fact, resign from

RHI the very next morning.  (Affidavit of David Wojdyl, dated May 21, 2007 ("Wojdyl Aff.") ¶

18.)  Wojdyl's printer log further indicates that during that timeframe and the day of his resignation,

he printed out 45 documents, including information relating to RHI's clients, their contact names,

email addresses, and telephone numbers; information relating to open and pending job orders with

RHI's customers; candidate information, including resumes that they had submitted to RHI to assist

in their placement; a document entitled "WALL STREET FSG PERM H-O-T" which was a list of

RHI's Financial Services Group's "hot" client prospects, candidates and job orders; an RHI

document which is basically a "How-To" training guide on recruiting candidates, and a 28-page

FSG "Training Guide." (May 14, 2007 Fay Decl. ¶ 39.)  Without the discovery requested herein,

one can only speculate what other information Wojdyl was likely copying, imaging or downloading

during that Sunday evening. Wojdyl's assertion that he often worked weekends to conscientiously follow up on job orders and attempt to make placements in an effort to suggest he was legitimately working for RHI that Sunday night is completely laughable. (May 21, 2007 Wojdyl Aff. ¶ 12.)

Neither Wojdyl nor Execu/Search offer any representations or explanations as to the disposition of those Sunday night documents. Suffice to say, not all the documents that Wojdyl printed were returned to Feinberg or RHI, as claimed by Wojdyl. There can be no way of knowing, absent granting the requested discovery, that Wojdyl did not disclose such information contained in those documents to others since resigning from RHI, or that the information did not somehow become wrongfully incorporated into Execu/Search's databases or other information and record systems.

Further undermining Defendants' credibility is evidence received by RHI that Wojdyl not only stole documents from RHI, but has used the information contained in those documents to solicit RHI's clients. In its original moving papers, RHI noted that it learned from at least one client with whom Wojdyl worked while with RHI, that it had been receiving telephone calls from Wojdyl regarding job orders that he had knowledge of, and had worked on, while he was employed by RHI. RHI has since learned that Wojdyl even told that client that he was calling to work the job orders that he got when he was with RHI. (Supp. Fay Decl. ¶ 11.) Significantly, the client was one of the clients listed as a "hot" client having job opportunities available on one over the very documents that it appears Wojdyl printed out on the Sunday night before his resignation. (Supp. Fay Decl. ¶ 12.) Contrary to Defendants' protestations of innocence, there can be no doubt that Wojdyl not only stole RHI's documents, but was in fact using the information contained therein and/or using information that he learned in the course of his employment with RHI, and would not have otherwise had, but for his employment with RHI. See Panther Systems, 783 F. Supp. at 66 ("even if defendants have not physically appropriated a [customer] list, 'a former employee may not solicit

the customers of his former employer if they would be unknown to the employee but for information obtained during his prior employment").

## II.     DEFENDANTS DO NOT DENY THAT WOJDYL BREACHED HIS FIDUCIARY DUTY TO RHI.

Defendants also completely ignore the well-established principle that an employee "is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." Maritime Fish Prods. V. World-Wide Prods., 100 A.D.2d 81, 88, 474 N.Y.S.2d 281, 285 (1st Dep't 1984). Here, Wojdyl was not only acting in Execu/Search's interests and against RHI's interests when he stole RHI's documents, but his failure to refrain from using the information he learned about RHI's clients and candidates while employed with RHI, amount to a breach of his duty of loyalty to RHI. See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 47-48 (2d Cir. 1999) (injunction appropriate where defendant competed with his former employer by targeting its client lists).

Once again, Defendants broad brush denials that it did not use the information, which is in any event contradicted by the evidence available to RHI, misses the mark. Wojdyl's theft of RHI's information for the benefit of Execu/Search, while still employed with RHI, is no different than an employee who secretly builds a competitive business prior to departure using his employer's proprietary secrets. See, e.g. DoubleClick, Inc. v. Henderson, No. 116914/97, 1997 WL 731413 (Sup. Ct. N.Y. County Nov. 7, 1997); Duane Jones v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954) (defendant employees breached fiduciary duties to plaintiff by conspiring while in its employment to form a new agency and take with it accounts held by plaintiff). Furthermore, the information need not amount to a trade secret to rise to a breach of duty of loyalty if the employee "engaged in an act such as stealing or memorizing his employer's customer lists." Panther Systems, 783 F. Supp. at 67 (citing Walter Karl v. Wood, 137 A.D.2d 22, 528 N.Y.S.2d 94, 98 (2d Dep't 1988).

The foregoing undisputed facts demonstrate that the probability that RHI will succeed on its claims of misappropriation, unfair competition, and breach of duty of loyalty, is greater than fifty percent. See Ecolab, 753 F. Supp. At 1109-10. At the very least, RHI has presented sufficiently serious questions going to the merits to make them a fair ground for litigation, entitling RHI to preliminary injunctive relief.

### III. DEFENDANTS' ASSERTION THAT THE INFORMATION STOLEN BY WOJDYL IS NOT CONFIDENTIAL, PROPRIETARY, OR SUBJECT TO TRADE SECRET PROTECTION IS COMPLETELY UNFOUNDED.

Defendants disingenuously attempt to portray the documents taken by Wojdyl as containing information that is somehow not confidential or not proprietary. In support of their contention, Defendants rely on a number of unfounded assertions.

For example, Defendants state that it is exceedingly rare that clients in this industry have any exclusive relationship or loyalty with a single placement firm. While that statement is not incorrect, nowhere does RHI argue that it enjoys an exclusive relationship with any of its clients. It is true, however, that RHI's relationship with its clients, and repeat business with those clients – which is a linchpin of RHI's business success -- is dependent on the attention and service which RHI gives, on an ongoing basis, to each of its clients and candidates. (May 14, 2007 Fay Decl. ¶ 5-6.) RHI's relationships with its clients are therefore based on confidence in the quality of the services offered and an increased recognition of, and familiarity with, RHI as a provider of such quality services. (Id.) Defendants also ignore RHI's contentions regarding the specific client and candidate information that RHI spent years culling and developing in its databases; information that is not ascertainable simply by picking up the phone or browsing through websites. Such information, if misappropriated, will certainly give a competitor an unfair advantage.

The sensitive nature of the information taken by Wojdyl is apparent in the documents themselves. One of the emails that Wojdyl admitted to have emailed to himself contained an

attachment which was a complete list of all of the FSG Group's clients *with whom RHI actually placed one or more permanent candidates in all of calendar year 2006, in the entire country, by client location.* This list contained *the names of almost 300 RHI FSG clients*, counting some of the clients' divisions, with whom RHI had a successful relationship, with its resulting good will, in 2006. The list is certainly confidential and proprietary information of RHI, and is not available to *anybody* outside of RHI. Moreover, it is by no means "stale" information, and provides a perfect roadmap which an unscrupulous former recruiting manager or a competitor could use to strategically attempt to trade on RHI's hard-earned goodwill with such clients, to unfairly compete. (Supp. Fay Decl. ¶ 20-21) Whether or not the new employer, i.e. Execu/Search, is aware of the misappropriation does not change the fact that it stands to benefit from the tortious misconduct and the inevitable disclosure of the confidential information.[1]

Defendants also argue that the identity of RHI's clients and their contact information are not legally protectable because, among other things, companies who are potential clients of recruiting firms like RHI and Execu/Search supposedly post their job openings on the internet for all to see. That may be true of the majority of permanent job openings that Execu/Search tries to fill, but that is not true of RHI. Rather, some of the perm job openings that RHI fills are confidential openings which the client *cannot* post on internet sites such as Monster.com or Careerbuilders.com, because they are replacing the person presently holding the position and, for obvious reasons, they cannot reveal that person's job is in jeopardy; other perm job openings that RHI clients have are not posted

---

[1]    Significantly, this was an attachment to an email which Wojdyl forwarded from his RHI email account to his personal home email account around 10:18 p.m. on Sunday night, March 25, 2007 – *the night before his resignation while Wojdyl was at RHI's facilities printing out confidential documents and engaging in his other unlawful conduct.* It is also curious that this was an email which Defendants' counsel provided to RHI's counsel, representing that they understand that Wojdyl deleted these documents from email from his Hotmail account and that he has not retained copies; and yet the "Printed" date and time which shows the email is "Tuesday, May 15, 2007 7:22 p.m." – the evening of the day that this office notified Execu/Search and Wojdyl that they were going to federal court to seek a temporary restraining order. (Supp. Fay Decl. ¶ 18.)

by the client at all because they choose not to expend their own time and resources to fill a needed position, which is why they are coming to RHI in the first place. (Supp. Fay Decl. ¶ 19.)

Defendants also attempt to argue that because Wojdyl worked on the "permanent placement" side of RHI's business in the financial services industry and does so for Execu/Search as well, that the "temporary placement" side of the business that both RHI and Execu/Search are engaged in, is somehow irrelevant to this dispute. In fact, Defendants go so far as to accuse RHI's counsel of using a "canned brief" because they invoke the fact that RHI gains a competitive advantage over its competitors – such as Execu/Search – in part because of the confidential and proprietary information RHI develops about its candidates, referring to their test scores and evaluations by various employers. However, Execu/Search is completely misleading the Court by saying that such information only applies to the temporary placement business and not to the permanent placement business in which Wojdyl was involved for both RHI and Execu/Search. (Supp. Fay Decl. ¶ 6.)

The way RHI's business works is that the temp and perm placement side of the business work very closely together, as do the temp staffing managers and the perm recruiting managers – and they do so because it makes perfect sense. Why? Because a substantial number, if not most, temp placement candidates are also looking for permanent positions, and, by the same token, most permanent placement candidates – if they are unemployed – are looking for temporary work while they look for permanent positions. As a result, a significant percentage of RHI's temp candidates register both with the temp division and the perm division, and a significant percentage of RHI's perm candidates register with both the perm division and the temp division. As a result, a large number of perm candidates who are ultimately placed by RHI have previously worked on temp assignments through RHI, and have a proven track record of performance – *evidenced by their test scores or evaluations by various clients for whom they worked* – which can then be used effectively

11

in presenting them for permanent placement to RHI's clients who place perm job orders. (Supp. Fay Decl. ¶ 7.) And, as a result of cross-selling between RHI's temp and perm divisions – which is part of RHI's proven business model – it is not unusual for perm recruiting managers to share billing credit for a temp placement, or for a temp recruiting manager to share billing credit for a perm placement. (Supp. Fay Decl. ¶ 8). Indeed, Execu/Search's CEO Fleischman makes a point of noting that Wojdyl had to "share credit" on many of his placements at RHI. To the extent that was true, however, it was a result of his cross-selling and "partnering" with other divisions, and reflects the extent to which the confidential client and candidate information which Wojdyl had access to, was not limited solely to the perm Financial Services Group to which he was assigned. (Id.)

And because of Wojdyl's access to RHI's confidential and proprietary information relating to RHI's temp candidates as well as perm candidates – and relating to those RHI clients with whom RHI has placed temp candidates as well as perm candidates – his being allowed to compete in violation of his Employment Agreement, given his demonstrated penchant for taking RHI's confidential and proprietary information and violating his legal obligations to both RHI *and according to Defendants, to Execu/Search as well*, would subject RHI to extremely unfair competition on the part of both Wojdyl and Execu/Search. (Supp. Fay Decl. ¶ 9.)

Execu/Search itself requires its employees to sign a "Confidentiality and Non-Solicitation Agreement" as a condition of employment. (Fleischman Decl., dated May 21, 2007, at Ex. A.) Such an agreement was referenced in Wojdyl's offer letter from Execu/Search but has not been produced by Execu/Search. That Execu/Search requires its recruiters to recognize that they "may be exposed to confidential information about [its] clients, candidates, other employers, and/or the Firm" speaks volumes about the strength of Execu/Search's position that RHI's customer and candidate information is not confidential.

Even more telling is how Wojdyl's offer letter goes on to state that "Execu/Search is committed to providing a secure environment *for confidential client information in order to prevent its loss or misuse*." (emphasis added). And, the final icing on the cake is the fact that Execu/Search then advised Wojdyl that his employment "is, therefore, conditioned on [his] execution of the Confidentiality and Non-Solicitation Agreement, attached hereto as Exhibit B," and then instructs that he is "required to abide by the terms of the Confidentiality and Non-Solicitation Agreement throughout [his] employment with Execu/Search and thereafter." Somewhat disingenuously, however, Mr. Fleischman rather conspicuously neglected to attach *that document* to his Declaration. The same is true of Wojdyl's Affidavit dated May 16, 2007, to which he also attached a copy of his Execu/Search Offer Letter – as Exhibit B – but rather obviously neglects to provide a copy of the Agreement. It is also interesting that both he and Mr. Fleischman failed to attach a copy of his compensation package, which was apparently attached as Exhibit A to the offer letter. It certainly makes one wonder what they are hiding. (Supp. Fay Decl. ¶¶ 15-16.)

## IV.   RHI'S RESTRICTIVE COVENANT IS ENFORCEABLE AND HAS BEEN UPHELD AS VALID BY OTHER COURTS.

Defendants complain that RHI's restrictive covenant, which limits Wojdyl from competing with RHI within a 50 mile radius from the office from which he worked, for a period of one year, should not be enforceable because such a restriction is unreasonably burdensome. RHI, however, has demonstrated at length in its moving papers why the restrictions it imposes in the employment agreement are both reasonable and necessary, and not designed to chill competitive conduct. Courts in New York have enforced restrictive covenants containing far broader and lengthier restrictions than those contained in Wojdyl's employment agreement. See Moving Brief, dated May 15, 2007, at 16. Given the fact that Defendants in fact wrongfully obtained RHI's confidential information, enforcement of such restrictions is particularly reasonable and necessary in this instance to protect

RHI's legitimate interest in not being subject to misuse and misappropriation of its confidential and proprietary business information.

Defendants rely principally on two unreported decisions in which RHI also sought a preliminary injunction. The facts in those cases, however, do not involve the egregious misconduct of blatant theft perpetrated by Defendants in this case. For example, in Robert Half International Inc. v. TMP Worldwide, Inc., No. 604050/02, slip op. (Sup. Ct. N.Y. County June 18, 2003) (Ramos, J.) plaintiff's request for a preliminary injunction was denied, in part, because the court found no evidence that the defendants in that case actually obtained any of RHI's confidential information, only that one non-party had access to certain information. That case did not involve the gross and wanton act of surreptitiously stealing RHI documents and concrete evidence of misuse of the stolen information, as is the case here. Similarly, in Robert Half International Inc. v. Le-Compte, No. 07-201-VAP (C.D. Cal. Apr. 5. 2007), decided under California law, which has more stringent non-compete laws than New York, the court denied injunctive relief where there was insufficient evidence of active solicitation of clients, as that doctrine is defined under California law. In contrast here, RHI was in fact advised by at least one client whom Wojdyl worked with while at RHI, and appears on Wojdyl's "hot" list, that it was being directly solicited by Wojdyl.

While digging up these unreported decisions, Defendants themselves neglected to cite to other cases where RHI successfully obtained enforcement of these same employment agreements. For example, in Robert Half International Inc. v. Archer, No. 92-3886 (R.I. Aug. 7, 1992) (copy attached hereto), a Rhode Island court enforced a restrictive covenant with a geographic and temporal scope of 45 miles from the Boston area and one year as reasonable and not overly broad. The facts of Archer similarly involved a Robert Half employee who had no prior experience before commencing his employment with RHI. Even though the employee transferred his operations to Providence, Rhode Island, the Court nevertheless stated that the employee was bound by the

14

"general non-competition restriction contained in the employment contract, which is a radius of 45 miles from Boston and which includes Providence, Rhode Island."

Defendants' argument that Wojdyl never had an opportunity to negotiate the Employment Agreement also lacks merit or relevance.  It is curious to note that he doesn't mention in his Affidavits that he was required to sign the Execu/Search Confidentiality and Non-solicitation Agreement as a condition of his employment there.  In any event, there is no dispute that Wojdyl executed the Employment Agreement of his own free will, and that he read and understood the terms of the Agreement.  (Fal Decl. ¶ 31.)  Wojdyl further certified that he reviewed and understood RHI's Acknowledgment of Trade Secrets, and received, in return, an opportunity for employment with RHI.  (Fay Decl. ¶ 32).  Cases are legion that hold that continued employment of an at-will employee, such as Wojdyl, constitutes sufficient consideration to support a covenant not to compete.  Ikon Office Solutions v. Leichtnam, No. 02-CV-0721E(SC), 2003 WL 251954 (W.D.N.Y. Jan. 3, 2003) (recognizing that "non-compete covenants and similar restrictive covenants are independently enforceable where an at-will employee receives continued employment as consideration"); Gazzola v. Westchester Med. Group, P.C., 10 A.D.3d 700, 782 N.Y.S.2d 115 (2d Dep't 2004) (plaintiff's continued employment constituted good and sufficient consideration for the restrictive covenants).

That Wojdyl somehow forgot that he signed an employment agreement containing, among other things, restrictive covenants not to compete against RHI or solicit RHI's clients and candidates, and an obligation not to disclose RHI's confidential, proprietary and trade secret information, less than one year ago, is highly incredible, *particularly given that he was reminded of his post-termination obligations the day he departed from RHI* (and does not relieve him of his obligations to RHI).  (Fay Decl. ¶ 36.)  In any event, Execu/Search does not deny that it was ever unaware of Wojdyl's post-employment obligations to RHI, and has evidently imposed similar

15

obligations upon Wojdyl.  To the extent Execu/Search encouraged Wojdyl to breach his contractual obligations to RHI, Execu/Search may be liable for tortious interference.

The foregoing facts demonstrate that RHI is likely to succeed on its breach of contract and tortious interference claims, or at least that RHI has raised sufficiently serious questions going to the merits to make them a fair ground for litigation.

## V.     RHI HAS DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM

### A.     RHI Did Not Delay Its Request for Injunctive Relief.

Defendants repeatedly harp on the fact that RHI delayed eight weeks in bringing this lawsuit, even though they admit that Wojdyl resigned seven weeks ago, and RHI only first became aware of the theft three weeks ago.  Defendants cite to a host of cases where injunctive relief was denied due to unexplained delays of several weeks, however, in most of these cases, the request for injunctive relief was filed *weeks after the filing of the Complaint.*  See, e.g. Marcy Playground Inc. v. Capitol Records, Inc., 6 F. Supp. 2d 277, 281 (S.D.N.Y. 1998) (seeking preliminary injunction three months after bringing suit); Calvin Klein Co. v. Farah Mfg. Co., Inc., 1985 U.S. Dist. LEXIS 13475, at *14 (S.D.N.Y. Nov. 26, 1985) (seven week delay in filing for injunction after filing complaint); JSC Foreign Econ. Ass'n Technostroyexport v. International Dev. & Trade Servs., Inc., 295 F. Supp. 2d 366, 392 (S.D.N.Y. 2003) (six week delay between the complaint and request for injunction).  Here, RHI requested injunctive relief *the very same day* that it filed the Complaint. Moreover, all of the cases cited by Defendants involved a delay of several weeks – well more than three – without a reasonable explanation.  No inexplicable delay has occurred in this case.  As soon as RHI learned of Defendants' misconduct, it promptly proceeded with an internal investigation, which resulted in RHI learning that Wojdyl was soliciting job orders from at least one of RHI's clients.

**B.      The Balance of Hardships Do Not Weigh In Favor of Defendants**

Where, such as here, the circumstances clearly demonstrate an act of actual theft, perpetrated with the intent to engage in unfair competition, RHI has not exaggerated the harm it may suffer absent injunctive relief.  Wojdyl has already shown, based on his proven bad acts and his continuous efforts to mislead the Court through his various misrepresentations, that he cannot be trusted not to disclose or misuse the information that he stole.  Wojdyl's clear intent the evening of Sunday March 25, 2007 was to use the information to compete unfairly against RHI, and the evidence thus far indicates that he did in fact do so.  The stolen information, which Defendants may still have in their possession, can never be secret again, particularly if it has been disseminated to other employees of Execu/Search and elsewhere.  Such irreparable harm cannot be compensated by money alone.

Wojdyl, having only worked for less than a year in the financial services personnel staffing industry and fresh off the heels of having a much lengthier career as a securities trader, cannot claim that he is being prevented to work in his chosen profession, particularly since he claims to be such a terrible performer.  In the face of explicit instructions from both RHI, and purportedly from Execu/Search, not to misappropriate any confidential information, Wojdyl nevertheless did so.  He has only himself to blame for the repercussions of his flagrant violations.  In any event, the fact that Wojdyl may have to take his brokerage licensing exams again does not preclude him from working in his chosen profession.

**VI.     RHI IS ENTITLED TO EXPEDITED ELECTRONIC DISCOVERY OF DEFENDANTS' COMPUTERS.**

RHI has no way to verify whether or not the stolen documents, and other RHI information Wojdyl admitted misappropriated has in fact been imported into Execu/Search's computer systems, databases or other records and electronic files.  The information may have been passed on to other employees of Execu/Search outside knowledge of its management.    Indeed, there is, as noted at the

outset, a conspicuous absence of *any* representations that Execu/Search has conducted any credible investigation into whether Wojdyl imported or otherwise transferred the information that he admittedly stole from RHI into Execu/Search's computer or other records systems, or disclosed such information to others at Execu/Search.  This demonstrates that Execu/Search is unprepared to take all steps necessary to ensure that others within its organization will not misuse the information that Wojdyl wrongfully misappropriated and may have disclosed.   The information may also have been downloaded into Wojdyl's personal home computer or his PDA, prior to their purported deletion from his email account.  Wojdyl's blanket statement that he no longer has access to RHI confidential information is not sufficient.  RHI has already proven that Wojdyl cannot be trusted. Only by allowing RHI to inspect and image the computers that Wojdyl had access to will RHI's interests be secured.  Furthermore, because RHI has demonstrated irreparable harm caused by Wojdyl's malicious theft, a fact that is not in dispute, the cases relied upon by Defendants in support of denying expedited discovery are not applicable.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in RHI's initial memorandum of law in support of its motion for a temporary restraining order, a preliminary injunction and expedited discovery, RHI respectfully requests that this Court grant expedited electronic discovery and issue a preliminary injunction.

Dated:  New York, New York
        May 23, 2007

                                   Respectfully submitted,

                                   SEYFARTH SHAW LLP

                                   By:_____/S/_____
                                        Gary H. Glaser, Esq.
                                        James S. Yu, Esq.
                                 1270 Avenue of the America, Suite 2500
                               New York, New York  10020-1801
                               (212) 218-5500
                               Email: gglaser@seyfarth.com
                                      jyu@seyfarth.com

                                 Attorneys for Plaintiff
                                     Robert Half International Inc.

**EXHIBIT A**

(9018-0367-slr)

STATE OF RHODE ISLAND                              SUPERIOR COURT
PROVIDENCE, SC.


ROBERT HALF INTERNATIONAL              :
INC.,                                  :
                                       :
                 Plaintiff,            :
                                       :
          vs.                          :     C.A. No. 92-3886
                                       :
ERIC ARCHER, RICHARD CARRIERE          :
AND ACCOUNTING RESOURCES,              :
INCORPORATED,                          :
                                       :
                 Defendants.           :


                          ORDER

        This matter initially came before the Court on
Plaintiff's Motion for a Temporary Restraining Order which was
granted, after hearing thereon, with a Temporary Restraining Order
being entered by the Court on June 23, 1992. Presently before the
Court is Plaintiff's, Robert Half International Inc. ("Robert
Half"), Motion for a Preliminary Injunction. Defendants are Eric
Archer ("Archer"), Richard Carriere ("Carriere"), and Accounting
Resources, Incorporated ("Accounting Resources").

        The Court has conducted a comprehensive evidentiary
hearing on the within motion during which time the facts of the
case were presented and they will not, therefore, be reviewed in
detail herein. All parties presented oral argument at the hearing,
and have submitted memoranda and supplemental memoranda of law in
support of their respective positions.

        The Court, having considered the Motion for Preliminary
Injunction and evidence, having heard argument of counsel and

reviewed the briefs submitted, and being fully advised in the premises, it is hereby

ORDERED, ADJUDGED AND DECREED

that Plaintiff's motion is hereby granted as to Defendants Archer and Accounting Resources but is denied as to Defendant Carriere, consistent with the following:

1.  <u>Burden of Proof</u>:

The burden of proof is on the Plaintiff to establish, by clear and convincing evidence:  (1) a probability that Plaintiff will prevail on the merits; (2) that plaintiff is likely to suffer irreparable harm in the event that injunctive relief is denied; (3) that the harm to Plaintiff outweighs potential harm to the opposing party; and (4) that the public interest will not be harmed by the grant of the injunctive relief sought.  With the sole exception of Defendant Carriere, as set forth below, I find that Plaintiff has satisfied its burden of proof on each of the foregoing elements with respect to Defendants Archer and Accounting Resources.

2.  <u>As To Defendant Archer</u>:

Defendant Archer was a principal representative of the Providence office of the former Robert Half of Providence, Inc., which has since merged into the present corporate Plaintiff, Robert Half International Inc.  If Defendant Archer were still employed by Plaintiff, the corporate defendant would simply be another competing corporation. Defendant Archer resigned, however, and it was his leaving Robert Half to establish and join the

2

corporate defendant, Accounting Resources, that prompted the instant litigation.

There is very little dispute as to the material facts in this case. Defendant Archer was first employed in the Boston operations of Plaintiff's predecessor, Robert Half of Boston, Inc. He signed an employment contract at the commencement of his employment, which contained restrictive covenants; these covenants basically prohibited him from going into a competing business for a period of one year from the termination of his employment.

Through the proceedings held in this matter, the Court has learned that, particularly with respect to the temporary side of the financial and accounting placement business, the information gathered by temporary placement recruiters or managers such as Defendant Archer, remains current for a period of at least a year after it has been obtained by the recruiter or manager; perhaps after a year period, some of such information might become somewhat stale, due to the turnover in the temporary candidate database. It appears that is what prompts successful recruiters to constantly contact companies and update their information. Since early 1991, Plaintiff has implemented a computerized program of follow-up reminders for its recruiters and managers. Prior to 1991, such system was done on a manual basis.

Defendant Archer asserts that he is no longer bound by the employment contract which he signed when he commenced his employment, since he was transferred to the Providence operations

3

of Robert Half in 1985 which were, at that time, organized as a separate corporate entity. Defendant Archer's contention in this regard is without merit.

Whether the Court applies the reasoning followed by the National Labor Relations Board and the courts under the National Labor Relations Act and other employment discrimination statutes in applying the "single employer" doctrine, or looks realistically at the undisputed facts, the conclusion is the same: Herbert Myers was, at the time of Archer's hire and subsequent transfer, the sole owner of both the Boston and Providence operations. He hired Archer. He was also the single individual who made virtually every major decision and controlled all aspects of employment, personnel policy and other matters for both the Boston and Providence operations of Robert Half.

When Defendant Archer went to work for Robert Half of Boston, he signed an employment contract and bound himself to the restrictive covenants set forth in such agreement.

When Mr. Myers decided that he could best utilize Defendant Archer's services in the Providence operations, it was he who sent Defendant Archer down to be in charge of the Providence office. The conduct of the parties with respect to the employment contract belies any termination of the employment relationship until Defendant Archer tendered his resignation from Plaintiff, effective as of June 5, 1992. Both before and after the sale of the stock in the corporate entities to Plaintiff, Mr. Myers was the employer of Defendant Archer — both with respect to his

service in the Boston office and his service in the Providence
office.

When Defendant Archer was transferred to the Providence
operations, it is true that he went to work on customers and
candidates in the Providence area.   It is also true that as a
policy matter, the Company told its recruiters and managers to
restrict their activities north and south of Route 495, with regard
to the Boston and Providence operations, respectively.   It is
likewise true that there was little interchange of temporary
employees between Providence and Boston.   There was some
interrelationship between Boston and Providence on the permanent
side, but very little on the temporary side.   What was generated
in Providence was the income of the Providence; that is the way
that Myers set up his corporate structure.   That does not, however,
render unenforceable the clear restriction which applies to the
general non-competition restriction contained in the employment
contract, which is a radius of 45 miles from Boston and which
includes Providence, Rhode Island.   The employer-employee
relationship that existed was simply not terminated until June 5,
1992, when Defendant Archer resigned.

Accordingly, whether viewed as a single employer, or
applying the concept of a loaned or borrowed employee, it is clear
that Defendant Archer was bound by his employment agreement at all
times until his resignation from employment in June 1992, and the
Court finds that the employment agreement remained in full force
and effect and valid through such date.

It is also clear from the evidence of record that Defendant Archer attempted to go into a directly competing business, and in such a way as to trade directly on the goodwill which had been given to him by Robert Half, which was associated with the Robert Half name and its Accountemps trade name. This fact is clearly evidenced by the announcements which were distributed by Defendant Accounting Resources' announcing that it was entering this business. The announcements included an explicit reference to the fact that Defendant Archer was formerly associated with Robert Half and Accountemps; this, in and of itself, is also a violation of the express provisions of Archer's employment contract.

The Court had been somewhat troubled by the apparent inconsistency between the 45-mile radius restriction contained in Defendant Archer's employment contract, and that contained in the employment contract entered into by Defendant Carriere when he commenced employment in the Providence office. However, Mr. Myers may well have anticipated transferring employees from the Boston office to the Providence office, but not the reverse. This could explain the inclusion of Providence within the territorial restriction of the Boston contract, but not the converse. Regardless of the parties' intent, however -- and evidence of such intent outside the four corners of the agreement may well not be admissible, in any event -- the Court need not resolve these differences. Rather, the Court need only look at the contract of Defendant Archer itself, and determine whether the restriction is

6

reasonably intended to protect the legitimate interests of the employer, Plaintiff herein.

The Court finds that it clearly is. In this regard, the Court has seen evidence of the business being a highly competitive one. The evidence also establishes that Plaintiff has a national advertising program which assists people such as Defendant Archer, who are employed in the various offices, to bring the services of Robert Half to the public. The Court has heard nothing in the record to establish anything but the fine national reputation of Plaintiff in the industry.

Defendant Archer brought particular skills as an accountant and a C.P.A. with him to Plaintiff, and Plaintiff gave both an opportunity to Archer as its employee, as well as obtained a service for the company. It is noteworthy, however, that Defendant Archer's prior experience was as an accountant, and that he had no prior experience before commencing his employment with Robert Half in the placement field. When Archer was sent to Providence, he was sent to a location which was within the restricted area: that is, within a radius of forty-five miles of Boston. The Court finds that that area was a necessary restriction. When Archer moved to Providence, he went to an area in which Plaintiff had already expended considerable time and expense in developing an ongoing business and good relationships with customers. The Court finds that the radius of forty-five miles from the Boston office is a reasonable one, and is not overly broad. In addition, the one-year restriction on general non-

7

competition and on Archer's prohibition against soliciting customers of Plaintiff, is similarly a reasonable one.

The Court notes that the testimony establishes an awareness by Defendant Archer and the other defendants that Mr. Archer's employment contract might present a problem. Defendant Archer is clearly an intelligent man, as was evident by his testimony and demeanor in the Court. He went into this operation with his eyes wide open. He testified that he intended to be bound by the employment contract when he signed it, and the Court finds that the contract was still in full force and effect when he terminated his employment voluntarily as of June 5, 1992.

Based on the foregoing and the record as a whole, as set forth more fully below, Defendant Archer is prohibited from competing with Plaintiff within a forty-five mile radius of Plaintiff's Boston, Massachusetts office for a period of one year from June 5, 1992; he is prohibited from using or disclosing any information gained by him concerning the customers or candidates of Plaintiff and he is prohibited from disclosing any such information to the corporate defendant, Accounting Resources, or to any other competitor of Plaintiff; Defendant Archer is prohibited from trading on the good name of Robert Half and/or Accountemps, and he may not make reference to such names except in connection with his filing of employment applications or résumés; and Defendant Archer is further prohibited from soliciting the trade or patronage of Plaintiff's customers for himself or any other person or entity for a period of one year, from June 5, 1992.

8

In the above regard, the Court is aware of Plaintiff's assertion that he did not receive any extensive training or instructions on how to perform his job by Plaintiff.  The Court notes that perhaps this was due to his training as a Certified Public Accountant and his knowledge of the potential needs of companies in the area of financial professionals by virtue of his background as an accountant.  Regardless of this fact, however, Plaintiff provided Archer with numerous resources which resulted in Archer's success in the Providence market on behalf of Plaintiff.  Significantly, the information to which Archer had access in connection with his employment, is confidential information generated by himself and other successful recruiters on behalf of Robert Half in making candidate and customer contacts, which was used in creating the ongoing relationships and goodwill.

The Court recognizes that there is little evidence of "trade secrets" being involved in this case.  However, regardless of whether viewed as trade secrets, or as confidential customer lists and confidential information pertaining to candidates, use of such information is susceptible to being enjoined under Rhode Island law.

In this connection, the one-year restriction is clearly not overly broad but, rather, is a necessary period to protect an employer such as Plaintiff from the use of such confidential information, to compete unfairly against it.

3.    <u>As To Defendant Accounting Resources</u>:

The request for injunctive relief as to the corporate defendant, Accounting Resources, comes about by reason of Defendant Archer's part ownership and involvement in the corporation and the operation of its business.    The other individual shareholders, officers and employees of Accounting Resources certainly have a right, based on their own contacts and efforts, to establish a nexus with particular customers, candidates or temporary employees, to seek to do business with such persons or companies.    However, they may not use in their business, any confidential information of Plaintiff relative to Plaintiff's customers, Plaintiff's customer contacts, candidates, or temporary employees of Plaintiff, whether or not obtained from Defendant Archer, and whether or not contained in Plaintiff's customer or candidate databases.

4.    <u>As To Defendant Carriere</u>:

Defendant Carriere also was party to an employment contract with Plaintiff's predecessor, Robert Half of Providence, Inc.  His contract, as indicated above, contained a general non-compete restriction, limited to one year, as well as restrictions on soliciting the trade of Plaintiff, also for a one-year period. Mr. Carriere's employment was terminated voluntarily by him, more than twelve months ago and these restrictions have, therefore, expired.    The Court finds that Plaintiff has introduced insufficient evidence to justify injunctive relief as to Defendant Carriere.    In this regard, Plaintiff has not established that Defendant Carriere has utilized or disclosed any confidential

10

information or trade secret information of Plaintiff. Accordingly, the Temporary Restraining Order is dissolved as to Defendant Carriere, and no preliminary injunctive relief is granted with respect to him.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for a Preliminary Injunction is hereby granted as follows:

1. Defendant Archer is prohibited, for a twelve (12) month period commencing June 5, 1992, from directly or indirectly owning, operating, managing, controlling, being employed by, participating in, or being connected in any manner with the ownership, management, operation or control of any executive recruiting firm, employment agency, temporary personnel service business or any business competitive with the business carried on by Plaintiff, within a forty-five (45) mile radius of the Plaintiff's office in Boston, Massachusetts, and Defendant Archer is further prohibited during said twelve (12) month period from soliciting the trade or patronage of any of Plaintiff's customers for himself or any other person or organization engaging in an executive recruiting, employment agency, or temporary personnel business. Plaintiff's customers shall for this purpose include all persons and organizations for whom Plaintiff performs or has performed services in the course of its business within three (3) years prior to June 5, 1992 (the date of Archer's termination of employment with Plaintiff).

2. Defendant Archer is prohibited from soliciting, inducing, or attempting to induce any employee of Plaintiff

(including candidates for temporary employment) to leave the Plaintiff's employ to become connected in any way with any other executive recruiting, employment agency, or temporary personnel business.

3. Defendants Archer and Accounting Resources are prohibited from disclosing or utilizing, directly or indirectly, the confidential information and trade secrets of Plaintiff, including but not limited to Plaintiff's customer and contacts lists and database and lists of placement candidates and candidates for temporary employment, and any information contained therein, and any other such information.

4. Defendants Archer and Accounting Resources are prohibited from in any way utilizing, directly or indirectly, the name "Robert Half" and/or "Accountemps" in the conduct of any business in their behalf or in behalf of others, or in any way making known that Defendant Archer was formerly employed by Plaintiff or of any division, subsidiary or predecessor in interest of Plaintiff, except by Defendant Archer in the bona fide seeking

92-3886

of employment consistent with his employment agreement with Plaintiff.

ENTER:                                    PER ORDER:

_____ J.    _Shirley A. Connelly, Asst_
Dated:  August 7th, 1992              _Clerk_

                                 Presented By:

                                 _Gary H. Glaser_
                                 Gary H. Glaser, Esq.
                                 EPSTEIN BECKER & GREEN, P.C.
                                 250 Park Avenue
                                 New York, New York   10177
                                 (212) 351-4500


                                 _Robert A. Moissonnier_
                                 Robert A. Moissonnier, Esq.
                                 POWERS, KINDER & KEENEY, INC.
                                 1400 Turks Head Building
                                 Providence, Rhode Island  02903
                                 (401) 454-2000


                    CERTIFICATION

        I hereby certify that I caused a true copy of the within
Order to be served to Herbert DeSimone, Jr., Esq., 49 Weybosset
Street, Providence, Rhode Island  02903 on the 7th day of August,
1992, by first class mail, postage pre-paid.

                                 _Sandra L. Ross_

13